# EXHIBIT A



LITTLETON PARK
LITTLETON PARK JOYCE UGHETTA & KELLY LLP

NEW YORK CITY
PURCHASE, NY
RED BANK, NJ
LOS ANGELES
PHILADELPHIA

Direct Dial: (484-254-6220
E-Mail: kristen.dennison@littletonpark.com

February 14, 2022

**VIA REGULAR MAIL & EMAIL**

Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Mail Stop 0485
Washington, DC 20528-0485
ogc@hq.dhs.gov

Re:   Subpoena – Employment Documents for Investigations Special Agent, Keith Slatowski

To Whom It May Concern:

Pursuant to Federal Rules of Civil Procedure 45 and the *Touhy* Regulations codified in 6 C.F.R. §§ 5.41–5.49, Defendant Sig Sauer, Inc. (hereinafter "Sig Sauer") respectfully seeks to review certain documents made by non-party witness, the U.S. Department of Homeland Security ("DHS"), relating to the employment of its investigations special agent, Keith Slatowski.

In conjunction with the attached Subpoena, this letter describes the relevance and materiality of the documents being sought for inspection.

### Factual and Procedural History

1. According to Mr. Slatowski's Complaint (attached as Exhibit 1), Sig Sauer sold about 9,000 P320 pistols to DHS in 2018. One of those P320 pistols (hereinafter the "Subject Pistol") was issued to Mr. Slatowski, a DHS investigations special agent.

2. On September 21, 2020, Mr. Slatowski was at quarterly firearms training at United States Postal Service range in New Castle, Delaware. While his Subject Pistol was holstered, Mr. Slatowski claims he touched the weapon's grip, which caused it to fire one round through his holster into his right leg. Mr. Slatowski was subsequently taken to Christiana Care Hospital for treatment to his leg.

3. On or around February 17, 2021, Mr. Slatowski sued Sig Sauer in the United States District Court for the Eastern District of Pennsylvania (Civil Action No. 2:21-cv-00729) in which he generally alleges that the Subject Pistol was defective because it discharged without a trigger pull. He asserts claims against Sig Sauer for (1) negligence; (2) breach of implied warranty of merchantability; (3) strict liability; (4) negligent infliction of emotional distress; and (5) intentional infliction of emotional distress.

Our File No.:  00132.00167
Page 2

4. On April 20, 2021, Sig Sauer filed its Answer denying liability and asserting affirmative
   defenses. A copy of Sig Sauer's Answer is attached as Exhibit 2.

### _Touhy_ Regulation Procedure

A party may serve a non-party, governmental agency with a subpoena pursuant to FRCP
45. But in addition to these standard requirements, there are regulatory prerequisites for when a
party seeks discovery from a non-party federal agency. The DHS has its own prerequisites and
regulations, which are known as "_Touhy_ Regulations," discussed in _United States ex rel. Touhy v.
Ragen,_ 340 U.S. 462 (1951); _see also Nicaj v. City of New York_, No. 14-CV-4215 AT JLC, 2015
WL 2152705, at *3 (S.D.N.Y. May 6, 2015) (suggesting that the defendants could have complied
with the DHS _Touhy_ regulations to obtain documents from DHS). DHS enacted _Touhy_ regulations
for when a party in a state civil suit seeks information from the agency. _See_ 6 C.F.R. §§ 5.41–5.49.

The proper procedure for when DHS documents are sought is codified in 6 C.F.R. §
5.45(a):

> If official information is sought, through testimony or otherwise, by a
> request or demand, the party seeking such release or testimony must (except
> as otherwise required by federal law or authorized by the Office of the
> General Counsel) set forth in writing, and with as much specificity as
> possible, the nature and relevance of the official information sought. Where
> documents or other materials are sought, the party should provide a
> description using the types of identifying information suggested in § 5.3(b).
> Subject to § 5.47, Department employees may only produce, disclose,
> release, comment upon, or testify concerning those matters which were
> specified in writing and properly approved by the appropriate Department
> official designated in § 5.44 . . . The Office of the General Counsel may
> waive the requirement of this subsection in appropriate circumstances.

"Requesters must describe the records sought in sufficient detail to enable DHS personnel
to locate them with a reasonable amount of effort . . . To the extent possible, requesters should
include specific information that may assist a component in identifying the requested records, such
as the date, title or name, author, recipient, subject matter of the record, case number, file
designation, or reference number." 6 C.F.R. § 5.3(b). The Office of the General Counsel may
authorize any DHS employee to produce any document acquired as part of the performance of that
employee's duties or by virtue of that employee's official status. 6 C.F.R. § 5.44(b). Lastly, in
addressing a demand for documents, DHS should consider the following factors:

> (1) Whether such compliance would be unduly burdensome or otherwise
> inappropriate under the applicable rules of discovery or the rules of
> procedure governing the case or matter in which the demand arose;

Our File No.: 00132.00167
Page 3

        (2) Whether compliance is appropriate under the relevant substantive law concerning privilege or disclosure of information;

        (3) The public interest;

        (4) The need to conserve the time of Department employees for the conduct of official business;

        (5) The need to avoid spending the time and money of the United States for private purposes;

        (6) The need to maintain impartiality between private litigants in cases where a substantial government interest is not implicated;

        (7) Whether compliance would have an adverse effect on performance by the Department of its mission and duties; and

        (8) The need to avoid involving the Department in controversial issues not related to its mission.

6 C.F.R. § 5.48

### **Scope of Document Demands**

        As identified in the attached subpoena duces tecum (annexed hereto as Exhibit 3) and Mr. Slatowski's HIPAA authorization (annexed hereto as Exhibit 4), Sig Sauer requests the production of the following documents in Mr. Slatowski's employment file[1]:

        1.    All Communications between You and Keith Slatowski concerning the Incident, including, but not limited to, how the Incident happened.

        2.    All Communications between You and the Immigration and Customs Enforcement Agency ("ICE") concerning the Incident, including, but not limited to, how the Incident happened.

        3.    All non-privileged Communications between You and any Person concerning the Incident, including, but not limited to, how the Incident happened.

        4.    All Documents concerning Your investigation of the Incident, including, but not limited to, any incident reports, accident reports, or witness statements.

        5.    All photographs, motion pictures, video recordings, body-camera footage, or other photographic reproduction showing any of the following:

---

[1] All capitalized terms are defined in the actual subpoena *duces tecum*, attached as Exhibit 3.

LITTLETON PARK JOYCE UGHETTA & KELLY LLP

Our File No.:  00132.00167
Page 4

     a.  Keith Slatowski's Subject Pistol that he alleges inadvertently discharged;

     b.  Keith Slatowki on September 21, 2020; and

     c.  The Incident that occurred on September 21, 2020.

    6.     Any and all of Keith Slatowski's practice range records; training and qualification records; his personnel and disciplinary file; and any formal or informal job evaluations.

    7.     All Documents and records concerning the ownership, maintenance, assignment, use, and issuance history of the Subject Pistol.

    8.     Any DHS standard operating procedures for its investigations special agents; firearm manuals and procedures; holster Documents including instruction or guidelines for holster use; and Documents concerning any accreditation or certification by any law enforcement accreditation body.

### Discussion of Document Demands

**Discoverability of information under Federal Rules of Civil Procedure**. Requests numbered 1–5 generally pertain to correspondence and DHS's investigation of the incident that is the subject of this lawsuit. This factual evidence is highly probative and would comment directly on *how* the incident happened: reports and correspondence that discuss the incident would also identify witnesses and their beliefs about how the Subject Pistol discharged.

    Liability is the main issue in this case—not damages. For instance, Mr. Slatowski alleges the Subject Pistol discharged in an unintended manner through no fault of his own. Contrary to his allegations, Sig Sauer has denied liability and believes that Mr. Slatowski caused part of his body or a foreign object to inadvertently pull the Subject Pistol's trigger. With that belief, Sig Sauer has asserted several affirmative defenses against Mr. Slatowski, including product misuse, comparative fault, and assumption of the risk. See Exhibit 2, pp. 22–24. For that reason, access to the immediate post-accident investigation into the condition of the Subject Pistol is critical.

    Sig Sauer also requests information that may serve as impeachment evidence. For instance, Mr. Slatowski has brought a legal action against Sig Sauer alleging that the Subject Pistol was defective, unreasonably dangerous, and that there was no comparative fault on his part. Therefore, any statements made by Mr. Slatowski or other witnesses are crucial factual evidence for the defense of this action. And to the extent Mr. Slatowski has made contradictory statements in any DHS report and this litigation, such evidence would be used as impeachment evidence against him. See Upstate Shredding, LLC v. Ne. Ferrous, Inc., No. 312-CV-1015 (BKS) (DEP), 2015 WL 12748319, at *4 (N.D.N.Y. Feb. 13, 2015) ("Plaintiffs specifically explain in their response papers that the 'the subpoenaed information will be used to cross-examine and/or impeach [trial] testimony.'") (alteration in original).

    Request No. 6 is also discoverable because the sought-after information touches on Mr. Slatowski's credentials and experience handling firearms, including the Subject Pistol that he

Our File No.: 00132.00167
Page 5

claims injured him. Request No. 7 seeks information about any maintenance, modifications, or alterations made to the Subject Pistol while in DHS's possession, which would directly impact liability. And Request No. 8 asks for information that generally discusses Mr. Slatowski's holster and firearm training—information relevant to whether Mr. Slatowski understood the appropriate and safe use of the Subject Pistol.

      **Privileged information**. Sig Sauer does not request any privileged information: any incidental confidential information (*e.g.*, social security number, *etc.*) can be redacted.

      **Public interest**. The public interest is not implicated in this lawsuit between two private parties over a personal injury dispute.

      **The need to conserve DHS's time/resources and if compliance negatively affects DHS's performance of its duties**. Sig Sauer's subpoena *duces tecum* is limited in scope and only requests information specific to one employee. So, the time it should take to respond to those requests should not be overly burdensome.

      **The need for impartiality between private litigants**. Information responsive to Sig Sauer's requests are critical for *both* Sig Sauer's defense of this litigation and Mr. Slatowski's prosecution of it. For example, a copy of any investigatory reports would allow the parties to ascertain the witness accounts of the incident and to determine if there are any recordings of interviews. Witness statements would be relevant because they would represent recollections immediately following the incident. Nearly half a year has elapsed since the incident: the parties may not have the opportunity to depose witnesses or former employees who are outside the court's jurisdiction or are otherwise unavailable. And even if the parties have the chance to depose relevant witnesses, those witnesses' memories likely have faded over time. Consequently, witness statements, investigatory reports, and relevant correspondence are the best present sense impressions of what happened. The names of witnesses would also, at least, narrow down the witness list for parties to consider deposing.

      **The need to not involve DHS from unrelated, controversial issues**. DHS was Mr. Slatowski's employer at all relevant times to this lawsuit. It is thus in sole possession of Mr. Slatowski's employment records and any investigatory reports created by DHS. Moreover, Mr. Slatowski alleges substantial damages, including permanent damage to his leg and the potential inability to return to his job. See Exhibit 1, ¶ 13. Therefore, the potential exists for a significant judgment. Given the extent of Mr. Slatowski's alleged damages, that DHS was Mr. Slatowski's employer, and the contestation of Mr. Slatowski's claims, the parties would suffer an injustice if the requested information is not shared with Sig Sauer.

      In sum, Sig Sauer should not be deprived of complete records that contain unbiased recollections of the Subject Pistol's overall condition and Mr. Slatowski's operation of the Subject Pistol. Further clarification and access to the requested documents would give the parties a more comprehensive understanding of the facts. Sig Sauer is entitled to the requested information because no reasonable alternatives exist for acquiring that information. Accordingly, Sig Sauer

Our File No.: 00132.00167
Page 6

respectfully requests that the parties to this action be given the opportunity to obtain the requested information related to Mr. Slatowski's incident.

Very truly yours,

**LITTLETON PARK**
**JOYCE UGHETTA & KELLY LLP**

By: _____

Kristen E. Dennison, Esquire

KED/pmd

Enclosures:    Exhibit 1 – Keith Slatowski's Complaint
                  Exhibit 2 – Sig Sauer, Inc.'s Answer
                  Exhibit 3 – Sig Sauer, Inc.'s Subpoena *Duces Tecum*
                  Exhibit 4 – Keith Slatowski's HIPAA Authorization

cc:    Robert Joyce, Esq.

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**KEITH SLATOWSKI AND BIANCA
CEMINI SLATOWSKI, h/w**
118 Wilson Road
King of Prussia, PA 19406

**CIVIL CASE NUMBER:**

v.

**SIG SAUER, INC.**
72 Pease Boulevard
Newington, NH 03801

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs, Keith Slatowski and Bianca Cemini Slatowski, by and through their counsel, hereby state the following Complaint in Civil Action against the above-captioned Defendant and, in support thereof, aver as follows:

## SUMMARY AND NATURE OF ACTION

1.      Plaintiff, Keith Slatowski, is an adult individual, citizen, and resident of the Commonwealth of Pennsylvania, residing at the above captioned address.

2.      Plaintiff, Bianca Cemini Slatowski, is an adult individual, citizen, and resident of the Commonwealth of Pennsylvania, residing at the above captioned address.

3.      This action seeks actual, compensatory, and punitive damages, and equitable relief, relating to Defendant, SIG Sauer Inc.'s (hereinafter "Defendant", "Sig" or "Sig Sauer"), negligence, defective design, breach of warranties and unfair and deceptive marketing practices regarding a semi-automatic gun.

4.      Specifically, this matter involves a striker-fired, semi-automatic pistol known as the "P320" that has fired without trigger pulls on numerous civilians and law enforcement agents across the nation and throughout the world.

5.      Slatowski, a resident of Pennsylvania, was issued a SIG Sauer P320 in connection with his duties as a Deportation Officer for the Immigration and Customs Enforcement Agency ("ICE") in Pennsylvania.

6.      Prior to September 21, 2020, Slatowski had performed firearms training with the subject product in Pennsylvania.

7.      Prior to September 21, 2020, Slatowski was required to have on his person the subject product in connection with his job responsibilities in Pennsylvania.

8.      On September 21, 2020, Slatowski was at quarterly firearms training at the United States Postal Service range in New Castle, Delaware.

9.      Slatowski and fellow ICE agents were doing practice drills before qualifying. Slatowski shot about four magazines of 9 millimeter hollow point rounds before running out of ammunition.  He then proceeded to reload with purple training rounds.

10.      Slatowski returned to the firing line and was instructed to fire two rounds into the target with no time limit.

11.      As he was given the order to fire, he reached for his weapon with his right hand.

12.      When he placed his hand on the pistol grip to draw it out of his holster, the weapon fired.  Slatowski never touched the weapon's trigger.

13.      The bullet struck him in his upper right hip and exited out the back of his lower thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage.

14.     The casing of the bullet did not eject and was found stuck in the P320's ejection port.

15.     Slatowski's P320 should not have discharged without the trigger being pulled, holstered or un-holstered.

16.     In its "Safety Without Compromise" marketing materials for the P320, SIG states:

## SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

17.     Slatowski's P320 should not have discharged without the trigger being pulled.

18.     Despite this express representation, which SIG has made for the last several years to the present, the weapon fired without the trigger bring pulled.

19.     Defendant brings causes of action under Pennsylvania law for negligence, strict products liability, breach of express warranty, breach of implied warranty, and negligent and intentional infliction of emotional distress in view of Sig's misrepresentations about the safety of the weapon.

20.     Defendant SIG, had knowledge long before this sale, that the P320, its first ever striker-fired pistol, was capable of firing by itself without the trigger being pulled due to defective striker-sear components inside the weapon's slide.

21.     For many years since the weapon was first introduced to the market in 2014, SIG has recklessly failed to recall it despite knowing of many grievous wounds inflicted upon law enforcement.

## JURISDICTION

22.     Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332.

23.     Defendant has a principal place of business in New Hampshire and, accordingly, is a citizen of New Hampshire.

24.     Defendant SIG does business in and is subject to personal jurisdiction in this judicial district. Defendant has registered to do business in the state of Pennsylvania and therefore is subject to both general jurisdiction and specific jurisdiction due to its conduct and actions within the state.

