**EXHIBIT I**

EXHIBIT

3



# Office of Inspector General County of Los Angeles

**Max Huntsman
Inspector General**

Assessing the Rise in Unintended Discharges Following the Sheriff's Department's Conversion to a New Handgun

December 2015

# Office of Inspector General County of Los Angeles

**MAX HUNTSMAN**
**INSPECTOR GENERAL**

## Assessing the Rise in Unintended Discharges Following the Sheriff's Department's Conversion to a New Handgun

by:

Walter W. Katz,
Deputy Inspector General

# Contents

Executive Summary ............................................................................... i

Background ....................................................................................... 1

   Adoption of the M&P Pistol............................................................ 1

   Conversion from the 92F to the M&P Pistol ................................... 4

   Unintended Discharge Investigation and Review ............................ 5

Methodology ..................................................................................... 7

Results of Review ............................................................................. 8

   A Sharp Overall Rise in Unintended Discharges ............................ 8

   Involved Weapon Trends: The M&P Now Dominates ....................... 8

   Setting of Incidents: Risk to public is increasing .......................... 11

   Factors Contributing to Unintended Discharges............................ 14

   Conversion Training ................................................................... 22

   Selection of M&P Handgun.......................................................... 27

   Selection of Weapon-Mounted Light ............................................ 27

   Selection of DG Grip Switch ....................................................... 33

   Unintended Discharge Accountability .......................................... 41

Conclusion....................................................................................... 48

Appendix A. Findings and Recommendations ................................... 49

Appendix B. Acronyms and Abbreviations........................................ 52

# Executive Summary

In late 2014, the Office of Inspector General (OIG) began receiving anecdotal information of a significant increase in unintended discharges[1] of handguns among Los Angeles County Sheriff's Department (LASD or Department) personnel. The information suggested that the recent adoption of a new standard issue pistol that was not equipped with an external manual safety had led to a steep rise in unintended discharges. The OIG, therefore, began a review that analyzed the introduction, training and performance record of the new handgun in the LASD to determine whether there was indeed a rise in unintended discharges, their likely causes, and any promising remedies suggested by the facts.  We found a sharp increase in unintended tactical discharges putting officers and the public at risk. Insufficient planning appears to have been taken in advance of the change and, at a minimum, the training needed for a safe conversion appears to have been underestimated.  The Department responded quickly and took some steps which may have helped to mitigate the risk, but it remains substantial.  As always, we have shared this report with the Department for fact-checking, removal of any confidential information and comment.  The Department was open to input and eager to review the report in detail and the Sheriff personally has expressed interest in an increase in training on the new weapon.

The nine millimeter caliber Beretta 92F had been the standard issue weapon for the LASD since 1992.  In 2009, the LASD began offering training on the Smith & Wesson at the Sheriff's Academy.  In 2011, the Los Angeles County Sheriff's Department decided to adopt a new standard issue handgun. In 2013, Los Angeles County entered into a contract with Smith & Wesson Holding Corporation (Smith& Wesson) to purchase up to 20,000 M&P nine millimeter handguns over a five-year period. The Berretta has an external safety lever and approximately an 11.5 pound trigger pull for the first (double-action) round fired, while the Smith & Wesson has

---

[1]  Throughout this report we us the term "unintended" or "unintentional" discharge to encompass all incidents where a firearm is fired without intent. Such events are also sometimes referred to as "accidental" discharges or "negligent" discharges, but whether such an incident is truly accidental or through the negligence of the weapon handler is often not clear until the matter has been investigated, thus we do not use the term "accidental" or "negligent.".

i

no external safety lever and has approximately a 6.5 pound trigger pull. The LASD decided that the Smith & Wesson handgun would be issued to all new hires – who were to be trained at the Sheriff's Academy – and to sworn personnel who attended and passed a conversion course.

The Department also decided that the new handgun would be made available with a mounted light. Los Angeles County entered into a contract with SureFire, LLC (SureFire) to acquire up to 20,000 weapon-lights and 20,000 pressure grip switches which allow operation of the light by squeezing the grip of the handgun (the "DG grip switch"). The training to convert personnel to the M&P handgun and mounted light began in January 2013.

The OIG found that as soon as widespread use of the new gun by field deputies commenced, there was a marked increase in tactical unintended discharges – that is, deputies firing weapons without intending to do so during police operations. In 2012, just before the M&P became standard issue, there were three tactical unintended discharges. In 2013, there were nine. In 2014, after substantial adoption of the new weapon in patrol settings, there were nineteen tactical unintended discharges, over a 500% increase when compared with 2012 .[2] In 2015, although the year and investigations of the shootings are not complete, there have been seven tactical unintended discharges, lower than 2014, but still double the number in 2012.  Non-tactical unintended discharges have remained roughly constant. Some unintended discharges have resulted in injuries to deputies, though none has yet resulted in injury to the public. This report describes the facts we found behind these numbers, quantifies the gun safety and risk management issues, and recounts the history of the acquisition of the new gun and weapon-light. To prepare this report we conducted an examination of the selection, adoption, training and distribution of the new handgun and weapon-light. We also conducted site visits, met with members of the LASD, as well as other County departments, and requested numerous supporting documents. OIG staff also observed an M&P

---

[2] The increase is even more pronounced when long arms (shotguns and rifles) are left out. In 2012, there was only one tactical unintended discharge by deputy with a Beretta pistol. In 2014, there were sixteen tactical unintended discharges by deputies with pistols, fifteen of them being with the Smith and Wesson M&P.

conversion class and discussed the developing issues regularly with Department personnel.

In this report, we first describe the frequency of the unintended discharges and how rapidly the problem emerged after introduction of the new handgun. We found there was a moderate increase in unintended discharges in non-tactical settings but that there was a six-fold increase in unintended discharges in tactical settings – that is while doing police work in the field – from 2012, before the introduction of the M&P, to 2014. Second, we review the actual incidents of unintended discharge and evaluate the possible causes of these incidents. We found that several factors apparently contributed to the significant increase. The first is that the lack of an external safety lever on the M&P coupled with inattention has led to unintended discharges in locker rooms, bathrooms and other locations. The second factor appears to be that some deputies are violating basic firearms safety rules by failing to follow the admonition to keep the index finger off the trigger until the user makes the conscious decision to fire the weapon. The new handgun is more sensitive in some ways than the Beretta and unintended discharges have risen as a result. Finally, weapon-light activation errors have led to a significant number of deputies reporting that they unintentionally pulled the trigger of their weapon when they intended only to turn on the light.

Third, we evaluate the "conversion" training required of all sworn personnel who choose to change their primary weapon from their current pistol to the Smith & Wesson M&P. We conclude that the current training program is insufficient to overcome old habits learned on other handguns. The Department has not sufficiently accounted for the complexity of conversion to a new handgun which combines the absence of a safety lever, a significantly lower amount of pressure required to pull the trigger and an independently activated weapon-light. As a result, many deputies appear to be undertrained for the weapon they are using.

Fourth, we review the history of the selection process for the gun, the mounted light and the activation switch. The LASD is unable to document a rigorous testing and evaluation process to determine which light to select and may not have adequately considered whether adding the pressure grip switch would create a

significant safety risk given the limited amount of formal training which was to be offered to deputies.

The report enumerates the Office of Inspector General's findings in specific areas and recommendations for mitigating the continuing problem of unintended discharges and avoiding similar consequences in the future when new equipment is considered. Among our recommendations, we suggest that the Sheriff's Department should:

- Conduct an in-depth analysis to determine whether the use of the pressure grip switch is warranted and deputies authorized to use it are properly trained.
- Strengthen its training procedure to allow armed personnel to convert safely from their previous firearm to the new Smith & Wesson M&P with the attached weapon-light.  The current transition calls for eight hours of conversion training and few agencies consider that amount sufficient.
- Incorporate follow-up training, preferably for all deputies, in order to ensure that the new safety practices are retained.
- Develop a product evaluations manual and documented testing and evaluation procedures for all future critical equipment selections.
- Adopt a more transparent process for evaluating and selecting new equipment.
- Establish a robust and consistent system for tracking, investigating, evaluating, and responding to unintended discharges.

Throughout the preparation of this report, Sheriff's Department personnel have remained open and responsive to our inquiries. They have shared available data with us and compiled data in response to our requests. We appreciate the cooperation of the Department at all levels. We have shared our findings and recommendations with the Sheriff's Department and will continue to monitor their actions in this matter.

# Background

## Adoption of the M&P Pistol

The LASD began testing and evaluating modern handguns in 2005 to replace the Beretta 92F semi-automatic pistol, which had been the Department's primary sidearm since 1992. In 2007, the LASD's Weapons Training Unit (WTU) began to evaluate the Smith & Wesson M&P pistol. In December, 2008, the LASD's Uniform and Safety Committee and the Executive Planning Council (EPC) approved the Smith & Wesson M&P as an optional on-duty and off-duty pistol. In 2009, outside consultants, the Landy Litigation Group, concluded that the size of the Beretta had a disproportionate impact on female recruits' ability to successfully complete firearms training and recommended that the LASD move away from the Beretta. The consultants and a working group of Sheriff's Department personnel evaluated the options and ultimately recommended the adoption of the Smith & Wesson M&P to significantly decrease the testing failure rate of female recruits.[3]

On January 31, 2011, the Chief of the Leadership and Training Division recommended that the LASD stop purchasing the 92F from Beretta and secure "a contract with Smith & Wesson." The Chief also recommended that the M&P be equipped with an attached weapon light. At the time, an estimate was provided that each pistol would cost $450.00 and the additional light would cost approximately $175.00.

In 2013, the LASD entered into a contract to purchase the Smith & Wesson M&P 9mm pistol as its standard service firearm directly from the manufacturer.[4] The five-year 20,000-unit sole source contract (i.e., no competitive bidding) with Smith & Wesson was meant to outfit the personnel who are issued duty handguns at a cost of $336.00 per 9mm full-size pistol.[5]

---

[3] Learning Domain 35 is the LASD Academy firearms course for recruits. It is a pass/fail course. Failure to complete the shooting test with a passing score requires the recruit to retake the academy in a remediation class. A second failure leads to the recruit's separation from the academy.