25.     The amount in controversy substantially exceeds, exclusive of interest and costs, $75,000.

## VENUE

26.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(3).

27.     Plaintiff is a 48-year-old resident of Pennsylvania who is licensed to carry concealed weapons.

## ALLEGATIONS

28.     Plaintiff has substantial firearms experience and was issued this gun for his job responsibilities in Pennsylvania.

29.     Plaintiff has suffered permanent physical injury and disfigurement as a direct and proximate result of the negligence and breach of warranties and deceptive marketing practices of SIG.

30.     Plaintiff is an eight (8) year veteran of the United States Marine Corps and served nine years as a Correctional Officer.

31.     He has been trained on various weapons, including the Glock-27, Remington 870 shotgun, AR-15 and chemical munitions.

32.     For the last twelve (12) years, Plaintiff has served as a Deportation Officer with Immigration Customs Enforcement (ICE).

33.     Plaintiff has attended various advanced academies dealing with tactical weapons and is certified on the Glock-19, Sig Sauer 229, Sig Sauer P320, Remington 870 shotgun, and AR-15

34.     Defendant designs and manufactures firearms for military and commercial markets in the Commonwealth of Pennsylvania, throughout the United States, and internationally. It markets and sells its products directly and through dealers.

35.     Defendant was formerly known as SIGARMS, Inc. and changed its name to SIG Sauer, Inc. in October 2007. The company was founded in 1985 and has its principal place of business in Exeter, New Hampshire.  Its Chief Executive Officer at all times relevant to this Complaint was Ron J. Cohen.

36.     On September 21, 2020, Plaintiff and fellow ICE agents were doing practice drills before qualifying.  Slatowski shot about four magazines of 9mm hollow point rounds before running out of ammunition.  He then proceeded to reload with purple training rounds.

37.     Plaintiff returned to the firing line and was instructed to fire two rounds into the target with no-time limit.

38.     As he was given the order to fire, he reached for his weapon with his right hand.

39.     As he began to draw it out of his concealed carry holster (issued with the P320), the weapon fired without him touching or pulling the trigger.

40.     The bullet struck him in his upper right hip and exited out the back of his lower thigh, causing substantial injury, maceration of tissue, blood loss, nerve damage and other injury.

41.     While the full extent of the physical damage to his leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and may not be able to return to this positon as a result of diminished physical capacity to perform his job.

42.     As a direct and proximate result of Defendants' negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Mr. Slatowski was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Mr. Slatowski has in the past and may in the future require medicines, medical care and treatment. Mr. Slatowski has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Mr. Slatowski has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Mr. Slatowski has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

43.     Years before the incident occurred, through and including the date of the incident, SIG expressly represented that the weapon could not fire without a trigger pull:

"[w]e've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



44.     In additional marketing material, under the heading "Striker Safety," defendant further states: The Striker Safety "[p]revents the striker from being released unless the trigger is pulled."

45.     At the same time, SIG SAUER contradictorily stated in the original owner's manual for the P320, on page 25, that the weapon could fire if dropped without the trigger being pulled if a round were "chambered," i.e., inside the firing chamber of the weapon's slide.

46.     It is standard operating procedure for all U.S. law enforcement agencies, local police departments, and the military, at a commander's discretion, to carry pistols with a chambered round.

47.     SIG was aware of the latter fact at the time it designed and manufactured all its pistols, including the P320.  The P320 is the first striker-fired pistol[1] it has ever manufactured.  It assembled it using the same frame from an earlier hammer-fired SIG model, the P250.

48.     While competing for a $580 million contract to supply the United States Army with a new service pistol in 2016, SIG's prototype P320s exhibited nearly 200 malfunctions during Army testing.   The army demanded that SIG fix all problems associated with the prototype.

49.     On May 10, 2017, the United States Army submitted an urgent engineering change proposal for the prototype P320, which essentially demanded that its entire internal firing system be replaced. SIG complied and made all requested changes to the Army version of the

---

[1] A striker-fired pistol is different from the traditional "hammer-fired" pistol.  It contains no external hammer to be pulled back by the user; rather, it has an internal "striker" that is held back under spring pressure inside the gun, like a bow and arrow. Once the slide is forcibly moved or "racked" backward, the weapon is fully cocked and in "condition zero," ready to fire.  The striker is now under significant spring tension to move forward and strike the round's primer.  The striker is held back the weapon's sear.  In the below illustrative photo of a typical striker-fired pistol the striker, in red, is held back by the sear, in blue.



weapon, but let approximately 500,000 P320s to be used by United States law enforcement and civilians alone.

50.     Sometime after January 2017, when a Connecticut law enforcement agent was shot by a P320 when it fell to the ground from less than three feet, SIG removed the warning on page 25 from the user manual regarding a chambered round, and replaced it with the following language:

 All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge**.

(emphasis in original).

51.     Defendant, SIG had never before represented that mere "vibration" could cause the weapon to discharge. Upon information and belief, no other firearms manufacturer has ever made such a representation.

52.     In a 2016 amendment to the user manual, moreover, SIG warned users not to lubricate the striker inside the gun, a normal part of the process of the cleaning and maintenance of any semi-automatic firearm. The striker, as noted, is held back while under spring pressure by and rests, in the P320, in tenuous contact with a small piece of metal inside the gun called weapon's sear.

53.     SIG has also expressly represented since the P320's manufacture and
distribution into the stream of commerce that the weapon possessed a "robust safety system":



54.     In fact, SIG's original design and manufacture of the P320 rendered the weapon
unreasonably dangerous for its intended uses, and any foreseeable the weapon unreasonable
dangerous for its intended uses, and for any foreseeable uses and accidents involving its intended
uses, including any normal carrying, holstering, un-holstering, or rough handling in any
altercation or combat, at the time SIG sold it to ICE.

55.     Specifically, it possessed an inadequate sear-striker connection, even after implementing a "voluntary upgrade" program for the gun, an inadequate internal striker safety, and lacked any external safety or tabbed trigger safety.

56.     When SIG shipped P320s to ICE, and thousands of others across the country, it knew, or should have known, that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and accidental discharges that could occur in the ordinary course of using the weapon.

57.     Before it shipped these weapons, it was aware of accidental discharges of the P320 weapon, and other SIG pistols, many of which pre-dated the 2018 sale to the Homeland Security Department.

58.     Upon information and belief, there have been many prior incidents of unintended discharges involving SIG weapons, both hammer-fired and striker-fired, that have discharged without the trigger being pulled, or simply while being handled, accidentally dropped, or while being holstered.

59.     In 2015, a Pennsylvania State Trooper and firearms instructor accidentally killed another trooper with his SIG Sauer while conducting safety training.

60.     In 2016, a tactical response training instructor near Sacramento dropped his SIG Sauer, firing a bullet into a student's truck.

61.     In the period between 2012 and 2015, the New York City Police Department reported 10 accidental discharges involving Sig Sauer weapons.

62.     In February 2016, a fully-holstered P320 discharged without a trigger pull inside a Roscommon, Michigan Police Officer's vehicle when the officer moved to exit the

vehicle during a snowstorm.   The incident was captured on the Officer's body cam video and shows that no object entered inside his holster at any time.

63.     In 2016, the Surprise, Arizona Police Department complained to SIG of two separate incidents of P320s firing without trigger pulls.

64.     These latter three incidents were not disclosed by SIG, despite long outstanding discovery requests in two separate federal proceedings, until the last day of discovery in the second proceeding in early 2019.

65.     In October 2016, a P320 fired un-commanded on retired NYPD Officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

66.     In November 2016, a P320 fired un-commanded on an Officer in Holmes Beach Florida, striking him in his leg.

67.     In 2017, a Sheriff's Deputy in Michigan accidentally discharged a SIG Sauer pistol, striking a schoolteacher in the neck.

68.     On January 5, 2017, a P320 shot a Stamford SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG's express representations that the weapon is drop safe, cannot fire without a trigger pull and does not require a safety to be drop sage.

69.     On February 28, 2017, a P320 accidentally discharged while in use by the University of Cincinnati Police Department.

70.     On June 14, 2017, a P320 accidentally discharged in Wilsonville, Oregon.

71.     On June 20, 2017, a P320 accidentally discharged while in use by the Howell Township, New Jersey Police Department.

72.     In June of 2017, SIG shipped approximately 800 P320s to the Loudoun County Sheriff's Department, privately assuring its leadership, Sheriff David Chapman that the problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as currently manufactured and designed.[2]

73.     On July 28, 2017, a P320 accidentally discharged in Tarrant County, Texas.

74.     On August 4, 2017, the Stamford SWAT team member sued SIG in U.S. District Court in Connecticut for an accidental discharge of a commercial version of the P320 that shot him in his knee.

75.     Four days later, SIG's CEO released a statement stating: "there have been zero (0) reported drop-related p320 incidents in the U.S. Commercial market."

76.     This statement was false, in view of SIG's knowledge that Officer Sherperis in Connecticut had been shot by a drop fire some eight months earlier with the commercial version of the P320, and that several other accidental discharges of the P320 had occurred before that date.

77.     On August 8, 2017, SIG announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standard for safety."

78.     This statement was also false, as there are no federal government standards for gun safety, a fact known to SIG when it issued this press release.

79.     No federal agency oversees how firearms are designed or built. Firearms were expressly exempted by Congress from any federal regulation when it created the Consumer Product Safety Commission in 1972.

---

[2]     As noted *infra*, both a non-upgraded and "upgraded" version of these P320s later fired un-commanded on and hit at least two Loudoun County deputy sheriffs in 2018 and 2019.

80.     SIG's "upgrade" program, which was presented to the public as purely option, not urgent, and not mandatory, offered to mark existing commercial versions of the P320 "better" by installing a much lighter trigger, and internal disconnect switch, an improved sear to prevent accidental discharges.

81.     On August 9, 2017, the Police Chief of Morrow, Georgia issued and emergency order removing the P320 from service.

82.     In October 2017, a P320 accidentally discharged in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground.

83.     On November 12, 2017, a P320 accidentally discharged in Dallas County, Texas.

84.     On February 7, 2018, Loudoun County, Virginia Deputy Sheriff Marcie Vadnais's P320 fired on her un-commanded in Virginia, severing her right femur causing catastrophic skeletal injury, deformity, three general anesthesia surgeries, severe emotional distress, and related trauma, ending her career. Upon CAT scanning her P320, it was found to have both a design and manufacturing defect: crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

85.     Months later in April 2018, SIG issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

86.     In May 2018, civilian Gunter Walker reported to SIG that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

87.     In June 2018, a Williams County, Ohio Officer reported that his P320 discharged twice in one moment as he was merely attempting to move the slide backward. One round grazed the Officer's arm; the other blew through his patrol car's driver's side door.

88.     In May 2018, a Rancho Cucamonga, California Officer reported that his P320 fired un-commanded merely while he was walking inside his department locker room; the casing of the round did not eject.

89.     In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

90.     In October 2018, firearms and retired Law Enforcement Officer Stephen Mayes' P320 fired un-commanded while seated in its holster, causing severe injury to his right leg.

91.     In December 2018, civilian Robert Lang's P320 fired on him un-commanded and caused serve tunneling wounds to this right leg.

92.     On May 19, 2019, the P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual Mayfair even near Harvard Square.

93.     The round struck a cellphone case on Ahern's left leg, deflected into a SWAT gear bag and came to rest in a ballistic helmet, narrowly missing everyone else in the van. The casing of the round did not eject. Lieutenant Ahern is a SIG certified armorer[3] on the P320.

---

[3] According to SIG Sauer documents, "[t]he SIG SAUER factory armorer certification enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty. Proper and routine weapon maintenance and inspection of a firearm are essential to ensure maximum reliability. Factory armorer courses at SIG SAUER Academy certify agency armorers or individuals to maintain, inspect, service, and repair selected SIG SAUER firearms while preserving the factory warranty. Upon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years." https://www.sigsaueracademy.com/course/armorer-certification

94.     Only July 23, 2019, a P320 fired un-commanded on Officer Walter Collete, Jr. of the Somerville, Massachusetts Police Department hitting him in his leg and causing substantial injuries to his leg.

95.     In August 2019, within the Eastern District of Pennsylvania, a Philadelphia Transit Officer's P320 fired un-commanded while fully-holstered, nearly striking a bystander in the subway. The incident was captured on video, and the officer was returned to duty the next day.

96.     The transit authority replaced all SIG P320s, and later fuller exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull. The officer, Craig Jacklyn, later stated:

> This weapon is a hazard. I actually spoke with a lawyer for my situation. Although No one was hurt...someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services. Philadelphia Police  Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well.

97.     On September 3, 2019, another P320 in use by the Loudoun County Virginia's Sheriff's Office fired un-commanded on another Loudoun County Deputy Sheriff, Carl Costello, hitting in his leg.

98.     On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts Police Department, was shot by his P320 without a trigger pull. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

99.     On October 11, 2019, a P320 fired un-commanded on Veterans Affairs Police

Officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon.

Upon inspection it was found that the spent casing did not eject.

100.     The Kneski discharge was investigated by Major Peter J Villani of the Veterans

Affairs Police Agency, also a SIG certified armorer on the P320. In his report he noted the

following:

> After reviewing the Officer's sidearm, it was noted that the P-320 came from Sig
> Sauer to the distributor prior to the point of sale already with the "upgrade"
> completed. The sidearm had approximately 100 rounds through it since purchased.
> Upon further examination of the internal parts of the frame module, I noticed that
> the foot of the striker that catches the [sear] has noticeable side to side and up and
> down movement within its channel along with upward movement of the slide from
> the frame. Also, the edge of the striker foot which has a height thickness of
> approximately 2mm, is only making contact with approximately .25 of a mm of the
> leading edge only of the disconnector hook. Since the striker has been changed
> with a lighter weight version during the "upgrade program", it is quite possible that
> any abrupt movement or twisting of the P-320 while holstered, could cause the foot
> of the striker to disengage itself from the disconnector hook on its own since there
> is so little contact between the striker foot and the [sear].

101.     On November 9, 2019, a P320 fired un-commanded on Officer Matthew

Gardette of the Manteca, California Police Department as he was getting ready for work. As he

merely attempted to place and fasten his duty belt around his waist, the P320 discharged inside

the holster.

102.     The holster was a Safariland level three retention holster with a hood securing

the pistol. The round blew out the bottom of the holster, impacted the locker room floor, and

missed both Officer Gardette and fellow officers by inches as it ricocheted into a locker door.

103.     On December 2, 2019, a P320 fired un-commanded while in the possession of

Detective David Albert, also of the Cambridge, Massachusetts Police Department, as he was in

the process of putting his duty belt on.

104.    Upon information and belief, employees at SIG Sauer's own training academy in New Hampshire have admitted to accidental discharges causing injury in both 2016 and 2017.

105.    To date, SIG has never issued a mandatory recall of the P320 for repairs; though it has done so in the past for other of its products with far lesser sales.

106.    In an interview in 2013, SIG's former Chief Financial Officer, Timothy Scullin, just before the P320 was brought to market in 2014, noted that SIG's revenue had risen approximately 1,400 percent from 2012 to 2013. He further stated that SIG Sauer's growth has outpaced the firearms' industry's growth by "two or three times."

107.    When asked what some of his biggest professional challenges he has faced in his career, he stated:

> At SIG, to grow this fast, people get really challenged. When you're growing 70 to 80 percent in a year, all the systems get stretched, and the people really get stretched. You have to be able to manage multiple tasks in a very fast environment, and in an environment that's highly regulated, so you can't mess up, otherwise you get shut down. It just creates a tremendous of stress on the people in the system. But we've got people that have risen to the challenge.