[4] The contract includes the Los Angeles County District Attorney and Probation Department and also has a "piggyback clause" that includes the Los Angeles Police Department, allowing the LAPD to purchase at the same price.



**Figure 1: Beretta 92F (source LASD)**

The LASD also entered into a five-year sole source contract with SureFire, LLC where the SureFire would supply up to 20,000 X300 Ultra gun-mounted lights at a price of $125.00 per unit, "DG ruggedized grip switch assemblies" at a price of $40.00 per unit, and MR11 adapter mounts at a price of $40.00 per unit.[6]  The grip switch allows an operator to squeeze a lever which runs parallel to the handgun's grip with one finger to activate a gun light. Without the grip switch, the user activates the gun light by operating a toggle switch directly on the barrel of the light with his thumb.

---

[5] The agreement also allows for the purchase of the M&P 9mm compact size pistol at $336 per unit, and .40 caliber full or compact pistols at $346 per unit. This report addresses the 9mm full-size unless noted otherwise.
[6] "DG" is the model name of SureFire's grip switch. The MR 11 adapter allows the attachment of the X300 Ultra to the Beretta 92F pistol that deputies can still carry.



Figure 2: Smith & Wesson M&P
(Source: LASD)

According to a 2014 LASD memorandum that recounted the selection process, the M&P was found to have particular advantages over the Beretta 92F, in that it has adjustable grips in small, medium and large sizes and has a trigger pull that is consistent between the first and subsequent shots, which leads to higher shooting scores.[7] The LASD began test deployments of the Smith & Wesson M&P pistol to incoming academy classes in 2009. The LASD temporarily halted deployment and replaced early M&Ps with the 92F after manufacturing issues emerged.

---

[7] The Beretta 92F is a semi-automatic handgun with double-action first trigger pull – that is pulling the trigger for the initial shot first cocks the hammer. Further pulling the trigger causes the hammer to release and strike the cartridge causing the bullet to fire. The mechanism then ejects the spent casing, reloads a cartridge in the chamber and sets the hammer in the cocked position ready to fire another round in single-action. The trigger requires over 11 pounds of force to fire the first round and approximately 6.5 pounds for subsequent rounds. In comparison, the M&P has a 6.5 pound trigger pull for all rounds fired.



**Figure 3: X300 Ultra Attached to M&P (Source: LASD)**

Once Smith & Wesson resolved the issue, full deployment to academy classes started in late 2011. In 2013 deployment expanded to also include experienced deputies willing to take a conversion class to adopt the new handgun.

The LASD achieved its desired outcome of reduced recruit failures. Before the introduction of the M&P, recruit remediation rates were as high as 61.3% with as many as ten recruits per class who still failed their test after remediation and were ultimately separated from the academy. Following the adoption of the M&P, the highest remediation rate in an academy class was 16.8%.

## Conversion from the 92F to the M&P Pistol

Rather than convert the entire department to the M&P, the LASD decided to allow experienced deputies to individually elect whether to adopt the new pistol or remain with their older gun. Department members who choose to use the M&P are required

to attend an eight-hour long course that combines lectures, range training and a shooting test. The training includes daytime exercises as well as low-light (or nighttime) exercises. Upon passing the shooting test, the employee turns in his or her prior LASD-issued pistol and is issued the M&P with the SureFire weapon-mounted light. The LASD does *not* supply the DG pressure switch with the new light but trainers encourage personnel to purchase one at their own expense.

Conversion training began in earnest in January of 2013. The pistol has proven to be popular and sign-ups for conversion classes have been brisk. Through November 10, 2014, 3,061 employees out of a total of 9,455 armed employees had gone through the conversion training and received the M&P pistol. The training has continued through 2015.

**Figure 4: M&P Conversion Training Jan 2013 - Nov 2014**



## Unintended Discharge Investigation and Review

LASD policy states that any LASD employee who unintentionally discharges a firearm is required to notify his/her supervisor immediately. The supervisor is required to respond to the scene to assess the situation and determine if there are any injuries or fatalities. The supervisor is also required to notify the watch commander, typically a lieutenant, who is required to make immediate notification

to the on-call Internal Affairs Bureau (IAB) lieutenant.[8] According to LASD policy, the IAB lieutenant will determine whether a response by an IAB Force/Shooting Response Team is warranted. In instances where any person is hit as a result of an unintended discharge, a response by IAB is required. In such cases, IAB will investigate the incident and submit the investigation to the Executive Force Review Committee (EFRC) to determine whether a policy violation occurred.[9]

Until recently, LASD policy did not require an IAB response or an administrative investigation when an unintended discharge did not strike a person. Beyond the notifications required by policy, a memorandum detailing the incident to the appropriate unit commander was all that was required. If the unit commander believed that the incident rose to the level of a possible policy violation he or she would initiate an administrative investigation that could potentially lead to discipline. It was only in the instance of an administrative investigation that an employee's unintended discharge was recorded in the Personnel Performance Index (PPI).[10] Beginning in February 2015, administrative investigations were initiated following all unintentional discharges. The LASD has recently proposed formal policy changes to how unintended discharges are investigated. This OIG review is based on LASD policy in place from 2013 into 2015.

---

[8] Los Angeles County Sheriff's Department, *Manual of Policy & Procedures*, section 3-10/100.00, Use of Force Reporting Procedures.
[9] Los Angeles County Sheriff's Department, *Manual of Policy & Procedures*, section 3-10/130.00, Activation of IAB Force/Shooting Response Teams.
[10] The Personnel Performance Index (PPI) is a database maintained by the Professional Standards Division which stores a LASD employee's history regarding use of force, administrative investigations, filed claims, lawsuits and other indicators.

# Methodology

We approached this review as an open-ended examination of the possible factors contributing to the rise in unintended discharges. As we developed an understanding of the facts, the review broadened to include a closer look at both the unintended discharge accountability measures that were in place as well as the selection and procurement of both the M&P pistol and the SureFire lighting equipment.

In the course of this review, we conducted a number of site visits and met with LASD members from Administrative and Technical Services, the Professional Standards Division, the Training Bureau, and the Internal Affairs Bureau. We observed and participated in a Weapons Training Unit M&P Conversion class. We collected data and documents from a number of different sources, including the LASD and the County's Internal Services Department (ISD).

We reviewed LASD policies, manuals, and training documents. We analyzed unintended discharge data, disposition records related to administrative investigations following unintended discharges, and the records of unintended discharges that did not lead to administrative investigations. We reviewed County procurement policies and manuals.

We also conducted a review of publicly available information of both the unintended discharge phenomenon and controversies in other jurisdictions over the use of weapon-mounted lights and pressure grip switches. Finally, we reviewed policies of other law enforcement agencies and consulted with other oversight agencies whose police departments had made policy decisions regarding weapon lights and grip switches.

The OIG review team included two attorneys with police oversight experience, two retired police chiefs, a retired Bureau of Alcohol, Tobacco, Firearms and Explosives supervisory special agent, and an Inspector with significant auditing experience.

# Results of Review

Unintended discharges are an inevitable part of handling firearms and are not a new phenomenon at the Los Angeles County Sheriff's Department. Data supplied by the LASD indicates that from 2004 through 2011, there were from two to fifteen unintended discharges per year with the peak of fifteen incidents reached in 2008 followed by a decline to nine in 2010 and 2011.

## A Sharp Overall Rise in Unintended Discharges

In 2012 the LASD experienced thirteen unintended discharge incidents. In 2013 there were nineteen unintended discharges, and by 2014, unintended discharges rose to thirty-one incidents – an increase of 63% over 2013 and 138% over 2012.



Figure 5: Unintended Discharges by Year

## Involved Weapon Trends: The M&P Now Dominates

The steep rise in unintended discharges may be attributed to the introduction of the Smith & Wesson M&P pistol and, as we will discuss below, the SureFire gun-mounted light. In 2012 there were thirteen unintended discharge incidents and no one particular weapon predominated. Of the thirteen incidents, three (23%) involved the Beretta 92F duty weapon. Variations of the Sig Sauer authorized duty

weapon were the involved weapon in three other incidents. The other seven incidents were spread among a range of handguns and long guns. The Smith & Wesson M&P was not involved in any incident:

Table 1: Weapons used in unintended discharges - 2012

| Firearm type | Number of incidents |
|---|---|
| Beretta 92F pistol | 3 |
| Colt M4 rifle | 1 |
| Glock 27 | 1 (off-duty) |
| Remington shotgun | 1 |
| Ruger P-90 .45 cal. pistol | 1 (off-duty) |
| Sig Sauer 9mm pistol | 1 |
| Sig Sauer .45 cal. pistol | 2 |
| Unknown make .22 cal. pistol | 1 (off-duty) |
| Unknown make .45 cal. pistol | 1 (off-duty) |
| Clearing suspect's weapon | 1 |
| **TOTAL INCIDENTS** | **13** |

In 2013 the number of incidents involving the Beretta 92F did not change appreciably, but as the conversion training began, the M&P started playing a significant role in unintended discharge events:

Table 2: Weapons used in unintended discharges - 2013

| Firearm type | Number of incidents |
|---|---|
| Beretta 92F pistol | 4 |
| Colt M4 rifle | 1 |
| Glock Model 7 | 1 (off-duty) |
| Remington shotgun | 3 |
| Smith & Wesson M&P 9mm | 8 |
| Smith & Wesson .38 cal. revolver | 1 (off-duty) |
| Clearing suspect weapon | 1 |
| **TOTAL INCIDENTS** | **19** |

9

Of the eight 2013 M&P incidents, three were academy-trained and five were conversion-trained.

By 2014, the Smith & Wesson M&P came to dominate as the weapon involved in unintended discharge incidents even though it was only issued to newly hired deputies – who would be assigned to Custody Division and typically not carrying their firearm while on duty — and to experienced deputies who were converting to the M&P. Of the 31 unintended discharge incidents, all but three involved the M&P. Of the 28 M&P (or its variants)-related incidents, one employee was academy trained on the M&P, 22 were conversion-trained and four had not received any formal training on the M&P.