## COUNT I

## STRICT PRODUCT LIABILITY

108.    Plaintiff incorporates allegations in the preceding paragraphs as though fully set forth at length herein.

SIG, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts  because:

    a.  SIG is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by SIG;

c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

109.   The P320 was in a defective condition as: (1) the danger contained therein was unknowable and unacceptable to the average or ordinary consumer; and/or (2) a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

110.   SIG breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

111.   The defective condition of the P320 caused Plaintiff's injuries.

112.   SIG is therefore strictly liable to Plaintiff.

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendant, SIG, Sauer, Inc., for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT II

## NEGLIGENCE

113.   Slatowski re-adopts and re-alleges all of the preceding paragraphs of this pleading as if fully set forth herein.

114.    At all relevant times, SIG owed Slatowski the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon him merely placing his hand on the weapon's grip before selling the gun and placing it into the stream of commerce.

115.    At all relevant times, SIG owed Slatowski the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon gripping the weapon before selling the gun and placing it into the stream of commerce.

116.    At all relevant times, SIG owed a duty to unambiguously warn consumers and/or intended users of the P320, including Slatowski, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, SIG knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

117.    SIG breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly so as to prevent un-commanded discharges;

    ii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

    iii.    By failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

iv.   By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

v.   By negligently failing to unambiguously warn purchasers and end users of the gun, including Slatowski, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vi.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges;

viii.   Other negligent acts and omissions to be developed in the course of discovery.

118.   SIG knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

119.   The gun's defective condition was not visible and Slatowski was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

120.   SIG's negligence as alleged in this Count directly and proximately caused the July 24, 2019 un-commanded discharge and Slatowski's injuries resulting from the accident.

121.    As a direct and proximate result of the negligence set forth in this Count, Slatowski suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Slatowski will suffer such losses and impairments in the future.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT III**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

122.    Slatowski readopts and re-alleges all the preceding paragraphs of this pleading as if fully set forth herein.

123.    At all relevant times, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Slatowski's injuries.

124.    SIG knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

125.    At all relevant times, Slatowski used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG. SIG breached the above-referenced implied warranties as to the gun because, at the time it left SIG's

possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

     i.     Failing to use due care in designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

     ii.    Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

     iii.   Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

     iv.   Negligently failing to unambiguously warn purchasers and end users of the gun, including Slatowski, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

     v.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

     vi.   Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges;

126.    Slatowski, as the end user of the gun, was a person who would foreseeably be injured by breaching the implied warranty referenced in this Count and SIG's breach of the warranty of merchantability as alleged herein directly and proximately cause the accident and Slatowski's injuries.

127.   As a direct and proximate result of the breaches set forth in this Count, Slatowski suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Slatowski will suffer such losses and impairments in the future.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT IV

## BREACH OF EXPRESS WARRANTY

128.   Slatowski readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

129.   At all times material hereto, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Slatowski's injuries. Upon information and belief, SIG knew or had reason to know the gun would be situated in holsters that would need to be removed from a law enforcement end user's service belt at the time they sold the gun, and that the purchaser was in fact relying on SIG's skill, judgment, and implied warranty of the gun's fitness for that particular purpose without firing.

130.   Accordingly, SIG impliedly warranted that the gun was suitable for the particular purpose of being situated within a holster that would need to be removed from service belts from time to time.

131.    At all relevant times, Slatowski used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG in using and handling the gun and its SIG-issued holster.

132.    SIG breached the above-referenced implied warranty as to the gun in that it was unreasonably dangerous and unfit to be removed while in its holster at the time it left SIG's possession by virtue of:

i.    Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

ii.    Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

iii.    Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

iv.    Negligently failing to unambiguously and conspicuously warn purchasers and end users of the gun, including Slatowski, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

v.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vi.    Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges;

vii.    Expressly warranting that the gun would not fire unless the trigger was pulled.

133.    A direct and proximate result of the breaches set forth in this Count, Slatowski suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Slatowski will suffer such losses and impairments in the future.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT V

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

134.    Slatowski readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

135.    By its actions, SIG knew, or should have known, that the design and/or manufacturing defect in the gun rendered it capable of discharging without the trigger being pulled. Yet it presented to ICE and Slatowski, and the general public, in marketing materials that numerous safeties would prevent the gun from firing unless the trigger was pulled.

136.    SIG's conduct created an unreasonable risk of causing the Plaintiff emotional distress.

137.    Slatowski's emotional distress was foreseeable.

138.    The emotional distress was severe enough that it might result in illness or bodily harm, and in fact did result in severe bodily harm; including severe damage to his right leg.

139.    SIG's conduct was the direct and proximate cause of Slatowski's distress.

140.    The trigger was not pulled by Slatowski, yet the weapon still fired and shot him in the leg, narrowly missing his femoral artery, which would have been a mortal injury.

141.    As a direct and proximate result of the breaches set forth in this Count, Slatowski suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Slatowski will suffer such losses and impairments in the future.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT VI

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

142.    Slatowski readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

143.    Upon information and belief, SIG had knowledge of the various defects with the commercial version of the P320 gun years before Slatowski was shot in September 21, 2020.

144.    Despite having such knowledge, it failed to issue a mandatory recall of the gun despite the ability to do so, which would have prevented the severe injury to Slatowski.

145.    Had SIG acted responsibly and repaired the defects in the commercial version of the P320 before February 2018, Slatowski never would have been shot. The round discharged from her weapon easily could have taken her life.

146.    SIG knew, or should have known, that severe emotional distress was a likely result of its outrageous and irresponsible conduct, which was designed to save in excess of $100 million in repair costs, by implementing a "voluntary upgrade" of the gun instead of a mandatory recall.

147.    SIG's conduct in this matter was self-serving, deceptive, reckless, intolerable and outrageous as described above, such as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.

148.    SIG's conduct was the direct and proximate cause of Slatowski's distress.

149.    The emotional distress sustained by Slatowski was severe, and was accompanied by severe and permanent physical injury.

150.    As a direct and proximate result of the breaches set forth in this Count, Slatowski suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for care and treatment. These injuries are either permanent or continuing in their nature and Slatowski will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff, Keith Slatowski, demands judgment in his favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT VII**

**LOSS OF CONSORTIUM**

151. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

152. At all relevant times hereto, Plaintiff, Bianca Cemini Slatowski, was the lawfully wedded wife of husband-plaintiff, Keith Slatowski.

153. As a result of the injuries sustained by Plaintiff, Keith Slatowski, wife-plaintiff Bianca Cemini Slatowski, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, Plaintiff, Keith Slatowski, all to her great loss and detriment.

WHEREFORE, Plaintiff, Bianca Cemini Slatowski, demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

Dated: February 17, 2021          **LAW OFFICES OF JEFFREY S. BAGNELL**

BY: ___/s/Jeffrey S. Bagnell_____
Jeffrey S. Bagnell
Federal Bar No. CT18983
Pro Hac Vice application pending
Jeffrey S. Bagnell, Esq., LLC
55 Greens Farms Road, #200-60
Westport, Connecticut 06880
(203) 984-8820
(203) 255-4454 (fax)

jeff@bagnell-law.com

**SALTZ MONGELUZZI & BENDESKY P.C.**


BY:___*/s/ Robert W. Zimmerman*_____
       LARRY BENDESKY
       ROBERT W. ZIMMERMAN
       I.D. Nos. 51026/208410
       One Liberty Place, 52nd Floor
       1650 Market Street
       Philadelphia, PA  19103
       (215) 496-8282
       Fax (215) 496-0999

       ***Attorneys for Plaintiffs***

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| KEITH AND BIANCA CEMINI SLATOWSKI, | : | Civil Action No. 2:21-cv-00729 |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| vs. | : |  |
|  | : |  |
| SIG SAUER, INC., | : |  |
|  | : | **JURY TRIAL DEMANDED** |
| Defendant. | : |  |
|  | : |  |

### DEFENDANT SIG SAUER, INC.'S ANSWER AND
### AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT

Defendant SIG SAUER, INC. ("SIG"), through its undersigned counsel, hereby files its Answer and Affirmative Defenses to Plaintiffs' Complaint, and respectfully submits as follows:

### SUMMARY AND NATURE OF ACTION

1.      Denied. After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

2.      Denied. After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

3.      SIG admits that Plaintiffs seek damages in this action, but SIG denies that it is liable to Plaintiffs. SIG denies any remaining allegations contained in Paragraph 3 of Plaintiffs' Complaint and demands strict proof thereof at trial.

4.      SIG denies the allegations contained in Paragraph 4 of Plaintiffs' Complaint and demands strict proof thereof at trial.

5.      Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

6.      Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

7.      Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

8.      Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

9.      Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

10.      Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

11.      Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

12.     Denied. After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

13.     Denied. After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

14.     Denied. After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

15.     SIG denies that Plaintiffs' P320 pistol discharged without the trigger being pulled and demands strict proof thereof at trial.

16.     SIG responds that the language quoted in paragraph 16 of Plaintiffs' Complaint is incomplete and not put in context. To the extent Plaintiffs is making any allegations in connection with the quoted language, SIG denies such allegations and further responds that the document speaks for itself, and therefore no responsive pleading is required. SIG denies the P320 pistol could have discharged without the trigger being pulled and demands strict proof thereof at trial.

17.     SIG denies that Plaintiffs' P320 pistol discharged without the trigger being pulled and demands strict proof thereof at trial.

18.     SIG denies that Plaintiffs' P320 pistol discharged without the trigger being pulled and demands strict proof thereof at trial.

19.     SIG admits that Plaintiffs seek damages in this action, but SIG denies that it is liable to Plaintiffs. SIG denies any remaining allegations contained in Paragraph 19 of Plaintiffs' Complaint and demands strict proof thereof at trial.

3

20.     SIG denies that the P320 pistol can discharge without the trigger being pulled and demands strict proof thereof at trial.  SIG denies all remaining allegations in Paragraph 20 of Plaintiffs' Complaint.

21.     SIG denies the allegations in Paragraph 21 of Plaintiffs' Complaint and demands strict proof thereof at trial.

### JURISDICTION

22.     Admitted.

23.     Admitted.

24.     Admitted only that SIG is registered to do business in the state of Pennsylvania. The remaining allegations contain conclusions of law to which no responsive pleading is required.

25.     SIG admits that Plaintiffs seek damages in this action and that the amount in controversy satisfies the requirements of 28 U.S.C. § 1332.  SIG denies that it is liable to Plaintiffs for any amount and denies any remaining allegations contained in Paragraph 25 of Plaintiffs' Complaint and demands strict proof thereof at trial.

26.     Admitted.

27.     Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

### ALLEGATIONS

28.     Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

29.    Denied. After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial. SIG specifically denies that it was negligent, breached any warranties, or practiced deceptive marketing practices and demands strict proof thereof at trial.

30.    Denied. After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

31.    Denied. After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

32.    Denied. After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

33.    Denied. After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

34.    SIG admits only that it designs and manufactures firearms and rifles, which are sold to third-party distributors, dealers, and various law enforcement and governmental agencies throughout the United States and internationally. SIG denies the remaining allegations contained in paragraph 34 of Plaintiffs' Complaint as stated, including specifically the allegation that SIG "markets and sells its products directly and through dealers."

5

35.   SIG admits that it was formerly known as SIGARMS, Inc., that it changed its name to Sig Sauer, Inc in October 2007, was founded in 1985, and that its CEO is Ron J. Cohen.  SIG denies that its principal place of business is in Exeter, NH.

36.   Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

37.   Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

38.   Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

39.   SIG denies that the P320 pistol could fire without a trigger pull and demands strict proof thereof at trial.  After reasonable investigation, SIG lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

40.   Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

41.   Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

42.     Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.  SIG denies that it was negligent, careless, reckless, or that the P320 pistol contained any defect relevant to the allegations in Plaintiffs' Complaint, and SIG demands strict proof thereof at trial.

43.     The statement contained in Paragraph 43 of Plaintiffs' Complaint is incomplete and not put into context.  To the extent Plaintiffs are making allegations in connection with the quoted language or the referenced documents, SIG denies such allegations, and SIG further responds that the document speaks for itself.  SIG further denies that the subject incident occurred without the trigger of the subject P320 being pulled and demands strict proof thereof at trial.

44.     The statement contained in Paragraph 44 of Plaintiffs' Complaint is incomplete and not put into context.  To the extent Plaintiffs are making allegations in connection with the quoted language or the referenced documents, SIG denies such allegations, and SIG further responds that the document speaks for itself.  SIG further denies that the subject incident occurred without the trigger of the subject P320 being pulled and demands strict proof thereof at trial.

45.     SIG admits that the product manual for the P320 model pistols plainly warned as follows:

7

## ⚠ WARNING – DROPPED PISTOL



If dropped, the pistol may fire. Keep the chamber empty unless actually firing!

### ANY FIREARM MAY FIRE IF DROPPED

SIG denies that this statement is contradictory to other statements made by SIG regarding the P320 model pistol, and SIG denies any remaining allegations contained in Paragraph 45 of Plaintiffs' Complaint and demands strict proof thereof at trial.

46.    Denied.  After reasonable investigation, Answering Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies same and demands strict proof thereof at trial.

47.    SIG admits only that the P320 is the first striker-fired pistol designed and manufactured by SIG.  SIG responds that the information contained in footnote 1 generally describes how a striker-fired pistol operates versus a hammer-fired pistol, but denies that the firearm shown in the footnote is a P30 pistol.  SIG denies the remaining allegations contained in Paragraph 47 of Plaintiffs' Complaint and demands strict proof thereof at trial.

48.    SIG admits that the U.S. Army selected a variant of the P320 model pistol, referred to as the M17 and M18 Modular Handgun System, as its new service weapon, with the contract being awarded to SIG in January 2017.  SIG further admits that it worked with the Army to make various modifications and performance improvements to the M17/M18 pistols during 2017.  SIG

8

denies the remaining allegations contained in Paragraph 48 of Plaintiffs' Complaint and demands strict proof thereof at trial.

49.     SIG admits that it worked with the Army to make various modifications and performance improvements to the Army's M17/M18 pistols during 2017. SIG denies the remaining allegations contained in Paragraph 49 of Plaintiffs' Complaint as stated and further states that the document referenced by Plaintiffs speaks for itself.

50.     SIG denies the description of the Connecticut incident as alleged in Paragraph 50 of SIG Plaintiffs' Complaint. With respect to the language attributed to the P320 owner's manual, SIG responds that the document speaks for itself. To the extent Plaintiffs are making any allegations in connection with the quoted language or the referenced document, SIG denies such allegations, and SIG denies any remaining allegations contained in Paragraph 50 of Plaintiffs' Complaint and demands strict proof thereof at trial.

51.     SIG denies the characterization of SIG's warning contained in the P320 owner's manual and further states that the document referenced speaks for itself. SIG denies any remaining allegations contained in Paragraph 51 of Plaintiffs' Complaint and demands strict proof thereof at trial.

52.     SIG denies the characterization of SIG's warning contained in the P320 owner's manual and further states that the document referenced speaks for itself. SIG denies any remaining allegations contained in Paragraph 52 of Plaintiffs' Complaint and demands strict proof thereof at trial.

53.     SIG responds that the language quoted in Paragraph 53 of Plaintiffs' Complaint is incomplete and not put into context. To the extent Plaintiffs are making any allegations in

connection with the quoted language or the referenced document, SIG denies such allegations, and SIG further responds that the referenced document speaks for itself.

54.     SIG denies the allegations contained in Paragraph 54 of Plaintiffs' Complaint and demands strict proof thereof at trial.

55.     SIG denies the allegations contained in Paragraph 55 of Plaintiffs' Complaint as stated and demands strict proof thereof at trial.

56.     SIG denies the allegations contained in Paragraph 56 of Plaintiffs' Complaint, and SIG specifically denies that the P320 model pistol was defective in its design and unreasonably dangerous and demands strict proof thereof at trial.

57.     SIG admits that it was aware of allegations of negligent discharges of the P320 and other pistols in 2018 that were the result of the user inadvertently pulling the trigger.  SIG denies any remaining allegations contained in Paragraph 57 of Plaintiffs' Complaint and demands strict proof thereof at trial.

58.     SIG denies the allegations contained in Paragraph 58 of Plaintiffs' Complaint as stated and demands strict proof thereof at trial.