Table 3: Weapons used in unintended discharges - 2014

| Firearm type | Number of incidents |
|---|---|
| Beretta 92F pistol | 1 |
| Colt M4 rifle | 1 |
| Remington shotgun | 1 |
| Smith & Wesson M&P 9mm[11] | 28 (2 off-duty) |
| **TOTAL INCIDENTS** | **31** |

While the number of incidents increased significantly, fortunately the injuries did not rise. In each of the three years we analyzed, two employees were wounded. Of the six employees injured from 2012 through 2014 (five deputies and one sergeant), three were on-duty and three were off-duty.

---

[11] Two of the on-duty incidents involved variants of the M&P: one with the M&P Shield and the other the M&P Compact. One of the off duty incidents also involved the M&P Compact.

> So far in 2015, deputies have been involved in twenty-one unintended discharge incidents. Only three of the events occurred while the deputy was off-duty.
>
> The Smith & Wesson M&P pistol was the involved weapon in **fourteen of the eighteen on-duty incidents** while the Beretta 92F was the involved weapon in only one event. One of the off-duty incidents involved a personally owned M&P Compact.
>
> **Four deputies** have been injured so far this year in incidents involving the M&P. Three deputies suffered gunshot wounds to the leg. In the other incident, a fellow deputy was injured by a bullet that ricocheted off the floor when his partner unintentionally fired his M&P pistol in a station locker room.
>
> As of this report, the LASD has issued approximately 6,100 M&P guns. While 2015 is not over, there are twenty-one unintended discharges year-to-date, a decrease from 2014, but a 61% increase over 2012.  As in 2013 and 2014, the increase in onduty unintended discharges is primarily in tactical situations, although the number is down to 200% from the 500% of 2014.  The Department attributes this reduction from peak levels in 2014 to its mitigation program.  However it may also be attributable to the passage of time, allowing many deputies to become more familiar with their weapon outside of training provided by the Department.  If the Department is correct, then additional training may be able to make the chosen platform safe.

## Setting of Incidents: Risk to Public has Increased

Unintended discharges can occur in a variety of settings. We reviewed the records made available by the LASD to determine whether the incidents occurred in a non-tactical setting (such as cleaning a weapon in the station, clearing it of live rounds or holstering a firearm in a locker room) or in a tactical or adversarial setting (such

as during a traffic stop, the search of a structure, or the service of a search warrant) where the employee was engaged in the performance of his or her duties. It is our view that non-tactical unintended discharge events, while still dangerous to the deputy and his fellow employees, pose a lesser danger to the public. When a deputy unintentionally fires his weapon during a tactical setting it is a direct risk to the public. Tactical unintended discharges may also be more likely to be caused by insufficient training in a complex weapon system.

From the three years we reviewed, 2012 through 2014, the total of *non-tactical* unintended discharges remained steady with ten in both 2012 and 2013 and twelve in 2014. It is the rise in incidents in tactical settings that is notable.

Table 4: Unintended Discharges by Setting 2012-2014

| Setting | 2012 | 2013 | 2014 |
|---|---|---|---|
| Non-tactical | 10 | 10 | 12 |
| Tactical | 3 | 9 | 19 |
| **Total** | **13** | **19** | **31** |

In 2012, the non-tactical incidents covered a wide range of weapons, including off-duty weapons and the clearing of an arrested suspect's firearm. In 2012, more than two-thirds of unintended discharge incidents were in a non-tactical setting. There were three tactical incidents in 2012. One involved a Colt M4 rifle, one involved a Remington shotgun and one deputy discharged a 92F during a protective sweep of a house.

Since the M&P was not in wide service in 2012, we will concentrate on events that took place in 2013 and 2014. In those two years, the M&P was involved in 35 unintended discharge incidents.

In 2013, there were ten non-tactical incidents which accounted for 53% of all unintended discharge events that year. Two of the ten involved the Beretta 92F and five involved the Smith and Wesson M&P.

The nine tactical incidents were roughly evenly divided among a variety of weapons, including the just-introduced M&P:

Table 5: Tactical Incident Unintended Discharges - 2013

| Firearm type | Number of incidents |
|---|---|
| Beretta 92F pistol | 2 |
| Colt M4 rifle | 1 |
| Remington shotgun | 3 |
| Smith & Wesson M&P 9mm | 3 |
| **TOTAL TACTICAL INCIDENTS** | **9** |

In 2014, there were twelve incidents in non-tactical settings. Nineteen unintended discharge incidents occurred in tactical settings. Thus non-tactical events made up only 39% of the total unintended discharge incidents. The M&P was involved in all twelve non-tactical incidents and sixteen of the nineteen (84%) incidents in tactical settings:

Table 6: Tactical Incident Unintended Discharges - 2014

| Firearm type | Number of incidents |
|---|---|
| Beretta 92F pistol | 1 |
| Colt M4 rifle | 1 |
| Remington shotgun | 1 |
| Smith & Wesson M&P 9mm | 16 |
| **TOTAL TACTICAL INCIDENTS** | **19** |

The rise in unintended discharge incidents in tactical settings (during the performance of a deputy's duties) is significant:



Figure 6: Year to year unintended discharges by setting (all firearms)

## Factors Contributing to Unintended Discharges

We examined the records and documents the LASD made available to us to determine the circumstances of each unintended discharge involving the Smith & Wesson M&P in 2013 and 2014. As mentioned previously, the LASD responded quickly to this issue and  instructed the Weapons Training Unit to conduct an analysis of the potential factors which were contributing to the increase in unitended discharges. The resulting report was of particular benefit in our analysis.

Of the seventeen non-tactical unintended discharges involving the M&P in 2013 and 2014, 76% of the incidents occurred while the firearm was being moved.  The following examples are representative:

- A deputy was taking his pistol out of the trunk of his patrol car when he unintentionally depressed the trigger.
- A deputy reached into a locker to remove an M&P belonging to his partner. He thought he was grabbing the grip and light grip switch when, in fact, one finger was on the trigger and the gun fired.

- A deputy was in a locker room getting ready to go into the field. His holster and tactical vest were hanging on the locker door. While he was placing his M&P pistol into the holster, the antennae from his radio, which was in a vest pouch, entered the trigger guard, caught on the trigger and a round discharged.

Table 7: Circumstances of non-tactical M&P discharges

| Circumstance | 2013 | 2014 |
|---|---|---|
| Cleaning (failure to unload) | 0 | 1 |
| Manipulating weapon[12] | 0 | 2 |
| Moving weapon[13] | 4 | 9 |
| Removing gun-mounted light | 1 | 0 |
| **Total** | **5** | **12** |

## Possible Contributing Factor: No external safety lever

The Beretta 92F is equipped with an external ambidextrous safety lever.[14] The M&P does not have an external safety switch. In addition, unless a deputy has already cocked the hammer, the 92F requires about five more pounds of force to fire the first round than the M&P. It appears to us it is possible that if the M&P were equipped with an external safety, some of the incidents while moving the pistol would not have occurred. When the LASD was going through the testing and evaluation process, the M&P was not manufactured with an external safety lever; but before the M&P was deployed by LASD, Smith & Wesson introduced variants of the M&P that are equipped with an external safety. According to the LASD, however, had an external safety variant been available during the selection process, the department would still have chosen the non-safety lever version:

[12] This would entail operating a part of the firearm such as releasing the slide.

[13] This involves some sort of movement of the firearm such as placing it in a holster or removing from a locker.

[14] According to Beretta, the safety lever is "accessible by the thumb of a right- or left- handed shooter. When the manual safety is engaged the linkage between trigger and sear is disconnected and a separated portion of the firing pin is rotated downward out of reach of the firing pin. At the end of the downward rotation, this same safety lever de-cocks the hammer, causing it to drop onto the pistol's slide without being able to strike the firing pin." Beretta Defense Technologies, *Military and Law Enforcement Product Catalogue*, at p. 23.

*Additionally, even had the M&P model with a safety been available, the [Uniform & Equipment] Committee's decision to select the model without a safety would not have changed. The M&P model with a safety (swipe down) worked exactly the opposite of the Beretta 92F (swipe up). The fine motor skill required to manipulate the M&P safety under combat stress situations, coupled with the more than 20 years of Beretta conditioning (safety manipulation), presented a serious officer safety concern/risk. The consensus was that re-training a 20+ year learned habit (muscle memory) on the Beretta safety would require more training than what could be accomplished in one or two days.[15]*

## Contributing Factor: Deputies violating basic firearms safety rules

A lack of proper safety precautions by deputies involved in unintended discharges is a significant contributor. During our review, we spoke with LASD weapons trainers and Department executives. Some expressed the belief that deputies were still not accustomed to the M&P's lack of a safety lever. Because the 92F had such a safety, as well as a relatively high trigger pull pressure, deputies had a high level of comfort that an unintended discharge would not occur. As equipped, the M&P does not have that same margin for error.

We reviewed LASD records, including an analysis by the LASD's Weapons Training Unit, and were able to identify the circumstances of sixteen of the nineteen tactical setting incidents involving the M&P in 2013 and 2014. Thirteen of the incidents occurred inside residences or buildings, typically during searches or protective sweeps, and four occurred outside in public. Of the latter, three occurred while deputies were attempting to detain suspects.

---

[15] LASD, Memorandum, "Accidental Discharges – Follow Up Information," December 4, 2014.

Table 8: Circumstances of tactical M&P discharges

| Circumstance | 2013 | 2014 |
|---|---|---|
| Activating/manipulating gun light | 2 | 4 |
| Drawing from holster (suspects present) | 0 | 1 |
| During containment (nothing more known) | 0 | 1 |
| Falling object strikes gun | 0 | 2 |
| Pushing door open | 0 | 1 |
| Re-gripping after control loss | 0 | 2 |
| Tripped while holding firearm | 0 | 1 |
| Residence/building search (nothing more known) | 1 | 2 |
| Transitioning weapon[16] | 0 | 2 |
| **Total** | **3** | **16** |

These incidents are concerning because of increased risk to fellow deputies and the public. As we will discuss below, the majority of the incidents have a common theme: the deputy had his or her finger on the trigger of the M&P when an unexpected occurrence took place. The following examples are emblematic:

- A deputy was clearing a closet when a heavy bag fell and struck his hand causing the weapon to fire. Had the deputy's finger been off the trigger, there would not have been a discharge.
- In another incident, a deputy was clearing a residence. He stumbled while checking a closet and became unbalanced when he fired one round. He also had his finger on the trigger.
- A deputy was conducting a traffic stop of a suspect who had reportedly brandished a firearm. As he attempted to draw his M&P pistol while still seated in his vehicle, he unintentionally fired and wounded himself in the thigh.