59.     The allegations contained in Paragraph 59 lack sufficient specificity to permit a meaningful response and as such SIG denies the allegations contained in Paragraph 59 of Plaintiffs' Complaint and demands strict proof thereof at trial.  Upon information and belief, the incident described in Paragraph 59 of Plaintiffs' Complaint, to the extent true, did not involve a P320 model pistol.

60.     The allegations contained in Paragraph 60 lack sufficient specificity to permit a meaningful response and as such SIG denies the allegations contained in Paragraph 60 of Plaintiffs' Complaint and demands strict proof thereof at trial.  Upon information and belief, the

10

incident described in Paragraph 60 of Plaintiffs' Complaint, to the extent true, did not involve a

P320 model pistol.

61.     The allegations contained in Paragraph 61 lack sufficient specificity to permit a

meaningful response and as such SIG denies the allegations contained in Paragraph 61 of

Plaintiffs' Complaint and demands strict proof thereof at trial.  Upon information and belief, the

incidents described in Paragraph 61 of Plaintiffs' Complaint, to the extent true, did not involve a

P320 model pistol.

62.     SIG admits that in February 2016, a Roscommon, Michigan Sheriff's Deputy was

involved in a negligent discharge incident involving a P320 pistol.  SIG further responds that the

Roscommon County Sheriff's Office investigated the incident and determined that the seatbelt

buckle in the deputy's cruiser became entangled in the trigger area of his holstered pistol, causing

the trigger to be pulled as the deputy exited his vehicle.  SIG further admits that the deputy's

bodycam was on at the time of the discharge, but denies that the subject P320 pistol, holster or

seatbelt are visible on the video.  SIG denies any remaining allegations contained in Paragraph 62

of Plaintiffs' Complaint and demands strict proof thereof at trial.

63.     SIG admits that it is aware of alleged incidents of negligent discharges in Surprise,

AZ in 2016, but SIG denies that those discharges occurred without a trigger pull as alleged in

Paragraph 63 of Plaintiffs' Complaint and demands strict proof thereof at trial.

64.     SIG denies the allegations contained in Paragraph 64 of Plaintiffs' Complaint as

stated and demands strict proof thereof at trial.

65.     SIG admits that it is aware of an alleged incident that occurred in October 2016 in

South Carolina involving Mr. Frankenberry, but SIG denies that the subject P320 pistol discharged

in that incident without a trigger pull. SIG denies any remaining allegations contained in Paragraph 65 of Plaintiffs' Complaint and demands strict proof thereof at trial.

66.     SIG admits that it is aware of an incident involving a Holmes Beach, Florida officer who was injured when his P320 pistol discharged following an overnight shift. SIG further responds that the investigation into that incident determined that the officer inadvertently pulled the trigger as he was attempting to unload the pistol. SIG denies any remaining allegations contained in Paragraph 66 of Plaintiffs' Complaint and demands strict proof thereof at trial.

67.     The allegations contained in Paragraph 67 lack sufficient specificity to permit a meaningful response and as such SIG denies the allegations contained in Paragraph 67 of Plaintiffs' Complaint and demands strict proof thereof at trial. Upon information and belief, the incidents described in Paragraph 67 of Plaintiffs' Complaint, to the extent true, did not involve a P320 model pistol.

68.     SIG admits that a Connecticut police officer alleged that he was injured when he dropped an unsecured P320 pistol while transporting it to his vehicle, but SIG denies the remaining allegations contained in Paragraph 68 of Plaintiffs' Complaint and demands strict proof thereof at trial.

69.     SIG admits that it was notified of an alleged negligent discharge of a dropped P320 pistol as alleged in Paragraph 69 of Plaintiffs' Complaint, but denies any remaining allegations contained in Paragraph 69 of Plaintiffs' Complaint and demands strict proof thereof at trial.

70.     SIG admits that it was notified of an alleged negligent discharge of a dropped P320 pistol as alleged in Paragraph 70 of Plaintiffs' Complaint, but denies any remaining allegations contained in Paragraph 70 of Plaintiffs' Complaint and demands strict proof thereof at trial.

71.     SIG admits that it was notified of an alleged negligent discharge of a dropped P320 pistol as alleged in Paragraph 71 of Plaintiffs' Complaint, but denies any remaining allegations contained in Paragraph 71 of Plaintiffs' Complaint and demands strict proof thereof at trial.

72.     SIG admits that it sold P320 pistols to the Loudon County Sheriff's Office in or around June 2017, which is entirely irrelevant to this action which involves a P320 model pistol purchased by the Immigration and Customs Enforcement Agency in Pennsylvania, not the Loudon County Sheriff's Office.  SIG denies any remaining allegations contained in Paragraph 72 of Plaintiffs' Complaint, including any allegations contained in footnote 2 and demands strict proof thereof at trial.

73.     SIG admits that it was notified of an alleged negligent discharge as alleged in Paragraph 73 of Plaintiffs' Complaint, but denies any remaining allegations contained in Paragraph 73 of Plaintiffs' Complaint and demands strict proof thereof at trial.

74.     SIG admits that a suit regarding a P320 model pistol was filed in Connecticut state court on or around August 4, 2017 and subsequently removed to the United States District Court for the District of Connecticut.  SIG further admits that the suit alleged that a negligent discharge of the P320 pistol caused the plaintiff injury.  SIG denies any remaining allegations contained in Paragraph 74 of Plaintiffs' Complaint and demands strict proof thereof at trial.

75.     SIG admits that there had been no drop-related P320 incidents in the U.S. consumer market that were reported to SIG as of August 2017, when SIG's CEO made a statement to that effect.  SIG denies any allegations related to the statement contained in Paragraph 75 of Plaintiffs' Complaint, as the statement speaks for itself.

76.     SIG denies the allegations contained in Paragraph 76 of Plaintiffs' Complaint as stated and demands strict proof thereof at trial.

77.    SIG admits that it announced the "P320 Voluntary Upgrade Program" on August 8, 2017. The language quoted in Paragraph 77 of Plaintiffs' Complaint is incomplete and not put into context. To the extent Plaintiffs are making any allegations in connection with the quoted language or the referenced document, SIG denies such allegations, and SIG further responds that the referenced document, in its full and complete version, speaks for itself.

78.    SIG denies the allegations contained in Paragraph 78 of Plaintiffs' Complaint as stated and demands strict proof thereof at trial.

79.    SIG admits that firearms are not regulated by the Consumer Product Safety Commission. SIG denies the remaining allegations contained in Paragraph 79 of Plaintiffs' Complaint as stated.

80.    SIG denies the allegations contained in Paragraph 80 of Plaintiffs' Complaint as stated and demands strict proof thereof at trial.

81.    SIG denies knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 81 of Plaintiffs' Complaint as stated and demands strict proof thereof at trial.

82.    The allegations contained in Paragraph 82 lack sufficient specificity to permit a meaningful response and as such SIG denies the allegations contained in Paragraph 82 of Plaintiffs' Complaint and demands strict proof thereof at trial.

83.    SIG admits that it was notified of an alleged negligent discharge of a dropped P320 pistol as alleged in Paragraph 83 of Plaintiffs' Complaint, but denies any remaining allegations contained in Paragraph 83 of Plaintiffs' Complaint and demands strict proof thereof at trial.

84.    SIG admits that Loudon County, Virginia deputy sheriff Marcie Vadnais was injured when she pulled the trigger on her P320 pistol as she was trying to remove her holstered

14

firearm from her belt while seated in her department-issued vehicle. SIG denies the remaining allegations contained in Paragraph 84 of Plaintiffs' Complaint and demands strict proof thereof at trial.

85.     SIG admits that it has sent supplemental information to customers reminding them of the continued availability of the free upgrade program. SIG further admits that the P320 model pistol has never been recalled. SIG denies any remaining allegations contained in Paragraph 85 of Plaintiffs' Complaint and demands strict proof thereof at trial.

86.     SIG admits that it was notified of an alleged negligent discharge as alleged in Paragraph 86 of Plaintiffs' Complaint, but denies any remaining allegations contained in Paragraph 86 of Plaintiffs' Complaint and demands strict proof thereof at trial.

87.     SIG admits that it was notified of an incident as alleged in Paragraph 87 of Plaintiffs' Complaint which involved an intentional trigger pull, but denies the characterization of the incident included in Paragraph 87. SIG denies any remaining allegations contained in Paragraph 87 of Plaintiffs' Complaint and demands strict proof thereof at trial.

88.     SIG admits that it was notified of an incident involving the discharge of a Rancho Cucamonga police officer's P320 pistol. SIG further responds that following an internal investigation by the Rancho Cucamonga Police Department, it was determined that a set of keys attached to the outside of a bag being carried by the officer had become inserted in the trigger area of the officer's P320, causing the trigger to be pulled. SIG denies any remaining allegations contained in Paragraph 88 of Plaintiffs' Complaint and demands strict proof thereof at trial.

89.     SIG lacks knowledge and information sufficient to form a belief as to the allegations contained in Paragraph 89 of Plaintiffs' Complaint and demands strict proof thereof at trial.

90.     SIG admits that it is aware of an alleged incident in October 2018 in Kentucky involving Mr. Mayes, but SIG denies that the subject P320 pistol discharged in that incident without a trigger pull.  SIG denies any remaining allegations contained in Paragraph 90 of Plaintiffs' Complaint and demands strict proof thereof at trial.

91.     SIG admits that it is aware of an alleged negligent discharge incident as alleged in Paragraph 91 of Plaintiffs' Complaint but denies that the incident occurred without a trigger pull. SIG denies any remaining allegations contained in Paragraph 91 of Plaintiffs' Complaint and demands strict proof thereof at trial.

92.     SIG admits that it was notified of an alleged negligent discharge as alleged in Paragraph 92 of Plaintiffs' Complaint but denies knowledge and information sufficient to form a belief as to the truth of the allegation contained in Paragraph 92 of Plaintiffs' Complaint and demands strict proof thereof at trial.

93.     SIG denies knowledge and information sufficient to form a belief as to the truth of the allegation contained in Paragraph 93 of Plaintiffs' Complaint.  SIG admits only that the language quoted in footnote 3 is included in written information produced by SIG, but denies that having an armorer's certification is relevant to safe firearm handling practices as it relates to the allegations contained in Paragraph 93 of Plaintiffs' Complaint.

94.     SIG denies the allegations contained in Paragraph 94 of Plaintiffs' Complaint as stated. Upon information and belief, the Somerville Police Department investigated the referenced negligent discharge incident and determined that the subject P320 pistol was unsecured inside a gym bag and while it was being carried, something inside the gym bag caused the trigger to be pulled.  SIG denies any remaining allegations contained in Paragraph 94 of Plaintiffs' Complaint and demands strict proof thereof at trial.

95.     SIG admits that it was notified of an alleged negligent discharge as alleged in
Paragraph 95 of Plaintiffs' Complaint, but denies any remaining allegations contained in Paragraph
95 of Plaintiffs' Complaint. SIG lacks knowledge and information sufficient to form a belief as to
the truth of the allegations contained in the last sentence of Paragraph 95 of Plaintiffs' Complaint
and demands strict proof thereof at trial.

96.     SIG lacks knowledge and information sufficient to form a belief as to the truth of
the allegations contained in Paragraph 96 of Plaintiffs' Complaint, but SIG denies that the P320
pistol could have discharged without a trigger pull and demands strict proof thereof at trial.  SIG
further states that the alleged statement in Paragraph 96 of Plaintiffs' Complaint speaks for itself,
and to the extent Plaintiffs are making any allegations related to this statement, they are denied.

97.     SIG lacks knowledge and information sufficient to form a belief as to the truth of
the allegations contained in Paragraph 97 of Plaintiffs' Complaint, but SIG denies that the P320
pistol could have discharged without a trigger pull and demands strict proof thereof at trial.

98.     SIG admits that it was notified of an alleged negligent discharge as alleged in
Paragraph 98 of Plaintiffs' Complaint, but denies any remaining allegations contained in Paragraph
98 of Plaintiffs' Complaint and demands strict proof thereof at trial.

99.     SIG admits that it was notified of an alleged negligent discharge as alleged in
Paragraph 99 of Plaintiffs' Complaint, but denies any remaining allegations contained in Paragraph
99 of Plaintiffs' Complaint and demands strict proof thereof at trial.

100.    SIG admits that Major Villani issued a report on his purported inspection of a P320
model pistol as alleged in Paragraph 100, but SIG denies that the information contained in Major
Villani's report is accurate.  SIG further states that the alleged statement in Paragraph 100 of
Plaintiffs' Complaint speaks for itself, and to the extent Plaintiffs are making any allegations

17

related to this statement, they are denied.  SIG denies any remaining allegations contained in Paragraph 100 of Plaintiffs' Complaint and demands strict proof thereof at trial.

101.    SIG admits that it was notified of an alleged negligent discharge as alleged in Paragraph 101 of Plaintiffs' Complaint, but denies any remaining allegations contained in Paragraph 101 of Plaintiffs' Complaint and demands strict proof thereof at trial.

102.    SIG denies knowledge and information sufficient to form a belief as to the truth of the matters contained in Paragraph 102 of Plaintiffs' Complaint and demands strict proof thereof at trial.

103.    SIG denies the allegations contained in Paragraph 103 of Plaintiffs' Complaint and demands strict proof thereof at trial.

104.    SIG admits that there have been prior instances of negligent discharges at the Sig Sauer Academy, but denies the allegations contained in Paragraph 104 of Plaintiffs' Complaint as stated and demands strict proof thereof at trial.

105.    SIG admits that the P320 model pistol has never been recalled.  SIG denies any remaining allegations contained in Paragraph 86 of Plaintiffs' Complaint and demands strict proof thereof at trial.

106.    SIG admits that certain of the language cited in Paragraph 106 of Plaintiffs' Complaint appeared in an interview of SIG's former Chief Financial Officer, but the statements are incomplete and not put into context.  As such, SIG denies any allegations contained within Paragraph 106 of Plaintiffs' Complaint and further state that the document speaks for itself as to the statements attributed to Mr. Scullin.

107.    SIG admits that certain of the language cited in Paragraph 107 of Plaintiffs' Complaint appeared in an interview of SIG's former Chief Financial Officer, but the statements

18

are incomplete and not put into context.  As such, SIG denies any allegations contained within Paragraph 106 of Plaintiffs' Complaint and further state that the document speaks for itself as to the statements attributed to Mr. Scullin.

**COUNT I**

**STRICT PRODUCT LIABILITY**

108.    In response to Paragraph 108 of Plaintiffs' Complaint, SIG repeats, reiterates and realleges each and every response to Paragraph 1 through Paragraph 107 as though fully set forth herein. SIG denies the allegations contained in subparagraphs a.-d. of Paragraph 108 of Plaintiffs' Complaint, and demands strict proof thereof at trial.  Any remaining allegations are denied as conclusions of law to which no responsive pleading is required.

109.    SIG denies the allegations contained in Paragraph 109 of Plaintiffs' Complaint as conclusions of law to which no responsive pleading is required.  To the extent a response is required, the allegations are denied and SIG demands strict proof thereof at trial.

110.    SIG denies the allegations contained in Paragraph 110 of Plaintiffs' Complaint as conclusions of law to which no responsive pleading is required.  To the extent a response is required, the allegations are denied and SIG demands strict proof thereof at trial.

111.    SIG denies the allegations contained in Paragraph 111 of Plaintiffs' Complaint as conclusions of law to which no responsive pleading is required.  To the extent a response is required, the allegations are denied and SIG demands strict proof thereof at trial.

112.    SIG denies the allegations contained in Paragraph 112 of Plaintiffs' Complaint as conclusions of law to which no responsive pleading is required.  To the extent a response is required, the allegations are denied and SIG demands strict proof thereof at trial.

**WHEREFORE**, Defendant SIG Sauer, Inc. demands judgment in its favor and against Plaintiffs together with all costs and attorney's fees.

**COUNT II**

**(Negligence)**

113.   In response to Paragraph 113 of Plaintiffs' Amended Complaint, SIG repeats, reiterates and realleges each and every response to Paragraph 1 through Paragraph 112 as though fully set forth herein.