The LASD Weapons Training Unit analysis of "accidental discharges" concluded:

---

[16] Discharge occurred while moving firearm from one hand to the other, for example to prevent a closing door from striking the gun hand, a deputy will switch the handgun to the opposite hand.

*Of note, the analysis revealed two primary causal factors which may explain the increase in unintentional discharges:*
- *Poor trigger discipline and*
- *Failure to adhere to the Four Basic Firearms Safety Rules.[17]*

In fact, the Weapons Training Unit analysis found in all but two of the thirty-one 2014 unintended discharge incidents, the employee had his finger on the trigger when the firearm discharged. The two exceptions occurred when an object, a coat hook and a portable radio antenna, respectively, caught on the trigger of an M&P pistol. The authors of the analysis noted that until 2002, LASD personnel were trained, "on target, on trigger," meaning that as a deputy is pointing his or her Beretta 92F at a target the finger would be on the trigger. According to interviews we conducted, in 2002, the training curriculum was updated so that deputies were taught to keep their trigger finger along the frame of the pistol and off the trigger until he or she made the decision to shoot. According to the Weapons Training Unit report, older deputies often kept the prior learned practice of resting their finger on the trigger, despite the new training. The report's authors concluded "that the practice of 'riding the trigger' has resulted in an increase in unintentional discharges."

Our review found no instances where the deputy actually had his M&P "on target" when a reported unintended discharge occurred. In fact, during interviews, some LASD staff expressed the opinion that many deputies habitually placed their fingers on the trigger in a potentially adversarial setting even when not pointing their gun at a suspect. The presence or absence of an external safety lever is not as relevant in tactical circumstances, as once a deputy draws a pistol in a potentially adversarial setting, he or she would generally flip the safety to the "off" position when using the Beretta 92F. If the deputy rests a finger on the trigger as a matter of habit whenever the handgun is drawn, the 6.5 pound trigger pull of the M&P

---

[17] The Four Basic Firearms Safety Rules are:
1. Treat every firearm as if it is loaded;
2. Never point the muzzle at anything you are not willing to shoot or destroy;
3. Keep your finger off the trigger until you have made the conscious decision to fire; and
4. Be aware of your target, backstop and what is beyond.
Source, LASD Training Bureau, "Unintentional Discharge Report and Mitigation Plan," at p. 8.

would make an unintended discharge significantly more likely than with the 92F's 11.5 pound trigger pull (for the first round fired).

The LASD reports that it has recently emphasized the Four Basic Firearms Safety Rules with a heightened focus during weapon's training. It has created  a "splash page" that appears during employe log-in on work computers reminding deputies of the rules and posted signs in mobile ranges listing the four rules. In addition, the LASD has added a "skill builder" component at its mobile ranges to focus on deputies keeping their fingers off the trigger as well as requiring personnel to sign their shooting score cards acknowledging the safety rules.

## *Contributing Factor: Weapon-light activation-related errors*

The presence of a weapon mounted light also appears to contribute to the increase in tactical unintended discharges. A deputy was attempting to activate the weapon-mounted light in six of the nineteen discharges in tactical settings in 2013 and 2014 involving the Smith & Wesson M&P.

**Figure 7: Circumstances – M&P Tactical Setting Discharges 2013-14**



When we took a closer look, we discovered that five of the six unintended discharges that involved activating the weapon-light shared a common

characteristic – the use of the pressure grip switch. Here is a summary of each incident occurring in 2013 and 2014:

- While conducting a sweep of a room, a gate swung closed on a deputy just as he was squeezing the grip switch. The deputy reported that his trigger finger slipped and he unintentionally pulled the M&P's trigger discharging one round.
- While making entry into a gated area to search for a suspect, a deputy squeezed the grip switch to activate the gun light and unintentionally discharged a round with either the index or middle finger.
- During service of eviction, a deputy attempted to activate his weapon light, but instead fired his handgun. The house was vacant.
- A deputy intended to activate the light with a grip switch to check if it was working but instead unintentionally discharged one round.
- A sworn employee intended to activate his gun light with a grip switch to illuminate a car containing suspects. The employee instead discharged one round. Fortunately, the M&P was pointed at the ground at the time.
- A deputy was inexplicably directing traffic with the weapon-mounted light rather than with a flashlight as trained by the LASD. The deputy discharged one round while doing so. This gun light did **not** have a grip switch attached.

Other than the last instance, an employee was attempting to activate the gun light with the SureFire DG grip switch when the unintended discharge occurred. Put another way, inadvertent pulling of the gun's trigger, rather than or in addition to the grip switch, appears to have been a factor in five out of nineteen M&P-related unintended discharges in a tactical setting in 2013 and 2014.  If the partially available data from 2015 is included, the ratio is six out of twenty-five.



Trigger (requires approx. 6.5 lbs. of pressure to fire).

SureFire X300 Ultra weapon-mounted light.

DG grip switch (pressing activates light).

**Figure 8: M&P/X300 Ultra/DG switch (Source: LASD)**

## Summary

In our analysis of the unintended discharge incidents from 2012 through 2014, several concerns emerged:

- From 2012 to 2014, unintended discharges rose by 138%.
- From 2012 to 2014, tactical unintended discharges rose by more than 500%.
- Prior to 2014, unintended discharges were largely confined to non-tactical settings. By 2014, nineteen of the thirty-one incidents, or 61%, took place in tactical settings.
- Prior to the field deployment of the Smith & Wesson M&P pistol in 2013, a broad mix of weapons were involved in unintended discharge events. In 2014, one weapon, the M&P accounted for 90% of all such incidents even though only about 32% of armed employees had converted to the M&P by the end of 2014.[18]

---

[18] So far in 2015, fourteen of the eighteen on-duty incidents and fifteen of twenty overall incidents have involved the M&P.

- By November of 2014, the LASD had converted 3,061 employees from the Beretta 92F or some other pistol to the M&P. Conversion class graduates accounted for twenty-three of the twenty-eight (82%) M&P incidents in 2014.
- According to LASD's analysis, in only two incidents in 2014 was the employee's finger not on the trigger when the weapon unintentionally discharged and in both of those two, a foreign object caught the trigger causing the pistol to discharge.
- In six out of the nineteen M&P incidents in tactical settings in 2013 and 2014, an employee was activating a weapon-light when an unintended discharge occurred.[19] In all of those the user's finger was either on the trigger or slipped onto the trigger.
- In five of the six incidents occurring during light activation, the employee was using a grip switch.

## Conversion Training

To understand how the Smith & Wesson M&P and the SureFire X300 Ultra function we took a closer look through direct observation of training and use of the M&P mounted with the light.

OIG staff observed and participated in the eight hour conversion training course. The instruction took place at the Sheriff's Department's Pitchess Detention Center Range in Castaic. The course consisted of classroom instruction including construction of the Smith & Wesson M&P 9 millimeter pistol, making the weapon safe and dismantling and cleaning the weapon. The instruction also included video and slide presentation material focused on safety issues specific to the weapon. The second component of the course, about two hours, was a series of outdoor live fire shooting exercises where each trainee fired live rounds on the range at stationary and moving targets from various distances as well as a stress exercise where trainees fired at targets after running with gun in hand. The third component returned deputies to the classroom to learn about low light tactics and use of the

---

[19] Through October 2015, seven of eighteen on-duty incidents were in a tactical setting and, based on summary information provided by the LASD, one of those incidents occurred while a deputy was activating his light.

gun-mounted light. The fourth component took place on the range after nightfall. Over a two hour period, employees learned to manipulate the weapon-light and use low light tactics with the new equipment.

Instructors, both during the classroom and live fire training, emphasized general gun safety as well as the safety considerations specific to the M&P. Trainees were reminded that the weapon has no external safety lever and they must overcome any impulse to look or reach for one. They were instructed that the first trigger pull of any series of shots requires no greater pressure than any other trigger pull in the series and were frequently reminded not to rest their index fingers on the trigger when not in the act of shooting. They were told that the internal safety mechanism of the M&P reduces the likelihood that it will fire if dropped. Trainers warned deputies to not just "toss" the M&P in the trunk of their patrol car, like they might with a Beretta, but to first check the trunk with their flashlight for any possible obstructions that could catch on the trigger. They were also warned to only use the weapon light in potential deadly force encounters and to use their separate handheld flashlight for other illumination purposes.

During low light training, attendees were taught to activate the weapon light using their non-gun hand to flip the toggle switch on the light itself or to use the DG pressure lever along the front of the hand grip, if they had purchased this additional mechanism. Instructors made several references to the ease and reliability of the grip switch mechanism and recommended, for those attendees who already had it on their guns, to activate the grip switch while drawing the pistol out of its holster, so as to make this action an automatic part of the gun draw process and eliminate a potentially distracting decision-making process at some later time in the incident.

Observing the training demonstrated to the OIG that the initial conversion process was well thought out, challenging and appeared adequately staffed. The classes were small – twelve or less for the live fire components. Two or three instructors supervised each live fire group. Trainees who had difficulty with any aspect of the live fire exercises were given individual attention and encouraged to repeat the key actions. Instructors repeated many times the warning to keep one's index finger off the trigger until intending to shoot. Some trainees occasionally rested their index

finger on the trigger in the heat of a multi-step exercise and were again admonished against it.

During the low light exercises, the challenges of mastering the new weapon and tactical light became evident. Trainees had to make quick decisions about when to activate the light, whether to deactivate it for tactical purposes or alternatively to use it off-target to illuminate a search area, and develop confident physical motions to activate and de-activate the light without distracting from the process of aiming the gun and evaluating the degree of threat from the target.

While the training course approached the subject matter in a comprehensive, multi-faceted way, the true test of the efficacy of the conversion process is whether old "muscle memories" and tactical habits are reliably replaced by new habits, especially under stressful conditions during police activity in the field. The training staff we interacted with voiced this same proposition themselves and viewed it as the central challenge of their conversion course.