114.   SIG denies the allegations contained in Paragraph 114 of Plaintiffs' Complaint as conclusions of law to which no responsive pleading is required.   To the extent a response is required, the allegations are denied and SIG demands strict proof thereof at trial.

115.   SIG denies the allegations contained in Paragraph 115 of Plaintiffs' Complaint as conclusions of law to which no responsive pleading is required.   To the extent a response is required, the allegations are denied and SIG demands strict proof thereof at trial.

116.   SIG denies the allegations contained in Paragraph 116 of Plaintiffs' Complaint as conclusions of law to which no responsive pleading is required.   To the extent a response is required, the allegations are denied and SIG demands strict proof thereof at trial.

117.   SIG denies the allegations contained in Paragraph 117, including the allegations contained in subparts i. – viii., of Plaintiffs' Amended Complaint and demands strict proof thereof at trial.

118.   SIG denies the allegations contained in Paragraph 118 of Plaintiffs' Amended Complaint and demands strict proof thereof at trial.

119.   SIG denies the allegations contained in Paragraph 119 of Plaintiffs' Amended Complaint and demands strict proof thereof at trial.

120.    SIG denies the allegations contained in Paragraph 120 of Plaintiffs' Amended
Complaint and demands strict proof thereof at trial.

121.    SIG denies the allegations contained in Paragraph 121 of Plaintiffs' Amended
Complaint and demands strict proof thereof at trial.

**WHEREFORE**, Defendant SIG Sauer, Inc. demands judgment in its favor and against
Plaintiffs together with all costs and attorney's fees.

## COUNT III

### (Breach of Implied Warranty of Merchantability)

122.    In response to Paragraph 122 of Plaintiffs' Amended Complaint, SIG repeats,
reiterates and realleges each and every response to Paragraph 1 through Paragraph 121 as though
fully set forth herein.

123.    SIG admits that it markets, sells, and distributes certain firearms, including the P320
model pistol, but denies any remaining allegations contained in Paragraph 123 of Plaintiffs'
Amended Complaint.

124.    SIG denies the allegations contained in Paragraph 124 of Plaintiffs' Amended
Complaint as alleged and demands strict proof thereof at trial.

125.    SIG denies the allegations contained in Paragraph 125 of Plaintiffs' Amended
Complaint, including the allegations contained in subparts i. – vi., and demands strict proof thereof
at trial.

126.    SIG denies the allegations contained in Paragraph 126 of Plaintiffs' Amended
Complaint and demands strict proof thereof at trial.

127.    SIG denies the allegations contained in Paragraph 127 of Plaintiffs' Complaint and
demands strict proof thereof at trial.

21

**WHEREFORE**, Defendant SIG Sauer, Inc. demands judgment in its favor and against Plaintiffs together with all costs and attorney's fees.

**COUNT IV**

**(Breach of Express Warranty)**

128.    In response to Paragraph 128 of Plaintiffs' Complaint, SIG repeats, reiterates and realleges each and every response to Paragraph 1 through Paragraph 127 as though fully set forth herein.

129.    SIG admits that it markets, sells, and distributes certain firearms, including the P320 model pistol, but denies any remaining allegations contained in Paragraph 129 of Plaintiffs' Complaint.

130.    The allegations contained in Paragraph 130 of Plaintiffs' Complaint contain legal conclusions and, as such, SIG denies such allegations and holds Plaintiff to his proof.   SIG demands strict proof thereof at trial.

131.    SIG denies the allegations contained in Paragraph 131 of Plaintiffs' Complaint and demands strict proof thereof at trial.

132.    SIG denies the allegations contained in Paragraph 132 of Plaintiffs' Complaint, including the allegations contained in subparts i. – vii., and demands strict proof thereof at trial.

133.    SIG denies the allegations contained in Paragraph 133 of Plaintiffs' Complaint and demands strict proof thereof at trial.

**WHEREFORE**, Defendant SIG Sauer, Inc. demands judgment in its favor and against Plaintiffs together with all costs and attorney's fees.

## COUNT V

### (Negligent Infliction of Emotional Distress)

134.    In response to Paragraph 134 of Plaintiffs' Complaint, SIG repeats, reiterates and realleges each and every response to Paragraph 1 through Paragraph 133 as though fully set forth herein.

135.    SIG denies the allegations contained in Paragraph 135 of Plaintiffs' Complaint and demands strict proof thereof at trial.

136.    SIG denies the allegations contained in Paragraph 136 of Plaintiffs' Complaint and demands strict proof thereof at trial.

137.    SIG denies the allegations contained in Paragraph 137 of Plaintiffs' Complaint and demands strict proof thereof at trial.

138.    SIG denies knowledge and information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 138 of Plaintiffs' Complaint.

139.    SIG denies the allegations contained in Paragraph 139 of Plaintiffs' Complaint and demands strict proof thereof at trial.

140.    SIG denies the allegations contained in Paragraph 140 of Plaintiffs' Complaint and demands strict proof thereof at trial.

141.    SIG denies knowledge and information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 141 of Plaintiffs' Complaint.

**WHEREFORE**, Defendant SIG Sauer, Inc. demands judgment in its favor and against Plaintiffs together with all costs and attorney's fees.

## COUNT VI

### (Intentional Infliction of Emotional Distress)

142.    In response to Paragraph 142 of Plaintiffs' Complaint, SIG repeats, reiterates and realleges each and every response to Paragraph 1 through Paragraph 141 as though fully set forth herein.

143.    SIG denies the allegations contained in Paragraph 143 of Plaintiffs' Complaint and demands strict proof thereof at trial.

144.    SIG admits that it has not recalled the P320 pistol.   SIG denies all remaining allegations contained in Paragraph 144 of Plaintiffs' Complaint.

145.    SIG denies the allegations contained in Paragraph 145 of Plaintiffs' Complaint, including specifically denying the allegations that it acted irresponsibly or that the subject P320 pistol is defective, and demands strict proof thereof at trial.

146.    SIG denies the allegations contained in Paragraph 146 of Plaintiffs' Complaint and demands strict proof thereof at trial.

147.    SIG denies the allegations contained in Paragraph 147 of Plaintiffs' Complaint and demands strict proof thereof at trial.

148.    SIG denies the allegations contained in Paragraph 148of Plaintiffs' Complaint and demands strict proof thereof at trial.

149.    SIG denies the allegations contained in Paragraph 149 of Plaintiffs' Complaint and demands strict proof thereof at trial.

150.    SIG denies knowledge and information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 150 of Plaintiffs' Complaint

**WHEREFORE**, Defendant SIG Sauer, Inc. demands judgment in its favor and against Plaintiffs together with all costs and attorney's fees.

**COUNT VII**

**(Loss of Consortium)**

151.   In response to Paragraph 151 of Plaintiffs' Complaint, SIG repeats, reiterates and realleges each and every response to Paragraph 1 through Paragraph 150 as though fully set forth herein.

152.   SIG denies knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 152 of Plaintiffs' Complaint.

153.   SIG denies knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 153 of Plaintiffs' Complaint

**WHEREFORE**, Defendant SIG Sauer, Inc. demands judgment in its favor and against Plaintiffs together with all costs and attorney's fees.

**AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**
**(Failure to State a Claim)**

Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**
**(Alteration/Improper Use)**

SIG has no control over the maintenance, handling, or use of its products. SIG further states that if there was any defect or deficiency to a product manufactured by SIG, at the time of the incident alleged, such defect or deficiency did not relate to the original design, manufacture or sale of the product or of any problems undertaken by SIG, but on the contrary, the result is of other

acts or omissions on the part of others for whom SIG is not responsible including negligent or faulty maintenance, handling, use, or alteration.

### THIRD AFFIRMATIVE DEFENSE
### (Written Warnings)

No warnings or instructions were required because any claimed danger would be apparent to an ordinary user. However, SIG provided written warnings against the particular uses, misuses, or abuses by the Plaintiff Keith Slatowski of the firearm that is the subject of the Complaint. The warnings and instructions were sufficient to inform an ordinary user of the risk of harm. The risk of harm was one that an ordinary user would reasonably expect.

### FOURTH AFFIRMATIVE DEFENSE
### (Negligence of Others)

The occurrence, injuries and damages claimed by Plaintiffs were proximately caused by the acts, omissions, fault and/or negligence of Plaintiffs and/or other third parties over whom SIG had no right to control.

### FIFTH AFFIRMATIVE DEFENSE
### (Contributory Negligence)

Plaintiff Keith Slatowski was the sole proximate cause of the occurrence, injuries and damages claimed by Plaintiffs.

### SIXTH AFFIRMATIVE DEFENSE
### (Superseding/Intervening Cause)

SIG will show that any injury was due to and proximately caused and occasioned by the intervening and/or superseding cause, negligence and/or recklessness of a party or parties other than SIG. Such intervening and/or superseding cause, negligence and/or recklessness was/were

the sole and proximate cause of the injuries sustained by Plaintiffs, and therefore, Plaintiffs cannot recover against SIG.

## SEVENTH AFFIRMATIVE DEFENSE
### (Pre-existing condition)

Any disability, disfigurement or injury claims alleged by Plaintiffs may be the result of a pre-existing condition or were caused by a subsequent injury or injuries and were not caused or aggravated by any act of negligence on the party of SIG.

## EIGHTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate Damages)

Plaintiffs' claims and damages may be limited, in whole or in part, by the Plaintiffs' failure to mitigate their damages. Plaintiffs may have failed to follow a proper post-operative care protocol and/or sought and underwent contra-indicated post-operative medical care and treatment that caused, aggravated, and/or exacerbated their alleged injuries and damages.

## NINTH AFFIRMATIVE DEFENSE
### (Assumption of Risk)

Plaintiff Keith Slatowski assumed the risk of the injuries and damages claimed as a result of the events set forth in the Complaint and his assumption of risk bars or reduces his recovery.

## TENTH AFFIRMATIVE DEFENSE
### (Setoff)

SIG invokes its right to a reduction in any dollar verdict which may be rendered in this case by credit for payments made to the Plaintiffs by other persons or entities, or by percentage reductions to which SIG would be entitled as a result of a jury finding against Plaintiffs or parties other than SIG.  SIG reserves its right to submit issues against parties, including the Plaintiffs, and other parties who may be absent from this case at the time the case is submitted to the jury.

### ELEVENTH AFFIRMATIVE DEFENSE
### (Compliance with Government Standards)

The subject firearm and all component parts complied with all federal, state and local codes, government and industry standards, regulations, specifications and statutes regarding the manufacture, sale and use of the product at all times pertinent to this action.

### TWELFTH AFFIRMATIVE DEFENSE
### (Misuse/Abuse)

Plaintiffs are not entitled to recover, or their damages may be reduced proportionally, to the extent any alleged damages or injuries were caused by the misuse, abuse, failure to properly maintain or care for the products at issue herein, or substantial modification of the product.

### THIRTEENTH AFFIRMATIVE DEFENSE
### (State of the Art)

Plaintiffs cannot recover herein against SIG because the design, manufacture, packaging, warning and labeling of the product described in Plaintiffs' Complaint was in conformity with the generally recognized state of the art, practice, custom, and knowledge at the time such product was designed, manufactured, packaged and labeled.

### FOURTEENTH AFFIRMATIVE DEFENSE
### (Contributory/Comparative Negligence)

Plaintiff Keith Slatowski's own negligence proximately caused the injuries complained of herein. In this regard, and generally, SIG hereby invokes the doctrine of contributory/comparative negligence, which reduces any recovery by Plaintiffs proportionately to the fault attributed to Plaintiff Keith Slatowski.

28

### FIFTEENTH AFIRMATIVE  DEFENSE
### (No Duty to Plaintiff)

SIG denies that it owed a duty to Plaintiff Keith Slatowski as alleged; however, if it is determined that SIG owed Plaintiff Keith Slatowski a duty, SIG denies that the duty was breached.  SIG was not negligent and acted with reasonable care under the facts and circumstances of this litigation.

### SIXTEENTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

Plaintiffs' claims are barred by the applicable statute of limitation.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' recovery is barred, diminished or reduced to the extent that the dangers, if any, associated with the product referenced in Plaintiffs' Complaint, were not unreasonable, were known by the Plaintiff Keith Slatowski, constituted commonly or generally known dangers, were open or obvious, and because Plaintiff Keith Slatowski was a knowledgeable user of the product.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and alleged damages are barred, reduced and/or limited pursuant to applicable statutory and common law regarding limitations of awards and damages, caps on recovery, setoffs, and apportionment.

### TWENTIETH AFFIRMATIVE DEFENSE
### (No Retroactive Enforcement)

Plaintiffs' claims are barred, in whole or in part, because they violate SIG's rights under the Due Process and ex post facto clauses of the United States Constitution, or other applicable state constitution, to the extent Plaintiffs seek to impose liability retroactively for conduct that was not actionable at the time it occurred.

## TWENTY-FIRST AFFIRMATIVE DEFENSE
### (Right to Amend)

SIG reserves the right to amend its answer and plead additional or more specific affirmative

defenses as warranted by the facts determined through the conclusion of the discovery process.

**WHEREFORE,** Defendant, Sig Sauer, Inc., respectfully requests judgment in its favor

and against Plaintiff together with costs and attorney's fees.

Respectfully submitted,

**LITTLETON PARK
JOYCE UGHETTA & KELLY LLP**

By:   /s/Kristen E. Dennison, Esquire
        Kristen E. Dennison, Esquire

201 King of Prussia Road, Suite 220
Radnor, PA 19087
Attorney ID No.: 86648
Email: kristen.dennison@littletonpark.com
Phone: (484) 254-6220
Fax: (484) 254-6221

***Attorneys for Defendant
SIG SAUER, INC.***

Date:   April 20, 2021

30

## CERTIFICATE OF SERVICE

I, Kristen E. Dennison, Esquire, hereby certify that on this date a true and correct copy of the attached document was filed electronically.  Notice of this filing is being electronically sent to all registered parties' counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Respectfully submitted,

**LITTLETON PARK**
**JOYCE UGHETTA & KELLY LLP**

By:  /s/Kristen E. Dennison, Esquire
　　　Kristen E. Dennison, Esquire

***Attorney for Defendant***
***SIG SAUER, INC.***

Date:   April 20, 2021

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF

KEITH AND BIANCE CEMINI SLATOWSKI

         -VS-
                         CIVIL ACTION NO: 2:21-CV-00729

SIG SAUER, INC.

## <u>NOTICE TO SERVE A SUBPOENA TO PRODUCE DOCUMENTS AND THINGS FOR DISCOVERY PERSUANT TO RULE 45</u>

TO: JEFFREY S. BAGNELL, ESQUIRE, Plaintiff Counsel

American Legal Records on behalf of Kristen E. Dennison, Esquire is serving a subpoena(s) identical to the one that is attached to this notice.

**Date:** 1/10/22

                              American Legal Records on behalf of:

CC: Kristen E. Dennison, Esquire
     Robert Zimmerman, Esquire

                        Kristen E. Dennison, Esquire
                        Attorney for Defendant

                        American Legal Records
                        1974 Sproul Road Suite 403
                        Broomall, PA 19008
                        (888)519-8565

JEFFREY S. BAGNELL, ESQUIRE
JEFFREY S. BAGNELL, ESQUIRE, LLC
55 GREENS FARMS ROAD, #200-60
WESTPORT, CONNECTICUT 06880

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# United States District Court
for the
EASTERN District Court of PENNSYLVANIA

KEITH AND BIANCE CEMINI SLATOWSKI

_____
*Plaintiff*

V.

SIG SAUER, INC.