The reality is that employees who may have worked with the Beretta 92F for twenty years are sent home with a new handgun and a gun light after four hours of live fire training where they have had to rapidly acquire new skills. It is very difficult to determine whether a specific aspect of training has been incorporated by the trainee sufficiently to show up reliably months or years later when circumstances may call for it. This is especially true of shooting-related training because most sworn personnel fire their weapons at suspects extremely rarely if at all during their careers. In this regard, given the dramatic rise in unintended discharges, tracking the increase in the number of sworn employees who have converted from their prior firearm to the M&P may currently provide the best available feedback on whether the conversion training is effective as the LASD does not have pre-set follow-up training for use of the M&P pistol, let alone the gun-mounted light in night time conditions.[20]

---

[20] Sworn personnel are required to "qualify" with their weapons four times a year. "During the first quarter period (January-March), sworn personnel through the rank of Division Chief . . . [must] achieve a minimum passing score

Training staff and their supervisors have modified the conversion training course regimen in response to the emerging pattern of unintended discharges. In February 2015, the WTU started providing each conversion course trainee with a DG grip switch mechanism to affix to their weapon for the duration of the course if the trainee did not already have one. The trainers now emphasize use of the DG grip switch and immediate activation during the un-holstering movement. The loaned DG grip switches are taken back at the end of the course but trainees who adopt the M&P are encouraged to purchase their own DG grip switch. The training unit prefers the DG because it allows for consistent one-handed use of the gun and the tactical light. Sheriff's Academy recruits are similarly trained to the DG switch procedure and then encouraged to buy their own DG grip switch. Of course, LASD employees who choose to not purchase the switch have now received little training on how to activate the gun light without it. Whether the training unit's increased focus on training with the grip switch over the several-hour period is sufficient to decrease unintended discharges remains to be seen. In fact, as we will discuss below, the decision to encourage the universal use of the grip switch runs counter to policies put in place at some other law enforcement agencies.

### Finding 1

**Conversion training is insufficient to overcome old habits.**

The steep rise in unintended discharges involving the Smith and Wesson M&P raises the question of whether major changes in the conversion training are necessary for officer safety and public safety. There is a large amount of information to cover in the conversion course offered by the LASD. Trainers have to familiarize employees with a new weapon as well as emphasize different safe handling characteristics and introduce employees to the gun-mounted light and those associated skills. We witnessed a broad range of ability among students when we observed the course. Some employees were far quicker to learn the new skills than others, though the trainers were

---

of 70 out of a possible 100 points." In the following three quarters, personnel qualify by participating in a combat training exercise at one of the Department's shooting ranges. (MPP § 3-01/050.65.)

thoughtful and patient in their instruction.  Instructors paid close attention to whether deputies had their finger resting on the trigger.  It is not clear, though, whether an eight-hour course, half of which is on the firing range, is sufficient to overcome habits employees may have adopted over the years of having carried the Beretta 92F or some other firearm. Experienced managers at other law enforcement agencies have informed us that their required minimum training for similar conversions range from eight to sixteen hours or more.[21]

## Recommendation 1 - Training

**1.1**   The LASD should evaluate the adequacy of its initial conversion training curriculum and also determine whether an eight-hour course is sufficient to overcome any ingrained habits.  Given the result of the current training approach, a course of sixteen hours or more should be strongly considered.

**1.2**    The LASD should consider follow up training and evaluation sessions for all conversion course graduates to monitor adherence to initial training of safety aspects and assign further training where needed.

**1.3**   The LASD should review low light training curricula for other departments and private vendors and evaluate whether its current curriculum reflects best training practices and is of sufficient duration to adequately train personnel.

**1.4**   The LASD should incorporate the use of both handheld lights and weapon-mounted lights into Continuous Professional Training. The

---

[21]  - Livermore (California) Police Department – Transition to the Glock (similar features to the M&P): Sixteen hours training.
- Los Angeles Police Department – Transition to the Smith & Wesson M&P or Glock from the Berretta 92F or Sig Sauer: Sixteen hours plus three successful "combat" style qualifications. Authorization to use a weapon-mounted light on the Glock or M&P requires an additional four of hours training with the light and a qualification. LAPD does not authorize the DG or pressure grip switch. (See p. 36 et seq. of this report.)
- U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives – Transition to the Glock pistol from the Sig Sauer pistol: Sixteen hours training.
- U.S. Drug Enforcement Administration – Transition to the Glock from the Sig Sauer: Eight hours.

LASD should develop training standards for activation of the light that focuses on that equipment which is provided or required for trainees.

## Selection of M&P Handgun

We reviewed the process for the selection of the Smith & Wesson M&P pistol. It appeared that the Weapons Training Unit (WTU) recommended the selection of the M&P over other candidate firearms based on consistent trigger pull for each fired round, changeable grip sizes, lighter weight, U.S. manufacturing and consistent parts availability, safety when disassembling, fully ambidextrous design, and pricing.

The WTU's findings were presented both to the Uniform and Equipment Committee and the Executive Planning Council (EPC) in 2009. The EPC had the final say and selected the M&P based on the adjustable grip sizes, consistent trigger pull and that those two factors would result in better shooting scores at the Academy. Based on the records provided for review by the LASD, the final selection of the M&P pistol appears to have been for the reasons described here.

The LASD elected to adopt the M&P variant with no external safety lever because the motion for activating the M&P safety lever was the opposite of that for the 92F. The LASD found that would pose a significant risk after the years of the opposite learned habit in using the 92F. Furthermore, the LASD found that 65% of law enforcement agencies in the United States used the Glock handgun which also does not have an external safety lever.

## Selection of Weapon-Mounted Light

In November of 2011, outside consultants (Landy Litigation Group) conducted a content validation of the Department's course of instruction for firearms. As a result of their review, the consultants recommended equipping handguns with weapon-mounted lights and thus anticipated an increase in the recruit passage rate in low light shooting courses.

We reviewed documents related to the selection of the SureFire X300 Ultra weapon light and the DG grip switch. Like the M&P, the purchase of the X300 Ultra was

through a sole source contract. The justification for the X300 Ultra was based on features that other manufacturers' models did not have: a high light output of 500 lumens, an ambidextrous switching system and the ability to attach a grip switch to any of the LASD-authorized handguns, including the 92F, for deputies who would not be converting to the M&P. The LASD found that other light manufacturers did not offer the ability to attach the switch to other authorized handguns.

A County department is subject to the rules and regulations of the Board of Supervisors as well as Internal Services Department's (ISD) Purchasing Division. Purchasing Division Rule P-3700 states that certain acquisitions "that are determined to be in the best interest of the County, may be obtained from a sole source." The rule's highlights include:

- Any sole source purchase over $5,000 must be approved by ISD's Purchasing Agent and reported to the Board of Supervisors.
- Sole source purchases can be awarded without bidding when the item can be obtained from only one source (e.g., proprietary to a manufacturer, distributor, and/or reseller, etc.).
- The Department must demonstrate the following:
  - The product is only available from one source,
  - It is the only brand that meets the qualifications or specifications of the requisitioning department,
  - It is a brand that must match or inter-member with an existing system, and cannot be substituted without replacing the system,
  - The product will, if purchased, avoid other costs (e.g. data conversion, training, purchase of additional hardware, etc.),
  - It is needed on an emergency basis, and time does not permit a solicitation.[22]

---

[22] Purchasing Division Rule P-3700 requires that the demonstration of meeting the sole source standards must be supported with the submission of "adequate documentation."

*LASD did not appear to have a structured light selection process*

The July 2012 sole source justification documentation we reviewed stated that the X300 Ultra was "the only handgun mounted light which meets the minimum mandatory criteria required by LASD." The LASD found a need for the light in that "the majority of law enforcement deadly shootings occur in low light conditions. As a result, the use of a high quality dedicated weapon-mounted light is essential to decrease civil liabilities during deadly force incidents. It is anticipated LASD will procure a weapon light for all Deputy Sheriffs and armed Security Officers within the next 3-5 years."

The LASD provided several justifications for the sole source purchase of the SureFire light, namely light output, ambidextrous operation, size, grip switches and cost.

- **Light output.** The SureFire X300 Ultra has an output of 500 lumens, which was very high relative to competitors at the time. The Department described the increased lumen output as "critical in reducing liability," as it "provides a greater amount of light 'on target.'" The LASD set the minimum mandatory requirement at 500 lumens. Among competitor models at the time, the next nearest output was 160 lumens.
- **Ambidextrous.** The sole source justification emphasizes that the X300 has "a completely ambidextrous switching system" that activates the same way on the left and the right, which is a "critical" feature when a deputy switches the gun from one hand to another.
- **Size.** The justification documentation states that the X300's small size is "critical to ensure" that, when mounted on the gun, it can still fit inside a standard police holster.
- **Grip switches.** The justification document states that the SureFire X300 is the only known commercially available light system that provides the option to use the DG grip switch on all eight approved LASD handguns.[23]

---

[23] The LASD now provides all Academy Cadets the Smith & Wesson M&P 9 millimeter pistol.  Academy training is directed toward this firearm and thousands of experienced deputies have adopted it as well, but the Department

- **Cost.** The standard law enforcement cost of the X300 was listed as $260 per light. SureFire offered to supply up to 15,000 lights for $125.00, the grip switch for $40.00 and an adapter to mount the X300 with the grip switch onto the older Beretta 92F for an additional $40.00.

The distinction between factors which make a product the best choice (still requiring a competitive process) and those which make it the only choice (permitting skipping the competitive process) are often debatable. Some of the features used to justify the uniqueness of the SureFire light appear to fall into the former category.  It is not unusual for government agencies to prefer the convenience of a sole source contract, but competitive bidding is the preferred method for spending public funds for good reason.[24] Where, as here, the entire process is not well documented, dispensing with competitive bidding increases the risk that public funds will be misspent.