_____
*Defendant*

Civil Action No. 2:21-CV-00729

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      USA DEPARTMENT OF HOMELAND SECURITY

_____
(Name of person to whom this subpoena is directed)

☑ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
SEE ATTACHED ADDENDUM

| Place: American Legal Records 1974 Sproul Road, Suite 403 Broomall, PA 19008 | Date and Time: 1/31/2022  10:00 am |
|---|---|

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45 (d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 1/10/2022

    *CLERK OF COURT*             OR           /s/ Kristen E. Dennison, Esquire

_____          _____
   *Signature of the Clerk or Deputy Clerk*               *Attorney's Signature*

The name, address, e-mail address, and telephone number of the attorney representing (*name of party*)_____ Defendant_____
Littleton Joyce Ughetta Park & Kelly - Radnor, 201 King of Prussia Road, Suite 220, Radnor, Pennsylvania 19087, who issues or requests this subpoena, are: American Legal Records, 1974 Sproul Road, Suite 403, Broomall, PA 19008 (888) 519-8568

_____

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

# ADDENDUM TO SUBPOENA

SEE ATTACHED EXHIBIT A

DOB: 08/05/1972
SSN: XXX-XX-8485

**Important:**
- To comply with subpoena please send requested records directly to American Legal Records via FAX (484) 603-5012, email Records@americanlegalrecords.com, or mail to 1974 Sproul Road, Suite 403, Broomall, PA 19008.
- Contact American Legal Records for assistance (contact information is on our cover letter) **DO NOT CONTACT THE LAW FIRM**.
- Secure email is an acceptable form of delivery
- **PRIOR APPROVAL IS REQUIRE FOR FEES** in excess of $100.
- **PRIOR APPROVAL IS REQUIRED FOR RADIOLOGY FILMS/ DIAGNOSTIC STUDIES OVER $40.00**
- Please include your **FEDERAL TAX ID NUMBER** on all invoices.
- **CERTIFICATION PAGE MUST BE SIGNED AND RETURNED TO** American Legal Records with the requested materials or indicating there are **NO** materials.
- American Legal Records reserves the right to refuse any invoices submitted AFTER the receipt of the records, without prior notice of approval or fees.

*Keith Slatowski, et al. v. Sig Sauer, Inc.*
Civil Action No. 2:21-cv-00729, Exhibit A to Subpoena

### Exhibit A to Subpoena to Department of Homeland Security

## DEFINITIONS AND INSTRUCTIONS

1.     "DHS," "You," and "Your" means the United States Department of Homeland Security and, where applicable, their officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

2.     ***"ICE" means the Immigration and Customs Enforcement Agency and,*** where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

3.     "Incident" means Plaintiff Keith Slatowski's alleged inadvertent discharge event involving his P320 pistol at ***the United States Postal Service range in New Castle, Delaware*** on September 21, 2020.

4.     "Subject pistol" means Keith Slatowski's P320 pistol that he alleges inadvertently discharged on September 21, 2020.

5.     "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

6.     "Document" is synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

7.     "Person" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

8.     "Concerning" means relating to, referring to, describing, evidencing or constituting.

9.     "All," "any," and "each" shall each be construed as encompassing any and all.

10.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

11.     "Refer(ring)," "relate(ing)," and regard(ing) means embodying, pertaining to, concerning, constituting, comprising, reflecting, recording, discussing, or having any logical or factual connection whatsoever with the subject matter in question.

*Keith Slatowski, et al. v. Sig Sauer, Inc.*
Civil Action No. 2:21-cv-00729, Exhibit A to Subpoena

12.     The use of the singular form of any word includes the plural and vice versa.

13.     In the event that any document is withheld on the basis of a claim of privilege or immunity, that document is to be identified by: (a) the nature of the privilege; (b) the type of document; (c) the general subject matter of the document; (d) the date of the document; (e) the author of the document, (f) the addressees of the document, and (g) any other recipients.

14.     If the document was but is no longer in your possession or subject to your control: (a) state what happened to it; (b) state the present location of the document and identify its custodian; and (c) state all other information necessary or helpful to enable this defendant to locate the document and to procure its production.

15.     Produce all ESI in single-page .TIFF format, with native files, accompanying text files, and appropriate load files.

16.     Unless specified in the Demand, the time period for the document requests is September 21, 2020 through the present.

## DEMANDS FOR DOCUMENTS

1.     Any investigation report created by (or on behalf of) the DHS that relates to Keith Slatowski's inadvertent discharge Incident of his P320 pistol that occurred on September 21, 2020.

2.     Any inspection report created by (or on behalf of) the DHS that relates to any testing or examination of Keith Slatowski's Subject Pistol after the pistol inadvertently discharged on September 21, 2020.

3.     All photographs, motion pictures, video recordings, body-camera footage, or other photographic reproduction capturing the Incident that occurred on September 21, 2020.

4.     Keith Slatowski's personnel file maintained by the DHS, including practice range records; training and qualification records; his disciplinary file; and any formal or informal job evaluations.

2

# EXHIBIT 4

## **AUTHORIZATION FOR RELEASE OF INFORMATION**

1.  I (the undersigned) authorize _____

                                                (Provider /Facility Name)

_____
(Street)                   (City/State)           (Zip Code)          (Phone Number)

To release information from the record(s) of: Slatowski, Keith _____

_____
                                     (Last Name)    (First Name)    (Middle)

Date of Birth: ___08/05/1972_____    Soc. Sec. No.: ___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_____

Covering the period(s) of treatment from: 09/21/2020  to PRESENT

2.       Information to be released (check all that apply):

___ Progress Notes ___ Radiology ___ Diagnostic Tests ___ Billing Records ___ X-Ray Films
___ Lab ___ History & Physical ___ EKGs ___ Operative/Procedure Report ___ Discharge Summary
___ Complete Medical Record (indicates information regarding insurance, demographics, referral documents and records from other facilities).
___ Other: _____

3.       Information is to be released to:

                                      (**Specific Requestor** Information)

                                      Littleton Park
                                      Joyce Ughetta & Kelly LLP
                                      Kristen E. Dennison, Esquire
                                        201 King of Prussia Road, Suite 220
                                      Radnor, PA 19087

4.  Purpose of disclosure: Third Party Litigation ____

5. I understand this consent may be revoked in writing at any time.  With the exception to the extent that disclosure of information has already occurred prior to the receipt of revocation by the above-named provider.  If written revocation is not received, authorization will be considered valid for a period of time not to exceed 180 days from the date of signing.  To initiate revocation of this authorization, direct all correspondence to the "Specific Requestor" above.

6.      I understand that this consent is to include disclosure of: (PLEASE INITIAL):
___ Alcohol and/or drug abuse record                 ___ Psychiatric records
___ Sexually transmitted disease information      ___ HIV/AIDS information

7. I understand that the covered entity to whom this authorization is directed may not condition treatment, payment, enrollment or eligibility of benefits on whether or not I sign the authorization.

8. A photocopy of this authorization is to be considered as valid as the original.

9. I understand that the information used or disclosed pursuant to this authorization may be subject to re-disclosure by the recipient and may no longer be protected by Federal Law.

SIGNATURE: _____    DATE: _____/_____/_____
Patient or person/legal representative (Next-of-kin or legal guardian to sign only if patient is a minor, legally incompetent, or deceased)

PRINT NAME:  KEITH SLATOWSKI

Relationship to patient of personal/legal representative signing for patient:_____

# This document was signed by:

## Keith Slatowski

(Requested Gesture: Peace Sign)







| | |
|---|---|
| Date | 6/10/2021 7:24 PM UTC |
| Phone | (484) 680-4337 |
| IP Address | 107.77.203.176 |
| Confirmation | A4BAE9FEFEC97961F141E6970FCD4D7A 684A21954E41D2AD20D4253098D47520 |

## V
**VINESIGN.COM**

# EXHIBIT B



*Office of the Principal Legal Advisor*

**U.S. Department of Homeland Security**
500 12th Street, SW; MS 5900
Washington, DC 20024

March 21, 2022

SENT VIA E-MAIL (3/21/2022)

Kristen E. Dennison, Esq.
Littleton, Park, Joyce, Ughetta, & Kelly, LLP
201 King of Prussia Rd, Suite 220
Radnor, PA 19087
kristen.dennison@littletonpark.com

Re:     Subpoena – Employment Documents for Investigations Special Agent, Keith Slatowski,
        *Slatowski v. Sig Sauer, Inc.* 21-cv-00729 (EDPA)

Dear Ms. Dennison:

        A copy of your *Touhy* request letter dated Feb 14, 2022 and accompanying subpoena,
dated January 10, 2022, to the U.S. Department of Homeland Security (DHS) was forwarded to
my attention.  Your *Touhy* request seeks the production of documents pursuant to Rule 45 of the
Federal Rules of Civil Procedure and the Local Rules of the Eastern District of Pennsylvania for
use in the above Federal proceedings, to which the United States is not a party.  The request
seeks the production of documents regarding eight categories[1] of information by January 31,
2022.  For the reasons that follow, your request for the production of documents is denied
pursuant to the DHS *Touhy* regulations. *See* 6 C.F.R. §§ 5.41-5.49.  Accordingly, Immigration
and Customs Enforcement (ICE) does not intend to produce the requested documents in response
to the subpoena.  In addition, even if the request for documents were not denied, ICE nonetheless
objects to the requested production of documents pursuant to Federal Rule of Civil Procedure
45(d)(2)(B), to the extent that Rule 45 applies.

**Touhy**

        There are published procedural prerequisites for obtaining information, whether oral or
written, from DHS of which ICE is a component.  The Supreme Court has held that a federal
agency is not required to comply with any request for testimony or documents that fails to
comport with the applicable agency regulations governing the production or disclosure of such
information.   *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).  DHS has
promulgated regulations that govern the release of testimony by DHS employees or documents
in a legal proceeding where the United States is not a party.  These *Touhy* regulations can be
found at  6 C.F.R.  §§ 5.41-5.49.      Compliance with the *Touhy* regulations is an absolute
condition precedent to obtaining testimony or other information from a DHS employee, as well
as documents. *See U.S. v. Soriano-Jarquin*, 492 F.3d 495 (4th Cir. 2007); *Ho v. U.S.,* 374
F.Supp.2d 82 (D.D.C. 2005); *Boeh v. Gates, et. al*., 25 F.3d 761 (9th Cir. 1994); *Saunders v.*

_____

[1] ICE is using the term "category" to pertain to the 8 document requests on pages 2 and 3 of the *Touhy* request.

Kristen E. Dennison, Esq.
Page 2

*Great Western Sugar Co.*, 396 F.2d 794 (10th Cir. 1968); *United States Steel Corp. v. Mattingly*, 663 F.2d 68 (10th Cir. 1980*)*.

Section 5.43 of the DHS *Touhy* regulations requires that service of subpoenas, court orders, and other demands or requests for official information be served on the DHS Office of the General Counsel (OGC). DHS OGC has delegated the ability to receive service of and respond to such requests to its components. In the event that the request for ICE information is delivered directly to an employee, the employee is to immediately forward a copy of that document to DHS OGC or its designee, ICE Office of the Principal Legal Advisor (OPLA).

Further, DHS regulations bar all DHS employees, including former employees, from *inter alia* providing responses to questions by attorneys in situations involving litigation regarding any material contained in the files of the Department, any information relating to material contained in the files of the Department, or any information acquired while the subject of the request for information is or was employed by DHS, unless authorized to do so by the DHS Office of General Counsel or its designees. *See* 6 C.F.R. § 5.44. Section 5.45 of the regulations also requires that the party seeking information must "set forth in writing, and with as much specificity as possible, the nature and relevance of the official information sought."

Upon receipt of a sufficiently detailed request, DHS or ICE will consider the following factors: (1) whether compliance would be unduly burdensome or otherwise inappropriate; (2) whether compliance is appropriate under the relevant substantive law concerning privilege or disclosure of information; (3) the public interest; (4) the need to conserve the time of DHS employees for the conduct of official business; (5) the need to avoid spending the time and money of the United States for private purposes; (6) the need to maintain impartiality between private litigants in cases where a substantial government interest is not implicated; (7) whether compliance would have an adverse effect on performance by the DHS of its mission and duties; and (8) the need to avoid involving the DHS in controversial issues not related to its mission. *See* 6 C.F.R. § 5.48(a).

In addition, ICE will not comply with a request when such compliance would violate a statute, regulation, Executive Order, or agency policy. Likewise, ICE will not comply with a request when such compliance would reveal agency deliberations, or potentially impede or prejudice an on-going law enforcement investigation. *See* 6 C.F.R. § 5.48(b).

ICE has reviewed your *Touhy* request and has determined that the request does not currently meet the requirements of 6 C.F.R. § 5.45. Your *Touhy* request does not adequately specify what information is being requested nor does it describe how each of the categories of information is relevant to the present legal proceeding. Your request seeks information on issues that do not appear to be relevant to the underlying litigation. For instance, your request seeks internal agency information regarding procedures for agents, firearm and holster manuals and procedures, among other information, as well as documents concerning any accreditation or certification by any law enforcement accreditation body in category 8. It is unclear how internal ICE policies are relevant to any claim or defense in the underlying suit. Even if an argument could be made that firearm and holster manuals and procedures were relevant, it is unclear how general standard operating procedures for agents and accreditation, or certification is relevant. Category 6 seeks, among other things personnel and evaluation records pertaining to the Plaintiff, without any explanation as to how that information is relevant to the suit. Additionally, category 7 does not explain how the requested records "would directly impact liability."

Moreover, the information sought may be law enforcement sensitive and/or subject to an Executive Privilege. For instance, much of your request seeks various communications, which

Kristen E. Dennison, Esq.
Page 3

may fall under the attorney-client or deliberative process privileges. Additionally, information may be law enforcement sensitive. For instance, in categories 4, 5 and 8 you request internal documents which may contain sensitive law enforcement information.

Your request as currently written is also overly broad and unduly burdensome as it does not specify a timeframe for the information you seek and also seeks communications without regard to the type of communication or the employees making the communications, as well as other documents without time limitations. In conducting ICE's mission, it is vital to conserve financial resources, as well as the time of DHS employees for the conduct of official business and not for private litigation purposes. *See* 6 C.F.R. § 5.48(a)(4) and (5). The breadth of your requests would impede the official business of the agency.

The information you seek may also be available through the parties to the litigation through the discovery process or may fall within the purview of other agencies or components other than ICE. Category 8, which seeks accreditation or certification can be obtained through the discovery process in the underlying suit.[2] Additionally, category 1 seeks communications between ICE and Plaintiff regarding the incident, as well as the Plaintiffs personnel and evaluation records in category 6, which could be sought from the Plaintiff through the discovery process. Also, to the extent that your requests call for legal conclusions and/or expert or opinion testimony, this type of information is generally prohibited under 6 C.F.R. § 5.49.

Additionally, assuming that your requests were modified to appropriately narrow and identify the information sought, the breadth and nature of the requests raise a potential that they seek information, the disclosure of which would violate the Privacy Act of 1974, 5. U.S.C. § 552a, or otherwise cause an unwarranted invasion of personal privacy. Thus, the records may not be disclosed by the agency without the prior written consent of the individual to whom the information applies, or pursuant to an order of a court of competent jurisdiction in compliance with the mandates of the Privacy Act and signed by a Judge. For future reference, enclosed please find ICE's standard Privacy Waiver, Form 60-001, which authorizes ICE to disclose records that would otherwise be protected by the Privacy Act.

While a HIPPA release was previously submitted with the *Touhy* request and subpoena, the release is insufficient under the Privacy Act to produce the requested records pertaining to the Plaintiff. Additionally, one of the described reasons for the need of the requested records is to "identify witnesses," in which further necessitates either a valid privacy waiver or appropriate court order.

If you wish to comply with the DHS *Touhy* regulations, we require a more detailed explanation of the documents you are seeking, and their relevance to the legal proceeding. Should you wish to submit revised requests and wish to discuss how such requests might satisfy the requirements of the *Touhy* regulations, ICE is available to do so. Upon the receipt of requests that comply with the requirements of 6 C.F.R. § 5.48, ICE will then consider the eight factors outlined in 6 C.F.R. § 5.48(a) to determine whether ICE will comply with the requests. ICE reserves the right to object to any future revised subpoenas, pursuant to the factors outlined in 6 C.F.R. § 5.48(a).[3]

---

[2] Your request for certification is also vague as it is unclear whether you are requesting information pertaining to the Plaintiff or the agency.