One feature that does set the SureFire apart – very high light output –potentially increases costs and the risks to officer and public safety. First, it dictates a shorter battery life of 1.5 hours as opposed to, for instance, 2.5 hours for the similar but less bright Streamlight TLR-1. Secondly, some tacticians warn that very strong lights can produce enough "splashback" reflected light to temporarily blind an officer inside a structure. Even SureFire's literature warns that this can be a danger indoors. SureFire states that while a high light output "is nearly always better," there are other factors a buyer should consider. When used indoors, "an excessively bright light can bounce off walls, windows, mirrors and other reflective surfaces and into your eyes, dangerously degrading your own night-adapted vision." Furthermore, higher output lights have "a shorter runtime [which] means you'll

authorizes sworn personnel to carry any of seven other handguns as well, either as the primary weapon or as a backup.  These include, for instance, the Beretta 92F, the Sig Sauer P226 and the H&K USP.
[24] See, e.g., Los Angeles City Inspector General's September 27, 2015, "*Investigation of the Department's Procurement Practices*," page 3.  The LAPD attempted to sole source first the M&P and then the Glock (a functionally similar gun), being rebuffed both times by Los Angeles City's Department of General Services because the two guns are not unique and therefore not subject to sole source contract.

consume more batteries."[25] We could not determine if the LASD considered these potential drawbacks.

The Department could provide no documentation of a structured evaluation process that provides the appearance of a dispassionate selection. Despite our requests for documentation, during our review we were not provided with any records that the LASD developed specifications *prior* to evaluating the various light products. These are warning signs which should alert an agency that a selection process may not have been objective.  Because there is no documentation of a process which produced specifications for the weapon-mounted light, we can only look to the specifications themselves contained in the sole source procurement request. These specifications mirror the features of the SureFire X300 Ultra.  This specificity and the lack of a documented process to decide on the specifications for the ideal tool can create the appearance of tailoring the specifications to a particular product.

## *The weapon light is not being deployed to non-M&P deputies*



**Figure 9: SureFire MR11 on 92F**

The LASD emphasis on the SureFire light's adaptability to other pistols suggests that it would be installed on pistols other than the M&P. We interviewed LASD staff to learn whether the SureFire X300 Ultra was being issued to deputies who were electing not to convert to the M&P pistol. That is not taking place. It was explained to us that attaching the light to the Beretta 92F would require the additional expense of purchasing the SureFire MR11 adapter mount as well as a new holster that could fit the 92F with the installed light. The concern was that, should a deputy then later decide to convert to the M&P, the LASD would have incurred prior costs with the 92F to purchase an adapter and holster which are not usable with the M&P.

---

[25] SureFire, LLC, *How to Choose Weaponlights,"* 2013, http://www.surefire.com/how_to_choose_weaponlights.

## *The LASD initially underestimated additional costs*

The ISD's sole source questionnaire asks the purchasing department whether "if purchased, the product will avoid other costs such as data conversion, training or purchase of additional hardware." For the weapon light and grip switch application, the LASD asserted in its sole source documentation that:

> No training costs are required as the current handgun mounted light training certification only requires watching a thirty minute department video via the internet. This training video can be watched during the course of a normal shift.

It is important that the purchasing agent for the County, the Internal Services Department, understands the full cost of a new purchase as extensive as 10,000 weapon-mounted lights. In fact, the cost to train deputies to use the new pistol with the new weapon light is more than merely watching a thirty minute video and includes both classroom time and range time during the eight-hour conversion course. Furthermore, the sole source justification request made no mention of regularly recurring costs to purchase replacement batteries.

### *Finding 2*

**The process for setting the minimum specifications for the weapon-mounted light was not documented.**

### *Recommendation 2*

**The LASD should develop policies and implement procedures to ensure the process by which specifications are established is well documented.**

### *Finding 3*

**The LASD did not develop a testing and evaluation procedure for the weapon-mounted light selection process.**

The decision to adopt a weapon-mounted light appears to have been sound and based on the recommendations of outside consultants. However, our inquiry revealed no systematic process to evaluate the weapon-mounted light that could be subject to oversight internally by LASD managers or by outside

reviewers. It does not appear that *formal* testing took place prior to selection to compare the different weapon-light models for operator safety and ease of use in high stress conditions.

### Recommendation 3

**Future testing and evaluation processes should reflect best practices with required characteristics such as:**[26]

**3.1**   Developing a product evaluation manual which regulates the testing of all potential weapons and tactical equipment.

**3.2**   Developing test requirements, data requirements, and foundation documents on measurability and testing prior to testing.

**3.3**   Developing a pre-test analysis to determine the "types and quantities of data needed and the results expected or anticipated."

**3.4**   Conducting the test activity with the requirement that the required data is collected and evaluated for validity.

**3.5**   Conducting a post-test evaluation comparing the measured outcomes to the expected outcomes.

## Selection of DG Grip Switch

*The reasons for the LASD's widespread adoption of the grip switch are not apparent.*

We sought to learn about the Department's process for evaluating and approving the weapon-light and grip switch. According to LASD documents we reviewed, on January 31, 2011, the Chief of the Leadership and Training Division recommended that LASD begin immediately to equip all newly hired armed personnel with the M&P and that the pistols were to be "flashlight-equipped." The memorandum did not recommend a particular light or mention equipping it with a grip switch.

LASD staff told OIG reviewers that a test and evaluation of weapon lights was conducted. We requested any testing and evaluation reports or records related to

---

[26] "Test and Evaluation Management Guide," 6th Ed., Department of Defense, Dec. 2012, 41-42.

the weapon light and grip switch that were created by the LASD prior to the selection of the X300 Ultra, but to date we have not received any such records. LASD staff also told us that the Weapons and Training Unit presented their findings and made a recommendation regarding the SureFire light to the Uniform and Equipment Committee (UEC) in 2012. The UEC consists of one commander from each division as well as a representative from each of the two unions that represent deputies and sergeants. The committee, which approves any proposals to the uniform worn or equipment carried by LASD personnel, approved the SureFire light and grip switch. The WTU then made a subsequent presentation at EPC which also formally approved the light and grip switch. We have not received any documents or minutes that memorialize either the presentations or committee approvals. More specific to the focus of this report, we received no records that mention equipping the weapon light with the grip switch which predate the sole source justification documents submitted to the Internal Services Department in July or August of 2012.

In the sole source documentation, the argument is made that, among other features, the SureFire is the only light that meets LASD's specifications in part because the light *and* the grip switch are adaptable to all LASD-approved handguns.

That the SureFire is not being issued to deputies who are not equipped with the M&P pistol is concerning since the light's adaptability to other LASD-approved weapons was highlighted by the LASD as one of its significant benefits. Since the LASD urged that purchasing the light was "essential to decrease civil liabilities," that primary purpose appears to be undercut by the LASD choice to not issue the light to the deputies who choose to continue to carry the Beretta 92F.

We requested that LASD supply any documentation related to the testing and evaluation of the grip switch. In August 2015, the LASD stated that "a search by the Weapons Training Unit revealed there were no records, documents, or presentation material available related to the original selection and testing process." We were told, though, that testing of two brands of grip switches – SureFire and Streamlight – "was done several years ago" and that both brands were reliable and "met the standards of the Weapons Training Unit."

*Pressure grip switches have been found dangerous by some law enforcement experts*

In light of the correlation between the DG grip switch and unintended discharges, we undertook a review of other law enforcement agency experiences with the grip switch. We reviewed firearms literature, reports of litigation settlements, news reports, policies of other law enforcement agencies and a report issued by another oversight agency, Denver's Office of the Independent Monitor. The grip-activated switch is a specialized piece of equipment originally designed for elite military units and later marketed to domestic law enforcement. Some police departments have prohibited its use by officers and a force investigations trainer regularly used by LASD has raised serious questions regarding the product. The following chronology is relevant to this issue:

- A 2009 article in *Tactical Response* about police tactical teams using weapon-mounted lights and remote switches highlighted the extensive training that such systems require. "When training with light systems, operators should be familiar with all the functions of the lights. They have permanent on/off switches, momentary pressure pad switches and low-light LED switches…. Operators must be able to activate these lights and do so while covering their area of responsibility, all while being ready and able to effectively engage. The activation of these switches can alter the grip operators have on a weapon. They must be able to do both – not one and then the other."[27]

- On October 13, 2010, a Plano, Texas police officer drew his handgun as he moved in to detain a twenty-five year old suspected drug dealer. The officer's pistol (not an M&P) was equipped with a SureFire X300 light and was attached to a grip switch. The officer said he pointed his gun at the suspect and intended to activate the light but instead squeezed the trigger and fired one round which struck and killed the suspect.[28]

---

[27] Dowe, Darin. "Weapon-Mounted Lights for Tactical Operations," *Tactical Response*, Nov./Dec. 2009.
[28] Goldstein, S. and Haag, M., "Gun-mounted flashlight blamed in fatal Plano police shooting," *Dallas Morning News*, Nov. 19, 2010.

- In January of 2011, a New York Police Department officer shot and wounded a seventy-six-year old man. The officer was participating in a raid on an apartment and intended to activate his SureFire X300 when he instead fired his weapon (public accounts do not describe whether the Emergency Services Unit officer had a grip switch attached to the light). The victim was a relative of the suspect but he was not the target of the raid.[29]

- Following the Plano and New York incidents, SureFire issued a public statement that the handgun-mounted light was first developed by SureFire in 1986 and "was quickly adopted by SWAT teams, including LAPD's (Los Angeles Police Department) D-Platoon" and that ". . . during this 24-year period the only reported safety-related incidents involving such lights are the two incidents mentioned above." SureFire emphasized that every piece of equipment issued to officers "requires training to be used effectively. Flashlights and weapon-mounted lights are no exception." Two of the four basic rules of firearm safety – including keeping the finger off the trigger and never pointing a weapon at anything you are not willing to injure or destroy – have to be "fully ingrained" through "proper training of sufficient quality and frequency."[30]

- The Force Science Institute – a private business which conducts research "to determine the true nature of human behavior in high stress and deadly force encounters"[31] – provides training to law enforcement agencies – including the LASD. After the Plano, Texas and New York incidents, the Force Science Research Center published a newsletter note warning that the grip switch is "fateful interaction between human performance dynamics and ill-conceived product configuration." [32] That interaction occurs "under stress, when the exertion of physical pressure tends to become intensified, an officer pressing his middle finger against the flashlight switch pad will produce a sympathetic reaction in the index finger. If that finger happens to be inside the trigger

[29] Celona, L., "'Flashlight' shoot happened before," *New York Post*, Jan. 25, 2011.
[30] SureFire, LLC, "Officer Training for Low-Light Conditions: A Matter of Life and Death,"
[31] Force Science Institute. "Who We Are," http://www.forcescience.org/whoweare.html.
[32] Force Science Research Center, "WARNING: Gun-mounted flashlight device susceptible to fatal errors under high stress," *Force Science News #173*, 2011.

guard and on the pistol's trigger, the reaction may be forceful enough to cause an unintentional discharge." Furthermore, "ideally, of course, the index finger would be outside the guard and on the frame until a conscious decision to shoot has been made. But research studies have convincingly shown that, despite training to the contrary, officers in high-stress situations tend to move the finger onto the trigger, often without even being aware they have done so."[33]

- Following the Force Science Institute warning, SureFire responded: "[S]ympathetic response is a real phenomenon, but it's not the boogeyman and it can be addressed with training." SureFire emphasized that the unintended discharges only occurred "because the officer's finger is on the trigger when it shouldn't be there."[34]

- A 2012 article in *Law Officer* Magazine found that handgun-mounted lights are critical for officer safety but that "switches on many current designs are relatively close to the trigger, which can be confused with the trigger, especially if the system is deployed with insufficient training and familiarity."[35] The author, a weapons trainer and "former Naval Special Warfare operator," advocated that officers should train extensively with a small handheld flashlight that should be "considered the primary source of supplemental illumination for most tasking and the pistol-mounted light serving a secondary role."