[3] Please note that while specificity and relevance are the first step in the *Touhy* analysis prior to an evaluation of the request under the eight factors outlined in 6 C.F.R. § 5.48(a), ICE has provided general additional information regarding potential issues with your request so that an appropriate request can be provided to ICE. This will assist in efficiently providing you with any

Kristen E. Dennison, Esq.
Page 4

***Rule 45***

This letter also serves as notice pursuant to Federal Rules of Civil Procedure Rule 45(d)(2)(B) that ICE is objecting to the requirements of the subpoena for the production of documents.  As stated above, your request does not meet the requirements of 6 C.F.R. § 5.48. The request does not adequately specify what information is being requested.   The request also fails to provide a sufficiently detailed explanation as to how the requested ICE information relates to or is relevant to this matter and would support any claim or defense in the subject litigation.   Your request is also overly broad and unduly burdensome and may also be privileged.  The information sought is also available to the parties through the discovery process.  Also, to the extent that your requests call for legal conclusions and/or expert or opinion information, this type of information is generally prohibited under 6 C.F.R. § 5.49.  In addition, ICE asserts the following objections.[4]

### a.  Relevance

With regard to the eight categories outlined in your request, you have not satisfied your burden of establishing that the requested information is relevant to your client's case.  *See* Fed. R. Civ. P. 26(b)(1), 6 C.F.R. § 5.45(a) (request must set forth, "with as much specificity as possible, the nature and relevance of the official information sought").[5]

Category 6 states that the information requested is relevant to "Mr. Slatowski's credentials and experience handling firearms, including the Subject Pistol that he claims injured him." However, your request does not describe how Mr. Slatowski's personnel and disciplinary file; and any formal or informal job evaluations is relevant to his experience with firearms.

Additionally, category 7 states that the requested information "would directly impact liability." However, your request does not describe how all documents and records concerning the ownership, maintenance, assignment, use, and issuance history of the Subject Pistol would impact liability. Category 8 asks for any DHS standard operating procedures for its investigation's special agents; firearm manuals and procedures; holster Documents including instruction or guidelines for holster use; and Documents concerning any accreditation or certification by any law enforcement accreditation body. Your request does not describe how internal ICE policies relate to a claim or defense in the suit.

### b.  Requests are overly broad, unduly burdensome and/or vague

The information sought in your *Touhy* request, as currently written, contains categories of information that are overly broad and unduly burdensome in violation of Rules 26 and 45 of the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 26(c), 45(d)(1), (d)(3).  Your request is also unduly burdensome under the applicable agency *Touhy* regulations.  See 6 C.F.R. § 5.48(a)(1).  Additionally, your request seeks an "overly broad" range of documents and information for a civil dispute in which the Executive is not a party.  See *Cheney v. U.S. Dist. Court for Dist. Of Columbia*, 542 U.S. 367, 386 (2004).  As the Supreme Court has noted, "special considerations control" when

---

information to which you may be entitled under the *Touhy* regulations.  Additional specificity is also outlined below under the Rule 45 section of the response.
[4] Due to the fact that the subpoena request is not sufficiently detailed, ICE reserves the right to assert additional objections or modify existing objections in the future once a sufficiently detailed *Touhy* request is received.
[5] Receiving a detailed description of the information sought in a *Touhy* request and a specific explanation as to its relevance, as required by the regulations, enables an agency, among other things, to determine whether providing the requested information would violate any statutes, regulations or privileges.

Kristen E. Dennison, Esq.
Page 5

discovery such as that involved in your subpoena is sought from the Executive. *Id.* at 385.  The
"paramount necessity of protecting the Executive Branch from vexatious litigation that might distract
from the energetic performance of its constitutional duties," as well as the unique privileges that may
be implicated in this context, require a subpoenaing party, at the very least, to meet "exacting
standards" of relevancy, admissibility, and specificity." *Id.* at 382, 386-87.

Under Rule 45(d)(1) of the Federal Rules of Civil Procedure, a party issuing a subpoena must
avoid imposing undue burden or expense on the respondent.  As currently written, however, the
subpoenas in this matter violate that obligation.  Your requests are also objectionably vague in
several respects.  See Fed. R. Civ. P 45(a)(1)(A)(iii)(subpoena must command production of
"designated" documents).

Category 1 does not adequately describe with sufficient specificity the scope of records that
you are requesting.[6]  Your request also does not define the types of communications for which you
are seeking documents. Your request also seeks all communications without regard for the position
of the employee making the communications. This would result in the need for ICE to conduct an
overly burdensome search. Thus, category 1 of your request is overly broad, unduly burdensome and
vague.

Category 2 does not adequately describe with sufficient specificity the scope of records that
you are requesting.[7]  Your request does not provide a timeframe for which you wish ICE to search
for responsive records.  This would result in potentially years' worth of records.  Additionally, you
do not specify the types of documents and communications that you are requesting.  Your request
seeks all communications without regard for the position of the ICE personnel making the
communications. Thus, your request for all communications in category 2, without any specification,
detail or description of the information that you seek is overly broad, unduly burdensome and vague.

Category 3 does not adequately describe with sufficient specificity the scope of records that
you are requesting.[8]  Your request asks for all communications without regard for the ICE personnel
making the communications or to whom the communications were made.  Thus, category 3 of your
request without any specification, detail or description of the information that you seek is overly
broad, unduly burdensome and vague.

Category 4 does not adequately describe with sufficient specificity the scope of records that
you are requesting.[9]  Your request does not provide a timeframe for which you wish ICE to search
for responsive records. Additionally, you do not specify the types of documents and witness
statements that you are requesting.  Your request seeks all witness statements without regard for the
position of the ICE personnel making the statement. Thus, category 4 of your request without any
specification, detail or description of the information that you seek is overly broad, unduly
burdensome and vague.

---

[6] Category 1 seeks all communications between DHS and the plaintiff, Keith Slatowski, concerning "the Incident, including, but
not limited to, how the Incident happened."
[7] Category 2 seeks all communications between DHS and the ICE "concerning the Incident, including, but not limited to, how the
Incident happened."
[8] Category 3 seeks all non-privileged communications between DHS and "any [p]erson concerning the Incident, including, but
not limited to, how the Incident happened*."*
[9] Category 4 seeks all documents concerning DHS's investigation of "the Incident, including, but not limited to, any incident
reports, accident reports, or witness statements."

Kristen E. Dennison, Esq.
Page 6

Category 5 does not adequately describe with sufficient specificity the scope of records that you are requesting.[10]  Your request does not specify a timeframe for the documents that you are requesting, and presumably means that your request seeks all documents for the entire timeframe that the "Subject Pistol" has been in possession of ICE. Additionally, your request as currently written is unduly burdensome as a response to this request could encompass several years of records and several employees. Thus, category 5 of your request is overly broad, unduly burdensome and vague.

Category 6 does not adequately describe with sufficient specificity the scope of records that you are requesting.[11]  Your request does not specify a timeframe for the documents that you are requesting. Additionally, your request is overly broad and unduly burdensome as it asks for all of "Keith Slatowski's practice range records; training and qualification records; his personnel and disciplinary file; and any formal or informal job evaluations." Thus, category 6 of your request is overly broad, unduly burdensome and vague.

Category 7 does not adequately describe with sufficient specificity the scope of records that you are requesting.[12]  Your request does not specify a timeframe for the documents that you are requesting, and presumably means that your request seeks all documents ever created regarding the history of the subject pistol.  Thus, category 7 of your request is overly broad, unduly burdensome and vague.

Category 8 does not adequately describe with sufficient specificity the scope of records that you are requesting.[13] Your request does not specify a timeframe for the documents that you are requesting, and presumably means that your request seeks all documents since the existence of the agency.  Additionally, it is unclear from the request whether you are seeking accreditation and certification history pertaining to the Plaintiff or the agency.  Thus, category 8 is vague, overly broad and unduly burdensome.

### c.  *Information likely in the possession of the Parties*

Your request seeks information that one would reasonably expect to be in the possession of a party to this matter. See Fed. R. Civ. P. 45(a)(1)(A)(iii).  For instance, your request seeks any and all of Keith Slatowski's practice range records; training and qualification records; his personnel file; and any formal or informal job evaluations.  Additionally, your request seeks communications between ICE and the Plaintiff regarding the incident, which would be in the possession of the Plaintiff.  Thus, such materials and information should be in the possession of a party and should not be sought from a non-party government entity pursuant to a subpoena.  Given that the documents that are referenced in your request should be in the possession of party, this is another aspect in which your subpoena in this matter is also unduly burdensome.  *See* Fed. R. Civ. P. 26(b)(2)(C) (court must limit discovery if information sought "can be obtained from some other source that is more convenient, less burdensome, or less expensive").

---

[10] Category 5 seeks all photographs, motion pictures, video recordings, body-camera footage, or other photographic reproduction showing any of the following: Keith Slatowski's Subject Pistol that he alleges inadvertently discharged; Keith Slatowski on September 21, 2020; and the Incident that occurred on September 21, 2020.

[11] Category 6 seeks any and all of "Keith Slatowski's practice range records; training and qualification records; his personnel and disciplinary file; and any formal or informal job evaluations."

[12] Category 7 seeks "[a]ll Documents and records concerning the ownership, maintenance, assignment, use, and issuance history of the Subject Pistol."

[13] Category 8 seeks "[a]ny DHS standard operating procedures for its investigations special agents; firearm manuals and procedures; holster Documents including instruction or guidelines for holster use; and Documents concerning any accreditation or certification by any law enforcement accreditation body."

Kristen E. Dennison, Esq.
Page 7

### d. *Attorney-Client Privilege, Deliberative Process Privilege and/or Law Enforcement Privilege*[14]

Categories 1-8 seek information that may be covered by the attorney-client privilege, deliberative process privilege and law enforcement privilege, and thus not subject to disclosure.[15] The attorney-client privilege protects from disclosure of client communications with a lawyer regarding legal advice.  The deliberative process privilege protects from disclosure those documents and information that contain the recommendations, opinions, and conclusions of agency employees. The law enforcement privilege protects from disclosure law enforcement techniques, or procedures, the disclosure of which could reasonably be expected to risk circumvention of the law, as well as to protect law enforcement personnel.

Regarding categories 1 and 4, any internal communications and documents of the type you are requesting may be covered by the attorney-client privilege, to the extent that they contain communications between program offices and the Office of Principal Legal Advisor (OPLA). Additionally, to the extent that such communications occurred with the Department of Justice, the communications would also be covered by the attorney-client privilege.  In addition, any communications or documents responsive to this request may also be covered by the deliberative process privilege to the extent that these documents contain recommendations, opinions, and/or conclusions of agency employees. Additionally, the information requested in categories 1, 2 and 4 may also contain sensitive law enforcement information, especially as it pertains to documents related to the investigation of the incident.

As it pertains to category 5 to any internal communications regarding the requested records or accompanying these records may be covered by the attorney-client privilege to the extent that they contain communications between program offices and the OPLA. In addition, any communications or documents responsive to this request may also be covered by the deliberative process privilege to the extent that these documents contain recommendations, opinions, and/or conclusions of agency employees. These records could be contained in or associated with other privileged materials.  For example, some of these records could be contained in an internal ICE report that has these photos as exhibits for an internal decision-making process. Additionally, depending on the specific depictions in any photographs and videos, that information may also contain sensitive law enforcement information.

As it pertains to category 6, the requested information may be covered by the attorney-client privilege and/or the deliberative process privilege. These records could be privileged, especially as it pertains to the disciplinary file requested to the extent that the files requested contain communications between program offices and the OPLA. In addition, any documents responsive to this request may also be covered by the deliberative process privilege to the extent that these documents contain recommendations, opinions, and/or conclusions of agency employees.  To the extent that the files requested contain internal ICE techniques and procedures, the information may also be law enforcement sensitive.

As it pertains to categories 7 and 8, the information requested may contain information that is law enforcement sensitive, especially as it pertains to internal ICE instructions, procedures and guidelines.  Category 7 may also contain information protected by the attorney-client privilege to the extent that the documents contain communications between program offices and the OPLA. In

---

[14] To the extent that any of the documents or communications that are the subject of this request contain information prepared in anticipation of litigation,, those documents would also be protected by the attorney work-product privilege.
[15] Please note that due to the lack of specificity in the requests, ICE is asserting the subject privileges based on the potential conflicts that may exist, after a consideration of the types of information that is being requested.

Kristen E. Dennison, Esq.
Page 8

addition, any communications or documents responsive to this request may also be covered by the deliberative process privilege to the extent that these documents contain recommendations, opinions, and/or conclusions of agency employees.

### e. Additional objections and privileges

The foregoing objections are not exclusive, and ICE reserves the right to assert further objections in response to the subpoenas as appropriate. Additionally, ICE reserves any and all privileges and other grounds for non-disclosure that may apply to any individual document, portion of a document, or information requested, including additional privileges and protections under the attorney-client privilege, work product doctrine, deliberative process privilege and law enforcement privilege. The breadth and nature of your subpoenas raise the likelihood that any responsive documents, to the extent that responsive materials exist, would include privileged or otherwise protected information.

Additionally, assuming that your requests were modified to appropriately narrow and identify the information sought, the breadth and nature of the requests raise a potential that they seek information, the disclosure of which would violate the Privacy Act of 1974, 5. U.S.C. § 552a, or otherwise cause an unwarranted invasion of personal privacy.

In the event that you wish to revise your request in response to this denial, it may be efficient and productive to confer, including about the requirements of DHS's *Touhy* regulations, before any formal submission of a revised request. If you require additional information on this matter, I can be reached by email at Alexandra.C.Ellis@ice.dhs.gov.

Sincerely,

*Alexandra Ellis*

Alexandra Ellis
Associate Legal Advisor
Government Information Law Division
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement

Attachment: Privacy Waiver ICE form 60-001

cc: Colin Cherico, Assistant United States Attorney

# EXHIBIT C

DEPARTMENT OF HOMELAND SECURITY
## AUTHORIZATION TO RELEASE INFORMATION TO ANOTHER PERSON

Please complete this form to authorize the Department of Homeland Security (DHS) or its designated DHS Component element to disclose your personal information to another person. You are asked to provide your information only to facilitate the identification and processing of your request. Without your information DHS or its designated DHS Component element may be unable to process your request.

**SECTION I. Personal Information**

| | | |
|---|---|---|
| Name<br>KEITH SLATOWSKI | | |
| Address<br>118 WILSON RD. | | |
| City<br>KING OF PRUSSIA | State<br>PA | Zip Code<br>19406 |
| Country<br>U.S. | Telephone Number(s)<br>+1 (484) 680-4337 | |
| Date of Birth<br>08/05/1972 | Place of Birth (city, state, country)<br>Philadelphia Pa USA | |

**SECTION II. Representative Information**

| | | |
|---|---|---|
| Name<br>Robert W. Zimmerman, Esq. Saltz Mongeluzzi & Bendesky P.C. | | |
| Address<br>1650 Market Street, 52nd Floor | | |
| City Philadelphia | State PA | Zip Code 19103 |
| Country USA | Telephone Number(s)<br>215-575-2886 | |

*Pursuant to the Privacy Act of 1974 (5 U.S.C. §552a(b)), I authorize DHS and/or its DHS Component elements to release any and all information relating to my redress request to my representative .*

*Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above in Section I. I understand that falsification of this statement is punishable under the provisions of 18 U.S.C. §1001 by a fine of not more than $10,000 or by imprisonment of not more than five years, or both.*

Signature _____    Date  03/18/2022

**PRIVACY ACT STATEMENT:**

**AUTHORITY:** Title IV of the Intelligence Reform and Terrorism Prevention Act of 2004 authorizes DHS to take security measures to protect travel, and under Subtitle B, Section 4012(1)(G), the Act directs DHS to provide appeal and correction opportunities for travelers whose information may be incorrect.

**PRINCIPAL PURPOSE(S):** DHS will use this information in order to assist you with seeking  redress in connection with travel.

**ROUTINE USE(S):** DHS will use and disclose this information to appropriate governmental agencies to verify your identity, distinguish your identity from that of another individual, such as someone included on a watch list, and/or address your redress request. Additionally, limited information may be shared with non-governmental entities, such as air carriers, where necessary for the sole purpose of carrying out your redress request.