- The Chief of the Denver Police Department banned the use of grip-mounted pressure switches in October of 2013: "Effective immediately; only standard weapon mounted lights which are activated with a paddle or rocker-style switch IN FRONT of the trigger guard are authorized for use. Any weapon mounted flashlights that are activated by FRONT STRAP PRESSURE SWITCH are UNAUTHORIZED (emphasis in original)." The policy change was in response to two accidental shootings that were "linked by a common fact:

---

[33] Ibid.
[34] McDonald, Derek, letter to SureFire Customers and Supporters, 2011.
[35] Good, Ken. "The Deployment of Pistol-Mounted Lights: Solid training reduces risks with and improves functionality of pistol mounted lights," *Law Officer*, August 14, 2012 ,
http://www.lawofficer.com/articles/2012/08/deployment-pistol-mounted-ligh.html

the officers were attempting to activate" their weapon-mounted lights.[36] In both instances, the shootings were found to be out of policy and the officers received significant discipline.[37]

- The Los Angeles Police Department permits officers to install a range of approved lights, including the SureFire X300 Ultra and the Streamlight TLR-1, but does not authorize remote activation switches.

- The Dallas Police Department allows officers to use mounted lights from an approved brand (SureFire, Streamlight or Insight) but specifically prohibits "any type of pressure switch, pressure pad, or similar device such as the Surefire DG pressure switch."[38]

- The Austin (Texas) Police Department banned grip switches in 2013: "1. Pistol mounted lights must be equipped with a rocker style switch and must be activated with the officer's non-shooting hand. 2. Pressure pad style switches are strictly prohibited for use with weapon mounted handgun lights."[39]

- In looking at the history of weapon-mounted lights and grip switches, Ken Cooper, a firearms and use of force instructor, noted in *The Denver Post* in 2014 that SureFire originally developed the grip switch for Navy SEALS. He pointed out that "the difference between law enforcement and Navy SEALS is thousands of hours of training." (Cooper was an expert witness on behalf of the deceased's family in the Plano, Texas incident.)[40]

While the LASD's Special Enforcement Bureau trains extensively with grip switches and weapon-lights, no formal review has been conducted by the LASD that the current training provided to *patrol* deputies is sufficient to effectively and safely use pressure grip switches. In discussing grip switches with numerous LASD managers, we encountered a range of opinions from whole-hearted support for the current light system to those who believe pressure grip switches should be prohibited to

---

[36] Mitchell, Nicholas, Denver Office of Independent Monitor, *2013 Annual Report*, at p. 53.
[37] Ibid.
[38] Dallas Police Department General Order, sec. 418.01, Primary Weapons, Specialty Weapons, and Ammunition.
[39] Austin Police Department, Approved Weapons and Ammunition List, January 1, 2013.
[40] Ingold, John and Olinger, David, "Gun-mounted flashlights spark concerns in wake of accidental Denver police shootings," *The Denver Post*, March 20, 2014.

others who believe that lights should not be mounted on pistols at all. There is clearly no consensus within the LASD and no indication that the above information has been considered.

### Finding 4

**The Department has not balanced the benefits of the grip switch light against the added risk to the public.**

It appears that the erroneous use of the grip switch may have contributed to a significant number of unintended discharges. The use of such a switch has been prohibited by a number of other law enforcement agencies. The LASD has not demonstrated that the current training is sufficient so that patrol deputies can use a DG grip switch-equipped handgun in a consistently safe manner.

During interviews of LASD personnel we learned that the proposal to adopt the Smith and Wesson handgun and the SureFire light system was presented to the U&E Committee which made the official recommendation. The proposal was apparently then briefed to the former Undersheriff the next day. The proposal was presented to the Executive Planning Committee – which consists of the highest ranking executives in the department – the same week and approved.

As our review shows, there was ample publicly available material which addressed the controversy over pressure grip switches at the time the LASD decided to allow deputies to use them with their lights. It does not appear that LASD considered those risks or conducted any formal testing and evaluation to weigh the potential risks and benefits. We were unable to learn if during the approval process anyone objected to either the light selection or the adoption of the grip switch.  There are certainly LASD staff who believe strongly that the switch is worth the complexity it adds to a deputy's job. However, the switch appears to have created a substantial hazard for deputies and the public and the Department has not documented any analytic process that weighs the two against each other.

## Recommendation 4

**The LASD should conduct a thorough evaluation of the safety, efficacy, risks, benefits and training costs associated with continuing use of the grip switch system in units other than the Special Enforcement Bureau.**  Should the Department conclude the risk of the grip switch is outweighed by its benefits, proper training should be provided to deputies before they are permitted to use the device.

## Finding 5

**The LASD lacked sufficient policies requiring testing and evaluation of potential new equipment.**

It appears there were no policies in place to regulate the setting of standards and testing and evaluation of potential new equipment.

After we began our inquiry, the LASD's Weapons Training Unit created a Weapons Training Review Committee to review all new testing and evaluation of Sheriff's Department weapons and related equipment. According to the LASD, "all findings are now documented reflecting the steps and processes used in evaluating and approving various equipment."[41] The new procedure, though, is conducted solely within the Weapons Training Unit without early involvement by the Uniform and Equipment Committee.

## Recommendation 5

**The LASD should reform the supervision process for testing and evaluating new equipment.**

**5.1**    The U&E Committee should be part of the evaluation from the beginning of the process rather than at the end.

---

[41] "Evaluation/Selection of Department's Firearms DG Switch," *Los Angeles County Sheriff's Department*, Office Correspondence, August 10, 2015.

**5.2**   All members of the U&E Committee and testers and evaluators should receive training in conflict of interest policies and objective evaluation procedures.

**5.3**   The U&E Committee should approve recommended minimum mandatory specifications prior to the testing and evaluation process where practicable. Where the evaluation appears to demonstrate that specifications should be modified, such modifications should require U&E Committee approval.

## Unintended Discharge Accountability

We examined to what extent the LASD was holding both itself and individual employees accountable for unintended discharges. When we first began requesting information on unintended discharges in 2014, we found that the LASD did not have an accurate count of how often such events occurred. Reporting from the unit to the Department level was inconsistent and the LASD had not yet recognized what some LASD members believed based on word of mouth – that there was a system-wide surge in unintended discharges.

To review the LASD's mechanisms for monitoring and investigating potential unintended discharge events, we asked the LASD to provide us with a number of related documents for the 2012 through 2014 timeframe including:

- The memoranda that unit commanders are required by policy to prepare following an unintended discharge (along with supporting documentation). *The Department provided documents for fourteen incidents in this group.*
- Closed administrative investigations related to unintended discharges. *There were fourteen additional incidents in this group.*

Many investigations of discharge incidents were still pending at the time of the request. Our review of these two modes of investigating unintended discharges is based on the selection of memoranda and reports we received at the time.

## Review of Unit Commander Memoranda

The incidents described in the fourteen memoranda that the OIG reviewed ranged from February 2012 to December 2014. The documents were generated by a unit commander (usually a station captain or equivalent manager) as a result of the unintended discharge incidents. The OIG's document request was intended to obtain records made at or near the time of the incident to gauge the LASD's effectiveness in addressing systemic risk issues as they arose. Eleven of the incidents the OIG reviewed involved the M&P, two were associated with the Beretta 92F, and for one incident the documentation did not disclose what firearm was used by the employee. Two of the events occurred while an employee was in a LASD locker room, the other twelve happened while the employee was engaged in his or her duties with weapon drawn. It took the LASD some time to gather the documents for our evaluation. This was because prior to our inquiries, LASD did not keep centralized or searchable records on unintended discharges in its Personnel Performance Index database (PPI) unless a unit commander opened a formal administrative investigation. Only then would the incident be captured in PPI and the documentation submitted for input in the database. Since this particular set of documents came from incidents where a unit commander did not find a potential policy violation, the records remained at the unit or division level.

We analyzed the quality of the documentation produced by the units based on four factors we believe are critical to conducting a thorough review of an unintended discharge:

1. Did the documentation include a formal statement by the involved employee?
2. Did the documentation reflect that an analysis of the causation of the unintended discharge occurred?
3. Was a conclusion reached whether or not the operator of the firearm was responsible for the incident?
4. Was there an indication that some form of remediation was put in place?



**Figure 10: Analysis of Unit Memoranda**

Three of the fourteen document sets we reviewed had all four factors present. Three incidents had only one factor present. Nearly half of the incident documents we received did not contain a statement about the incident by the involved employee. In all fourteen incidents, it appeared that the conduct of the employee was a significant factor which contributed to the incident, yet in only eight incidents did the unit commander order the employee to undergo some form of further training or education.

### Finding 6

**The process of review by memorandum was inadequate to assess the responsibility of individual deputies for unintended discharges and to identify an emerging Department-wide issue.**

Broad discretion given to unit commanders resulted in some incidents being thinly documented with no remedial or disciplinary action taken, while in other units, captains would regularly open administrative investigations which led to discipline. This delayed detection of the spike in unintended discharges.