**DISCLOSURE:** Furnishing this information is voluntary; however DHS may not be able to process your redress request without the information requested.

# EXHIBIT D



**S A L T Z**
**M O N G E L U Z Z I**
**& B E N D E S K Y** PC
T R I A L   L A W Y E R S

DELAWARE COUNTY OFFICE
20 WEST THIRD STREET
P.O. BOX 1670
MEDIA, PA 19063
VOICE 610.627.9777
FAX 610.627.9787

ONE LIBERTY PLACE, 52ND FLOOR
1650 MARKET STREET
PHILADELPHIA, PA 19103
VOICE 215.496.8282
FAX 215.496.0999

NEW JERSEY OFFICE
8000 SAGEMORE DRIVE
SUITE 8303
MARLTON, NJ 08053
VOICE 856.751.8383
FAX 856.751.0868

MONTGOMERY COUNTY OFFICE
120 GIBRALTAR RD
SUITE 218
HORSHAM, PA 19044
VOICE 215.496.8282
FAX 215.496.4444

DANIEL L. CEISLER
DIRECT DIAL 215-575-2965
Dceisler@smbb.com

February 15, 2022

**By FedEx - Overnight**

Office of Principal Legal Advisor
Immigration and Customs Enforcement
500 12th Street SW, Mail Stop 5902
Washington, D.C. 20536-5902

>    *Re:*    *Touhy Request Pursuant To 6 C.F.R. §§ 5.41-5.49*
>    *Keith and Bianca Slatowski v. Sig Sauer, Inc., Civil Action No. 2:21-cv-*
>    *00729*

Dear Sir or Ma'am:

My office represents Immigration and Customs Enforcement Officer Keith Slatowski in a civil lawsuit against firearms manufacturer Sig Sauer, Inc. This lawsuit relates to injuries Mr. Slatowski suffered during quarterly firearms training on September 21, 2020. Mr. Slatowski was using a Sig Sauer P320 pistol as part of a drill, when the pistol discharged in his holster without Mr. Slatowski touching the trigger. Mr. Slatowski was struck in the thigh by the bullet. This malfunction has been part of a wave of similar incidents across the country involving the P320. A copy of the Complaint in this matter is enclosed for your reference.

It is our understanding that ICE, most likely the Office of Professional Responsibility and/or the Office of Firearms and Tactical Programs, has produced a document, report, and/or White Paper detailing incidents of unintended discharges of the Sig Sauer P320 across the agency. Upon our information and belief, the document, report and/or White Paper is entitled "ICE-Wide Weapons Malfunction and Misfires." This document will provide highly probative evidence of the defect in the P320. Our office requests the Department of Homeland Security produce the document, report and/or White Paper, drafts thereof, and presentations related thereto.

Page 2
April 28, 2022

———————————————

     Our office further requests any pre-acquisition testing reports conducted on the Sig Sauer P320. Such reports would also be highly probative of evidence of manufacturing and/or design defects in the P320.

     In the event there is personal identifying information in the request documents, such information may be redacted. The documents requests will have no impact on national security.

     Please contact me at your earliest convenience upon reviewing this letter. I can be reached at 215-575-2965, or via email at dceisler@smbb.com. Thank you very much for your consideration. I look forward to hearing from you.

               Very Respectfully,

               SALTZ MONGELUZZI & BENDESKY P.C.

               DANIEL L. CEISLER, ESQ.

DLC
Enclosures

CC:
Immigration and Customs Enforcement
Office of Principal Legal Advisor
500 12th Street SW
Mailstop 5900
Washington, DC 20536

# EXHIBIT E

*Office of the Principal Legal Advisor*

**U.S. Department of Homeland Security**
31 Hopkins Plaza, Room 1600
Baltimore, MD  21201



U.S. Immigration
and Customs
Enforcement

March 3, 2022

<u>Via e-mail</u>
Daniel L. Ceisler, Esq.
Saltz Mongeluzzi & Bendesky, P.C.
1650 Market Street
Philadelphia, PA 19103
dceisler@smbb.com

Re: Touhy Request in *Slatowski v. Sig Sauer, Inc*., No. 21-729 (E.D. Pa. filed Feb. 17, 2021)

Dear Mr. Ceisler,

A copy of your letter dated February 15, 2022, to the U.S. Immigration and Customs Enforcement (ICE) has been forwarded to my attention.  Your letter requests ICE records for use in a Federal proceeding to which the United States is not a party.  Specifically, you've requested a "document, report and/or white paper entitled "ICE-Wide Weapons Malfunction and Misfires" and "pre-acquisition testing reports conducted on the Sig Sauer P320".

The purpose of this letter is to inform you of the procedural prerequisites for obtaining information, whether oral or written, from the Department of Homeland Security (DHS) of which ICE is a component.  The DHS has enacted regulations that govern the release of testimony by DHS employees or documents in a legal proceeding where the United States is not a party.  These regulations are commonly referred to as *Touhy* regulations and can be found at 6 C.F.R. §§ 5.41-5.49.  *See generally United States ex. rel. Touhy v. Ragen*, 340 U.S. 462 (1951). The *Touhy* regulations are an absolute condition precedent to obtaining testimony or other information from a DHS employee, and the regulations must be complied with before the DHS or ICE may respond to any such request.  *See U.S. v. Soriano-Jarquin*, 492 F.3d 495 (4th Cir. 2007); *Ho v. U.S.,* 374 F.Supp.2d 82 (D.D.C. 2005).

Section 5.43 of the DHS *Touhy* regulations, requires that service of subpoenas, court orders, and other demands or requests for official information be served on the DHS Office of the General Counsel (OGC).  DHS OGC has delegated this responsibility to its components.  In the event that the request for ICE information is delivered directly to an employee, the employee is to immediately forward a copy of that document to the DHS OGC or its designee, ICE Office of the Principal Legal Advisor.

Further, DHS regulations bar all DHS employees, including former employees, from *inter alia* providing responses to questions by attorneys in situations involving litigation regarding any material contained in the files of the Department, any information relating to material contained in the files of the Department, or any information acquired while the subject of the request for information is or was employed by DHS, unless authorized to do so by the

DHS Office of General Counsel or its designees.  *See* 6 C.F.R. § 5.44.  Section 5.45 of the regulations also requires that the party seeking information must "set forth in writing, and with as much specificity as possible, the nature and relevance of the official information sought."

Upon receipt of a sufficiently detailed request, DHS or ICE will consider the following factors: (1) whether compliance would be unduly burdensome or otherwise inappropriate; (2) whether compliance is appropriate under the relevant substantive law concerning privilege or disclosure of information; (3) the public interest; (4) the need to conserve the time of DHS employees for the conduct of official business; (5) the need to avoid spending the time and money of the United States for private purposes; (6) the need to maintain impartiality between private litigants in cases where a substantial government interest is not implicated; (7) whether compliance would have an adverse effect on performance by the DHS of its mission and duties; and (8) the need to avoid involving the DHS in controversial issues not related to its mission. *See* 6 C.F.R. § 5.48(a).

In addition, ICE will not comply with a request when such compliance would violate a statute, regulation, Executive Order, or agency policy.  Likewise, the ICE will not comply with a request when such compliance would reveal agency deliberations, or potentially impede or prejudice an on-going law enforcement investigation.  *See* 6 C.F.R. § 5.48(b).

Your letter dated February 15, 2022, does not adequately describe how the information sought is relevant to the present legal proceeding.  Further, it appears that information you have requested may be protected under the Privacy Act, 5 U.S.C. § 552a.  In which case, the records may not be disclosed by the agency without the prior written consent of the individual to whom the information applies, or pursuant to the order of a court of competent jurisdiction and signed by a Judge.  For your convenience, I've attached a copy of ICE Form 60-001, which is a privacy waiver authorizing information disclosure to a third party.

If you wish to comply with the DHS's *Touhy* regulations, please offer a more detailed explanation of how the requested information is relevant to the legal proceeding and (if relevant) the completed privacy waiver form(s).

Thank you for your anticipated cooperation in complying with applicable Federal law.  If you require additional information on this matter, I can be reached by e-mail at: Alexandra.C.Ellis@ice.dhs.gov.

Sincerely,

*Alexandra Ellis*

Alexandra Ellis
Associate Legal Advisor
Government Information Law Division
Immigration Customs and Enforcement

Attach:  ICE Form 60-001 Privacy Waiver

# EXHIBIT F



SALTZ
MONGELUZZI
& BENDESKY PC
TRIAL LAWYERS

| DELAWARE COUNTY OFFICE | ONE LIBERTY PLACE, 52ND FLOOR | NEW JERSEY OFFICE |
| 20 WEST THIRD STREET | 1650 MARKET STREET | 8000 SAGEMORE DRIVE |
| P.O. BOX 1670 | PHILADELPHIA, PA 19103 | SUITE 8303 |
| MEDIA, PA 19063 | VOICE 215.496.8282 | MARLTON, NJ 08053 |
| VOICE 610.627.9777 | FAX 215.496.0999 | VOICE 856.751.8383 |
| FAX 610.627.9787 | | FAX 856.751.0868 |

MONTGOMERY COUNTY OFFICE
120 GIBRALTAR RD
SUITE 218
HORSHAM, PA 19044
VOICE 215.496.8282
FAX 215.496.4444

DANIEL L. CEISLER
DIRECT DIAL 215-575-2965
Dceisler@smbb.com

March 8, 2022

**By Email: Alexandra.C.Ellis@ice.dhs.gov**

Alexandra Ellis, Esq.
Associate Legal Advisor
Government Information Law Division
Office of the Principal Legal Advisor
Immigration and Customs Enforcement
500 12th Street SW
Mailstop 5900
Washington, DC 20536

> **Re:    *Touhy Request Pursuant To 6 C.F.R. §§ 5.41-5.49***
> ***Keith and Bianca Slatowski v. Sig Sauer, Inc., Civil Action No. 2:21-cv-***
> ***00729***

Dear Attorney Ellis:

Please allow this letter to serve as a supplement to my February 15, 2022 letter and as a response to your March 3, 2022 letter.

My office submitted a request pursuant to 6 C.F.R. §§ 5.41-5.49 seeking information related to unintended discharges within ICE involving the Sig Sauer P320. Specifically, our request seeks a document, report, and/or White Paper detailing incidents of unintended discharges of the Sig Sauer P320 across the agency. Upon our information and belief, the document, report and/or White Paper is entitled "ICE-Wide Weapons Malfunction and Misfires." In the event a document matching this description exists, but does not have this precise title, we wish for ICE to produce the document. It is our belief that this document was most likely created by the Office of Professional Responsibility and/or the Office of Firearms and Tactical Programs.

Page 2
March 8, 2022

---

Your letter dated March 3, 2022 stated that our request did not adequately describe how the information we sought was relevant to our ongoing legal proceeding. By way of additional detail, my office represents ICE Agent Keith Slatowski in a products liability claim against Sig Sauer. Agent Slatowski was seriously injured when his defective agency-issued P320 discharged while inside his holster during a training exercise. Agent Slatowski's incident was one of dozens of incidents across the country where law enforcement officer was shot by a Sig Sauer P320 that they alleged discharged without the trigger being pulled.

Evidence of other similar incidents is highly probative that the Sig Sauer P320 suffers from a design and/or manufacturing defect that can cause it to discharge without a trigger pull. Under Pennsylvania law, evidence of other similar incidents involving a particular product may be admissible in Court to prove that the product is defective. To the extent that ICE is aware of additional incidents, including those that resulted in no injuries, that information is very relevant to Agent Slatowski's action.

Should ICE identify this document and find that it contains the personal information of the agents involved, such personal information may be redacted.

Additionally, our request seeks any pre-acquisition testing reports conducted on the Sig Sauer P320. Pre-acquisition testing reports may have identified flaws or issues with the Sig Sauer P320 that may not have been resolved in firearms which were ultimately provided to end-users like Agent Slatowski. Such reports would also be highly probative of evidence of manufacturing and/or design defects in the P320.

Thank you very much for your consideration. I look forward to hearing from you.

Very Respectfully,

SALTZ MONGELUZZI & BENDESKY P.C.

DANIEL L. CEISLER, ESQ.

# EXHIBIT G

*Office of the Principal Legal Advisor*

**U.S. Department of Homeland Security**
31 Hopkins Plaza, Room 1600
Baltimore, MD 21201



U.S. Immigration
and Customs
Enforcement

March 28, 2022

<u>Via e-mail</u>
Daniel L. Ceisler, Esq.
Saltz Mongeluzzi & Bendesky, P.C.
1650 Market Street
Philadelphia, PA 19103
dceisler@smbb.com

Re: Touhy Request in *Slatowski v. Sig Sauer, Inc.*, No. 21-729 (E.D. Pa. filed Feb. 17, 2021)

Dear Mr. Ceisler,

      A copy of your *Touhy* request dated February 15, 2022, to the U.S. Immigration and Customs Enforcement (ICE) was previously forwarded to my attention. Your request sought a document, report and/or white paper entitled "ICE-Wide Weapons Malfunction and Misfires" (hereinafter referred to as "misfire report") and "pre-acquisition testing reports conducted on the Sig Sauer P320" that you claim would be relevant to a product liability litigation, to which ICE is not a party. On March 3, 2022, ICE responded via e-mail denying your *Touhy* request because you neglected to articulate with specificity the relevance of the requested information to your client's case. On March 8, 2022, you submitted a supplemental *Touhy* request indicating evidence of similar misfire incidents and pre-acquisition testing reports can be highly probative of a P320 design or manufacture defect and under Pennsylvania law, evidence of similar incidents or design flaws which were unresolved may be admissible in Court to prove that the product is defective.

      When evaluating a *Touhy* request, ICE considers the following factors: (1) whether compliance would be unduly burdensome or otherwise inappropriate; (2) whether compliance is appropriate under the relevant substantive law concerning privilege or disclosure of information; (3) the public interest; (4) the need to conserve the time of DHS employees for the conduct of official business; (5) the need to avoid spending the time and money of the United States for private purposes; (6) the need to maintain impartiality between private litigants in cases where a substantial government interest is not implicated; (7) whether compliance would have an adverse effect on performance by the DHS of its mission and duties; and (8) the need to avoid involving the DHS in controversial issues not related to its mission. *See* 6 C.F.R. § 5.48(a).

      To the extent the misfire report exists, ICE declines to comply with your request pursuant to 6 C.F.R. § 5.48(a) for the reasons that follow. First, the subject litigation is between two private parties and there is no express public interest which warrants ICE's involvement in the matter. Second, ICE intends to maintain impartiality between the private litigants due to ICE's apparent conflict of interest. ICE has a formal relationship with each of the parties in the subject private litigation; DO Keith Slatowski is an ICE employee and Sig Sauer has a contractual

relationship with ICE.  Third, ICE declines to become involved in a controversial private matter which is unrelated to its mission of enforcing immigration and customs law to protect the American people and the United States.  Finally, the requested misfire report, which allegedly summarizes misfires that occurred in ICE nationwide, is not pertinent to the subject litigation because the product liability lawsuit is fact specific to DO Keith Slatowski's alleged misfire incident.

To the extent that Sig Sauer P320 pre-acquisition testing reports exist, ICE declines to comply pursuant to 6. C.F.R. § 5.48(a) for the reasons explained in the paragraph above. Additionally, any such P320 pre-acquisition testing reports would presumably be in possession of the party Defendant, SIG SAUER, Inc., and such records would be available through the routine discovery process.

The foregoing objections are not exclusive, and ICE reserves the right to assert further objections in response to the requests as appropriate. Additionally, ICE reserves any and all privileges and other grounds for non-disclosure that may apply to any individual document, portion of a document, or information requested, including additional privileges and protections under the attorney-client privilege, work product doctrine, deliberative process privilege, proprietary privilege and law enforcement privilege.

If you require additional information on this matter, I can be reached by e-mail at: Alexandra.C.Ellis@ice.dhs.gov.

Sincerely,

*Alexandra Ellis*

Alexandra Ellis
Associate Legal Advisor
Government Information Law Division
Immigration Customs and Enforcement

Cc: Colin Cherico, Assistant United States Attorney