## Recommendation 6

**The LASD should implement procedures to better collect, track and disseminate unintended discharge data.** At a minimum, the Department should standardize the level of scrutiny and documentation expected for every unintended discharge investigation. It should collate the results of these investigations and the collected data should include the weapon used, the presence of attached equipment and the training history of the employee as well as whether the employee had any other prior unintended discharge incidents.

## Finding 7

**The LASD does not have an adequate early warning system to identify systemic risks.**

Because the records of these incidents were not centralized for analysis, unintended discharges involving the M&P pistol and the SureFire light and grip switch were becoming more frequent yet no warning system was in place to alert the LASD's executive management to the emerging risk factors at an earlier stage. During our conversations with LASD staff we heard the conventional wisdom numerous times that when the LASD transitioned from a revolver to the 92F there was a temporary rise in unintended discharges. Leaving aside the question of whether a temporary rise in a deadly risk to the public is acceptable, such anecdotal experience does not support the assumption that every such rise will be temporary

## Recommendation 7

**The LASD should develop a strategy to identify, track, and assess risks associated with the incorporation of new weapons and other equipment.**

## Review of Administrative Investigations

For our review of administrative investigations – that is, formal investigations with potential discipline – we were provided with the fourteen disposition memoranda

which described the outcomes of investigations following an unintended discharge. The provided memoranda did not identify the involved employees or disclose employees' prior discipline history. We did not receive the investigation files so it was not possible to analyze whether these investigations identified systemic issues related to the M&P.

The most common discipline outcomes for the records we reviewed were either a written reprimand or a one-day suspension for violating the LASD's Performance to Standards policy,[42] with one deputy receiving a four-day suspension.



Figure 11: Discipline imposed for unintended discharges[43]

As we conducted our inquiry into the LASD's handling of unintended discharges, the LASD started to reform its protocol after recognizing that the incidents were not being handled in a consistent manner. LASD provided us with a draft of the proposed protocol changes which include:[44]

---

[42] MPP § 3-01/050.10 Performance to Standards states, in part: "Members shall maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions. Members shall perform their duties in a manner which will tend to establish and maintain the highest standard of efficiency in carrying out the functions and objectives of the Department."
[43] The chart only reflects 13 findings, as one investigation was inactivated due to the expiration of the one-year statute of limitations. (See Govt. Code § 3304.)
[44] "Unintentional Discharge Report and Mitigation Plan," *Los Angeles County Sheriff's Department, Administrative & Training Division, Training Bureau, Weapons Training Unit,* Feb. 2. 2015.

- Specific responsibilities to create a discharge database and to track all discharges including whether a weapon light was used and whether a pressure grip switch was installed.
- Mandatory re-training of all personnel who have an unintended discharge.
- The Internal Affairs Bureau (IAB) will investigate all unintended discharges and pay special attention to weapons safety related issues. At the completion of an investigation, a determination will be made if the discharge was negligent or accidental. In 2014, the LASD opened investigations into all unintended discharges which had not been administratively investigated but were still within the one year statutory limitation period.
- If there is any question whether the weapon discharged because of a malfunction, the firearm will be held by the watch commander pending a forensic examination.
- The notification form to Internal Affairs will be updated to capture detailed data regarding the involved weapon, the presence and use of a mounted light and grip switch, the last training attended, whether a suspect was present during the incident and other data points.
- IAB will be the custodian of records of all shooting data and will issue quarterly reports on the trends and status of all unintended discharge investigations.
- The proposal also calls for treating negligent discharges as a serious policy violation and for discipline to range from a written reprimand to discharge, with Education Based Discipline remaining as an option.
- The Weapons Training Unit now receives notifications of all unintended discharges so any potential training issues can be quickly identified.

## Finding 8

**Prior to the proposed protocol, the LASD's accountability system for unintended discharges has been inconsistent and inadequate.**

We found that the manner in which LASD collects and tracks unintended shooting data was sporadic and incomplete. The Professional Standards Division initially did not have a complete picture of how many unintended

discharges were occurring or the circumstances behind the incidents. Feedback to the Weapons Training Unit – which has the responsibility to adjust its curriculum when warranted – was largely based on anecdote rather than actual data distributed to the WTU in a systematic manner. When an unintended discharge did occur, handling of the incident was dependent on the preferences of the unit commander leading some employees to receive a suspension without pay while others faced no risk of discipline or change to their permanent record whatsoever. While the proposed protocol mandates that investigations are opened for all incidents, the unit commander will still retain a large amount of discretion as to the findings and the degree of discipline for founded policy violations.

### Recommendation 8

**8.1**   LASD should formally adopt the proposal that all employees who unintentionally discharge a weapon undergo further training regardless of the disciplinary outcome.

**8.2**   LASD should formally adopt the proposal that the IAB investigate all unintended discharges.

**8.3**   Each division should consult with the IAB to ensure that the proposed discipline for an unintended discharge incident is consistent across the LASD.

# Conclusion

The matter of unintended discharges is a critical issue. There is a continued risk that either LASD employees or civilians may be seriously wounded or killed by an unintended discharge. Whether the specific cause of increased unintended discharges is a lack of sufficient training, acquired bad habits that have not been broken, or equipment whose risks may outweigh the benefits should be carefully examined before a tragedy occurs.

It is incumbent on the LASD to take measures to mitigate such risk and conduct a robust evaluation to determine the most effective equipment and training that will keep deputies and the public safe. Simultaneously, the Sheriff must develop robust guidelines, policies and practices which lead to a transparent and accountable selection process for equipment purchases.

While the main thrust of this report is weapons safety, we became aware of other issues regarding the purchase of the equipment and the investigation of shootings that we will continue to discuss with the LASD.

# Appendix A.

# Findings and Recommendations

| Finding | Recommendation |
|---|---|
| **Finding 1:**<br>**Conversion training is insufficient to overcome old habits.** | **Recommendation 1:**<br>**1.1**    The LASD should evaluate the adequacy of its initial conversion training curriculum and also determine whether an eight-hour course is sufficient to overcome any ingrained habits.  Given the result of the current training approach, a course of sixteen hours or more should be strongly considered<br>**1.2**    The LASD should consider follow up training/evaluation sessions for all conversion course graduates to monitor adherence to initial training of safety aspects and assign further training where needed.<br>**1.3**    The LASD should review low light training curricula for other departments and private vendors and evaluate whether its current curriculum reflects best training practices and is of sufficient duration to adequately train personnel.<br>**1.4**    The LASD should incorporate the use of both handheld lights and weapon-mounted lights into Continuous Professional Training (CPT). The LASD also should develop training standards based upon whether the LASD will continue to allow the pressure grip light switch as an option. If the grip switch is not used, due to preference or policy, consideration should be given to only training for off-hand thumb activation. |
| **Finding 2:**<br>**The process for setting the minimum specifications for the weapon-mounted light was not documented.** | **Recommendation 2:**<br>The LASD should develop policies and implement procedures to ensure the process by which specifications are established is well documented. |

| Finding | Recommendation |
|---|---|
| **Finding 3:**<br>**The LASD did not develop a testing and evaluation procedure for the weapon-mounted light selection process.** | Recommendation 3:<br>Future testing and evaluation processes should reflect best practices with required characteristics such as:<br>**3.1**    Developing a product evaluation manual which regulates the testing of all potential weapons and tactical equipment.<br>**3.2**    Developing test requirements, data requirements, and foundation documents on measurability and testing prior to testing.<br>**3.3**    Developing a pre-test analysis to determine the "types and quantities of data needed and the results expected or anticipated."<br>**3.4**    Conducting the test activity with the requirement that the required data is collected and evaluated for validity.<br>**3.5**    Conducting a post-test evaluation by comparing the measured outcomes to the expected outcomes. |
| **Finding 4:**<br>**The Department has not balanced the benefits of the grip switch light against the added risk to the public** | **Recommendation 4:**<br>**The LASD should conduct a thorough evaluation of the safety, efficacy, risks, benefits and training costs associated with continuing use of the grip switch system in units other than the Special Enforcement Bureau.** |

| Finding | Recommendation |
|---|---|
| **Finding 5:**<br>**The LASD lacked sufficient policies requiring testing and evaluation of potential new equipment.** | **Recommendation 5:**<br>The LASD should reform the oversight process for testing and evaluating new equipment.<br>**5.1**    The U&E Committee should be part of the evaluation from the beginning of the process rather than at the end.<br>**5.2**    All members of the U&E Committee and testers and evaluators should receive training in conflict of interest policies and objective evaluation procedures.<br>**5.3**    The U&E Committee should approve recommended minimum mandatory specifications prior to the testing and evaluation process where practicable. Where the evaluation appears to demonstrate that specifications should be modified, such modifications should require U&E Committee approval. |
| **Finding 6:**<br>**The process of review by memorandum was inadequate to assess the responsibility of individual deputies for unintended discharges and to identify an emerging Department-wide issue.** | **Recommendation 6:**<br>The LASD should implement procedures to better collect, track and disseminate unintended discharge data. |
| **Finding 7:**<br>**The LASD does not have an adequate early warning system to identify systemic risks.** | **Recommendation 7:**<br>The LASD should develop a strategy to identify, track, and assess risks associated with the incorporation of new weapons and other equipment. |
| **Finding 8:**<br>**Prior to the proposed protocol, the LASD's accountability system for unintended discharges has been inconsistent and inadequate.** | **Recommendation 8:**<br>**8.1**    LASD should formally adopt the proposal that all employees who unintentionally discharge a weapon undergo further training regardless of the disciplinary outcome.<br>**8.2**    LASD should formally adopt the proposal that IAB investigate all unintended discharges.<br>**8.3**    Each Division should consult with IAB to ensure that the proposed discipline for an unintended discharge incident is consistent across the LASD. |

# Appendix B.

# Acronyms and Abbreviations

| EFRC | Executive Force Review Committee |
|------|----------------------------------|
| EPC | Executive Planning Council |
| IAB | Internal Affairs Bureau |
| ISD | Internal Services Department |
| LASD | Los Angeles County Sheriff's Department |
| M&P | Smith & Wesson M&P handgun |
| OIG | Office of Inspector General |
| UEC or U&E Committee | Uniform and Equipment Committee |
| WTU | Weapons Training Unit |