## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH SLATOWSKI and | : | |
| BIANCA CEMINI SLATOWSKI | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 21-729-RBS |
| | : | |
| SIG SAUER, INC. | : | |

### MEMORANDUM

Presently before the Court is Defendant Sig Sauer, Inc.'s ("Defendant" or "Sig Sauer")

Motion for Summary Judgment.  (ECF No. 35.)  Keith Slatowski ("Officer Slatowski"), a

deportation officer for the United States Department of Homeland Security Immigration and

Customers Enforcement ("ICE"), and his wife, Bianca Cemini Slatowski ("Mrs. Slatowski")

(collectively "Plaintiffs"), sued Sig Sauer, a firearms manufacturer, after Officer Slatowski was

injured during an ICE training drill when his Sig Sauer-manufactured pistol fired unintentionally.

(Compl., ECF No. 1, ¶¶ 5, 12, 152-53; Slatowski Dep. Tr., Ex. A, ECF No. 35-5, at 42:22-

43:11.)  Sig Sauer argues that Plaintiffs cannot establish their defective design product liability

claim because the expert testimony they have offered to prove causation is inadmissible and

unreliable.  (Mot., ECF No. 35-1, at 1, 10-11, 22.)  As a result, Defendant moves for summary

judgment.  For the following reasons, Sig Sauer's Motion will be granted.

### I.     BACKGROUND

Officer Slatowski used a Sig Sauer P320 pistol at an ICE basic weapons qualifications

and basic marksmanship training on September 21, 2020.  (Compl., ¶ 5; Opp'n, ECF No. 38, at

8.)  At his deposition, Officer Slatowski testified that when he heard the whistle to start the

exercise, "I went to draw my weapon and at the time when my – my hand hit the dovetail, all I

heard was a boom."  (Slatowski Dep. Tr. at 47:7-9.)  When Officer Slatowski put his hand on the

dovetail, he "went to [the] pistol grip" and the "gun went off." (*Id*. at 48:1-3.) The gun was still in the holster when it discharged. (*Id*. at 48:4-6.) Immediately afterwards, "I looked down and the gun is flying out." (*Id*. at 47:9-10.) Officer Slatowski felt that the gun was then "pushed up" and he remembered "seeing the gun falling on the ground." (*Id*. at 48:11-23, 49:4-6; *see also* 49:7-23.) He testified that he did not recall having the gun in his hand after the discharge. (*Id*. at 48:24-49:3.)

In an affidavit submitted to ICE's Office of Professional Responsibility after the incident, Brian McShane ("Officer McShane"), Officer Slatowski's training officer, wrote that he heard a bang immediately after the whistle for the drill was blown, and it was clear that something was not right based on the timing of the sounds. He looked at Officer Slatowski and "realized that he had some type of unintentional discharge. His weapon was hovering over the holster; he was just holding it." (McShane Aff., Ex. B, ECF No. 35-6, at ICE-000007, ICE-000010; *see also* McShane Dep. Tr., Ex. C, ECF No. 35-7, at 16:23-17:11.) Officer McShane recalled that "[w]hen my eyes got to him, his gun was – he was holding his gun just above his holster." (*Id*. at 18:12-15.) "At some point he threw or dropped the gun to the ground." (McShane Aff. at ICE-000007.) Officer McShane wrote that he "didn't see [the pistol] before it went off." (*Id*. at ICE-000008.) "I saw it immediately afterwards. I looked over when I heard the gun go off." (*Id*.) "When I heard the bang and looked over[,] the slide was locked back and the gun was just above his holster." (*Id*. at ICE-000009.) Officer McShane stated that Officer Slatowski did not exhibit any unusual behavior prior to the discharge or wear anything that may have interfered with the proper operation of the pistol. (*Id*.) Officer Slatowski was following instructions and acting appropriately. (*Id*.)

A forensic nurse advised Officer McShane "that there was gun power residue in the holster, which would indicate that the round went through the holster," although the holster did not appear damaged to Officer McShane when he submitted it for testing. (*Id*. at ICE-000008.)

When the gun was flying out of the holster, Officer Slatowski testified that his "instructor grabbed [him]. [He] looked down and [] saw the exit wound in [his] thigh." (Slatowski Dep. Tr. at 47:10-13.) Officer Slatowski's instructor put a tourniquet on his leg, and he was rushed to the hospital. (*Id*. at 47:14-17.)

ICE purchased P320 pistols after it disseminated a Solicitation for the purchase of "compact, 9mm Luger, semi-automatic duty pistol[s]." (Solicitation Number: HSCEMS-16-R-00003, Statement of Work ("SOW"), Ex. D, ECF No. 35-8, at SIG-Slatowski 001060.) The Solicitation specified the types of safety features that the purchased guns could and could not include: The desired gun "shall not have a thumb, finger or grip-actuated safety device" and "a thumb, finger or grip-actuated de-cocking device." (*Id*. at SIG-Slatowski 001067.) It "may have integral trigger safety which is deactivated by the normal placement of the trigger finger on the trigger during firing." (*Id*.) The desired gun "shall have [an] integral safety device which prevents the forward movement of the firing pin/striker without articulation of the trigger," "an integral safety which prevents the pistol from firing when dropped," and an "integral safety device which prevents the pistol from firing out of battery."[1] (*Id*.)

Plaintiffs filed this action in federal court on the basis of diversity jurisdiction. (Compl., ¶¶ 22-25.) They alleged seven causes of action against Sig Sauer: strict product liability (count I); negligence (count II), breach of the implied warranty of merchantability (count III); breach of express warranty (count IV); negligent infliction of emotional distress (count V); intentional

inflection of emotional distress (count VI); and loss of consortium (count VII).  (*Id.*, ¶¶ 108-53.)
Sig Sauer has moved for summary judgment.  (ECF No. 35.)

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."  **Fed.
R. Civ. P. 56(a)**.  When making this determination, we must weigh all facts in the light most
favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving
party.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018).  "For its part, '[t]he
non-moving party must oppose the motion and, in doing so, may not rest upon the mere
allegations or denials of his pleadings' but, instead, 'must set forth specific facts showing that
there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not
suffice.'"  *Id.* at 288-89 (quoting *D.E. v. Central Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d
Cir. 2014)).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party.'"  *Id.* at 289 (quoting *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248 (1986)).  "Conversely, 'where a non-moving party fails sufficiently to
establish the existence of an essential element of its case on which it bears the burden of proof at
trial, there is not a genuine dispute with respect to a material fact and thus the moving party is
entitled to judgment as a matter of law.'"  *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146
(3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)).

Federal Rule of Evidence 702 governs the admissibility of testimony by expert.  "Expert
evidence can be both powerful and quite misleading because of the difficulty in evaluating it."
*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993).  The trial judge serves as a

---

[1] The Solicitation also specifies that the gun "shall not have a magazine disconnect which
prevents the firearm from firing when the magazine is removed from the pistol" and "shall not have an

gatekeeper who ensures "that any and all expert testimony or evidence is not only relevant but also reliable." *Kannankeril v. Terminix Int'l*, 128 F.3d 802, 805 (3d Cir. 1997) (citing *Daubert*, 509 U.S. at 589). The party offering an expert bears the burden of demonstrating the admissibility of the expert's opinion. *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999). Federal Rule of Evidence 702 contains a "trilogy" of requirements: "qualification, reliability and fit." *Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

"Qualification refers to the requirement that the witness possess specialized expertise." *Estate of Schneider*, 320 F.3d at 404. This requirement has been interpreted liberally, and "a broad range of knowledge, skills, and training" may qualify someone as an expert. *Id.*

The reliability element requires that the testimony "be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; and the expert must have good grounds for his or her opinion." *Id.* (internal quotations and citations omitted). The Third Circuit has articulated factors trial courts should consider in evaluating the reliability of an expert's opinion, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994). To satisfy the fit requirement, "testimony must be relevant for the purposes of the case and must assist the trier of fact." *Estate of Schneider*, 320 F.3d at 404.

---

integrated 'lock-out' as a permanent part of the pistol." (*Id.*)

III.    **DISCUSSION**

    A.    **Expert Testimony is Required to Prove Plaintiffs' Claims.**

Under Pennsylvania law, to prevail on a claim of defective design in a product liability action, a plaintiff must prove (1) that the product was defective, (2) that the defect existed when the product left the hands of the defendant, and (3) that the defect caused the harm. *Pullins v. Stihl Inc.*, No. 03-5343, 2006 WL 1390586, at *5 (E.D. Pa. May 19, 2006) (citing *Ellis v. Chicago Bridge & Iron Co.*, 545 A.2d 906, 909 (Pa. Super. Ct. 1988)).  Sig Sauer argues that expert testimony is generally required to prove causation when a design defect is alleged, and a "plaintiff in a complex design case cannot establish causation when the district court excludes his expert from offering causation opinions or testimony at trial."  (Mot. at 10.)

In opposition, Plaintiffs argue that causation is a factual question that should be submitted to a jury, and that there is "overwhelming evidence for a jury to conclude that an external safety like a tabbed trigger safety . . . would have prevented" the unintended discharge in this case. (Opp'n at 44-45.)  Expert testimony is not required when the matter under consideration is simple, and a jury will be able to rely on "a common understanding of how pulling on two different items, one without a safety interlock, and one with a safety interlock, can have two widely different results" to establish causation.  (*Id*. at 50.)

"Expert evidence is generally required in a products liability case where a defect is alleged." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 159 (3d Cir. 2000).  This is especially true when the "inner-workings of a machine unfamiliar to the pubic at large are at issue," *Pullins*, 2006 WL 1390586, at *6, and the "subject matter is highly technical and beyond the jury's understanding." *Westfield Ins. v. Detroit Diesel Corp.*, No. 10-100, 2012 WL 1611311, at *3 (W.D. Pa. May 8, 2012).  While the Third Circuit has not "foreclosed the possibility that a

6

defective condition may be established through non-expert evidence," this is only appropriate

when the issues are "simple" and "within the range of comprehension of the average juror."[2]

*Oddi*, 234 F.3d at 159 (citation omitted).  We agree with the district courts that have concluded

in similar actions against Sig Sauer that the "inner workings and mechanics of the P320 are not

matters of general knowledge, but instead involve a complex and technical understanding of

firearms, engineering, and physics."  *Davis v. Sig Sauer, Inc.*, No. 22-10, 2024 WL 54595, at *5

(E.D. Ky. Jan. 4, 2024); *Mayes v. Sig Sauer, Inc.* No. 19-146, 2023 WL 2730264, at *9 (W.D.

Ky. Mar. 30, 2023); *see also Westfield Ins.*, 2012 WL 1611311, at *4 ("The inner workings of

the engine and its components are highly technical in nature, and therefore 'within the peculiar

competence of experts.'") (citation omitted).  Accordingly, we find that expert testimony is

required in this case, and Sig Sauer's Motion turns on the admissibility of the opinions of experts

James Tertin and William Vigilante, Jr. [3]  *See Oddi*, 234 F.3d at 159; *Westfield Ins.*, 2012 WL

1611311, at *4.

>   **B.     A Hearing is Not Required to Rule on the Instant Motion.**

Under Third Circuit precedents, whether to hold a hearing or rule on the admissibility of

expert testimony on a written record alone is within the discretion of the trial court.  *See Oddi*,

234 F.3d at 153; *Padillas*, 186 F.3d at 418.  When a "ruling on admissibility turns on factual

issues" or there is a "scant record" on which to evaluate how an expert arrived at their

---

[2] The cases Plaintiffs cite to argue that expert testimony is not required to prove causation in this case do not support their position.  (*See* Opp'n at 50.)  In *Oddi*, the Third Circuit affirmed the district court's ruling that expert discovery was necessary to prove causation because a juror could not be expected to know that testing a particular truck would have disclosed the defect.  234 F.3d at 159. *Cipriani v. Sun Pipe Line Co.*, 574 A.2d 706, 710 (Pa. Super. Ct. 1990) does not involve a design defect claim, and the complexity of the gun in this case is distinguishable from a cutting blade without a proper guard that was at issue in *Padillas*.  186 F.3d at 415.

[3] Plaintiffs state that they do not intend to present testimony at trial from Timothy Hicks, a third expert that prepared a report in this matter.  (Opp'n at 8 n.12.)  Accordingly, we do not address Sig

conclusions, failure to hold a hearing prior to ruling on the admissibility of expert testimony may be an abuse of discretion. *Padillas*, 186 F.3d at 418; *Oddi*, 234 F.3d at 153.

However, "a hearing is not required where the district court is presented with a full record." *Henry v. St. Croix Alumina, LLC*, 572 F. App'x 114, 119 (3d Cir. 2014); *see also Oddi*, 234 F.3d at 154 (holding that a hearing was not necessary when "the district court already had before it the depositions and affidavits of the plaintiff's experts.  Nothing more was required."); *Kerrigan*, 223 F. Supp. 2d at 634 (holding that a hearing was not necessary when the record included the expert's report, deposition transcript, an affidavit in response to the motion to exclude, and two supporting videotapes showing the expert's examination); *Hamilton v. Emerson Elec. Co.*, 133 F. Supp. 2d 360, 374 (M.D. Pa. 2001) (declining to hold a hearing in part because "we have before us enough evidence to determine the reliability of [an expert] under *Daubert*.  In addition to [the expert's] report and its supplement, we examined his deposition," which included "deficiencies [that] are [the] primary justifications for our determination that [the] testimony is unreliable."); *Voilas v. Gen. Motors Corp.*, 73 F. Supp. 2d 452, 455 (D.N.J. 1999) (holding that a hearing was "unwarranted" in part "because this Court has before it a sufficient factual record upon which to base its conclusion").

Here, the parties have provided us and we have reviewed the expert reports of both of Plaintiffs' proffered experts (Tertin Rpt., Ex. F, ECF No. 35-10; Vigilante Rpt., Ex. H, ECF No. 35-12), deposition testimony from both experts (Tertin Dep. Tr., Ex. G, ECF No. 35-11; Vigilante Dep. Tr., Ex. I, ECF No. 35-13), and deposition testimony and affidavits upon which the experts relied.  (*See, e.g.*, Slatowski Dep. Tr.; McShane Aff.; McShane Dep. Tr.)  The record before us includes data sources and factual information upon which Plaintiffs' experts relied and

---

Sauer's arguments with respect to Hicks' opinion and interactions between Hicks' opinion and the other two experts' opinions and reports.  *See* Mot. at 20-21.

videos of their respective examinations of the P320 pistol and other guns.  (*See, e.g.*, SOW; ICE

Executive Summary: Increase in ICE Unintentional Discharges, Ex. M, ECF No. 35-17; Ex. A –

Other Similar Incident Videos, ECF No. 38-1; Four Affs. re Unintentional Discharges, Ex. B,

ECF No. 38-2; Data re Unintentional Discharges Produced in Response to Touhy Request, Ex.

H, ECF No. 38-8; Ex. M – Tertin Videos, ECF No. 38-13; Ex. O – Vigilante Videos, ECF No.

38-15.)  This record is sufficient to assess the reliability of Plaintiff's experts' opinions without

holding a hearing.  *See Oddi*, 234 F.3d at 154; *Kerrigan*, 223 F. Supp. 2d at 634; *Hamilton*, 133

F. Supp. 2d at 374.

      **C.**    **The Testimony of James Tertin is Not Admissible to Prove Causation.**

            *1.*    *Mr. Tertin's Opinion*

Tertin is a gunsmith.  (Tertin Rpt. at 2.)  He was hired to examine the P320 pistol "for

functionality and design."  (Tertin Dep. Tr. at 8:18-20.)  He inspected the P320 pistol that Officer

Slatowski fired and reviewed CT scans of the pistol.  (Tertin Rpt. at 3.)  Tertin described the

features of the P320 pistol in great detail and stated that "given the very minimal trigger

movement within the pre-travel phase and before trigger actuation required to disengage the

internal safeties, a foreign object or pressure against the holster can leave the gun unacceptably

vulnerable to a discharge without an intentional trigger pull."  (*Id*. at 12, *see also* 4-12.)  Tertin

described the different forms of manual safeties that could have been incorporated into the P320

pistol, including a tabbed trigger safety.  (*Id*. at 12-15.)  He wrote that the P320 pistol is "unique

amongst single-action pistols[] and uniquely dangerous" as "nearly every Sig Sauer P320 sold to

law enforcement and the general public is sold without any type of manual safety."  (*Id*. at 15.)

Tertin is aware that a striker-fired pistol by Glock is the P320 pistol's biggest competitor, and it

includes a trigger safety.  (*Id*. at 18.)  He is familiar with the "distinctively dangerous

characteristics" of the P320 pistol based on close to one hundred incidents of the pistol unintentionally discharging, and he drew from YouTube videos and other videos of unintentional discharges and data from ICE.  (*Id*. at 15.)

Tertin acknowledged that he had limited information as to how the intentional discharge in this case occurred.  For example, he recognized that he does not know whether Office Slatowski's finger or a foreign object actuated the trigger.  (Tertin Dep. Tr. at 135:20-136:2.)  He did not know what holster the pistol was in when it discharged.  (*Id*. at 88:11-18.)  He concluded that "with the absence of any manual safeties on that P320, somehow the trigger was actuated by a finger [or] by an object [or] by something that caused that pistol to fire," while qualifying the basis of his opinion: "That's the only opinion I can really afford because I wasn't there.  I didn't see it."  (*Id*. at 56:15-57:5.)

Tertin performed some testing of a P320 pistol that he purchased, and he included a video of his examination.  (*Id*. at 143:15-24.; Ex. M – Tertin Videos.)  Tertin testified that he was not able to simulate the P320 pistol firing without trigger actuation.  (Tertin Dep. Tr. at 45:2-48:4.)

Regarding the efficacy of a tabbed trigger to prevent an unintended discharge, Tertin testified that it was "possible, but highly unlikely" that "things other than a finger can get into a tabbed trigger and pull that trigger and discharge the weapon."  (*Id*. at 61:1-4.)  When confronted with examples at his deposition, Tertin was unfamiliar with instances in which a tabbed trigger did not prevent the unintentional discharge of a Glock firearm.  (*Id*. at 61:1-63:23.)  Tertin conceded that it was possible that a P320 pistol would still discharge unintentionally if it had a tabbed trigger if "something got squarely on that trigger and pulled it back."  (*Id*. at 136:3-8.)

Tertin offered a number of conclusions, including that:

12. In the event Mr. Slatowski's trigger was touched by his finger or a foreign object, the firearm most likely would not have discharged if it was equipped with a manual safety.

14. In the event that Mr. Slatowski's trigger was touched by his finger or a foreign object, it most likely would not have discharged if the gun was safely designed.

15. The defective design of the P320 was a proximate cause of Plaintiff's accident, in the event that his finger or a foreign object touch[ed] the trigger.

(Tertin Rpt. at 19.)

### 2.   *Mr. Tertin's Opinion is Not Admissible*

Sig Sauer challenges the reliability of Tertin's expert testimony.  The gun manufacturer argues that Tertin's opinion is speculative because he does not offer an opinion as to what actuated the trigger in this case.  (Mot. at 14.)  Tertin's examination of the P320 pistol in this case was limited and he was not successful in getting the gun to fire without trigger actuation. (*Id*. at 15-16.)  He did not test where a finger or object needs to make contact on a tabbed trigger to cause a gun to discharge or investigate unintentional discharges with pistols equipped with a tabbed trigger.  (*Id*. at 16-17.)  Sig Sauer maintains that Tertin's opinion is *ipse dixit* and that Tertin has not provided a basis for his conclusion that Officer Slatowski's pistol would not have unintentionally discharged had it been equipped with a tabbed trigger.  (*Id*. at 16.)  "In the absence of any reliable foundation, Tertin's causation opinions are pure speculation."  (*Id*. at 17.)

Plaintiffs maintain that Tertin's causation opinions are "based on reliable methodology, corroborated by testing and real-world data."  (Opp'n at 46.)  They maintain that Tertin "personally conducted videotaped testing of the conditions which would cause a P320 to discharge and compared it to the conditions which would cause a tabbed trigger-equipped Glock to discharge" and relied on videos of P320 pistols discharging.  (*Id*. at 46-47; *see also* 40; Ex. M – Tertin Videos.)

Under Fed. R. Evidence 702 and *Daubert*, Tertin's causation testimony is not admissible. His report is primarily descriptive: it describes at length the features and operation of the P320

pistol and the nature of manual safeties.  (Tertin Rpt. at 4-16.)  Courts have frequently rejected

the use of case reports to prove causation in product liability cases involving pharmaceutical

products, and their reasoning is equally forceful in this context.  *See e.g.*, *Soldo v. Sandoz Pharm.*

*Corp.*, 244 F. Supp. 2d 434, 538, 539 n.9 (W.D. Pa. 2003) (collecting cases).  Case reports are

"compilations of reported phenomena . . . [and] reflect reported data, not scientific

methodologies."  *Soldo*, 244 F. Supp. 2d at 538 (quoting *Brumbaugh v. Sandoz Pharm. Corp.*, 77

F. Supp. 2d 1153, 1156 (D. Mont. 1999)).  "[T]hey do not contain a testable and systemic inquiry

into the mechanism of causation" or "isolate and investigate the effects of alternative causation

agents."  *Id*.  In other words, reports that "simply describe[] reported phenomena . . . and do not

investigate or explain the mechanism of causation" are not reliable scientific evidence of

causation.  *Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995).

      Here too, Tertin has described the features of a P320 pistol and the nature of various

manual safety mechanisms, but he has not provided a methodology, reasoning or support to

explain why or how a tabbed trigger would have prevented the unintentional discharge in this

case.  While Tertin included a few videos that allegedly compared the P320 pistol to a Glock

pistol, which includes a tabbed trigger (Ex. M – Tertin Videos), these videos do not resemble or

simulate the conditions in which Officer Slatowski's P320 pistol discharged.  For example, they

do not appear to model a pistol in a holster.   Tertin does not explain how the examination

supports his conclusion, and he acknowledged in his deposition that a pistol could still

unintentionally discharge if it was equipped with a tabbed trigger and that he was not able to

simulate the P320 pistol unintentionally discharging in his examination of the gun.  (Tertin Dep.

Tr., 45:2-48:4, 61:1-4, 136:3-8.)

      "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to

admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner,* 522 U.S. at 146. We find that Tertin "does not use any discernible methodology" to reach his conclusion or "provide [any] assurance that his methodology . . . is reliable." *See Hamilton*, 133 F. Supp. 2d at 370-74. Tertin has provided "no evidence that he tested his hypothesis" nor has he even shown that his hypothesis was testable. *Id.* at 373; *see also In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.*, 509 F. Supp. 3d 116, 157 (D.N.J. 2020) (excluding an opinion of a plaintiff's causation expert because "by failing to conduct an exposure analysis," their conclusion was "too attenuated"). Furthermore, he has not demonstrated that his analysis is generally accepted or subject to peer review. *Hamilton*, 133 F. Supp. 2d at 372. As a result, Tertin's causation testimony is not admissible.

> **D.** **The Testimony of William Vigilante, Jr. is Not Admissible to Prove Causation.**

> *1. Dr. Vigilante's Opinion*

Vigilante has a Ph.D. in Ergonomics (Human Factors) Psychology and is a National Rifle Association certified firearms instructor and Range Safety Officer. (Vigilante Rpt. at 2-3.) He concludes that "had Sig Sauer integrated an external manual safety into the design of the Sig P320[,] it would have significantly reduced the risk of an unintentional discharge without adversely affecting the utility of the gun." (*Id.* at 31.)

Vigilante opines that Sig Sauer's "failure to integrate an external manual safety into the design of the P320 . . . was most likely a cause of the subject unintentional discharge." (*Id.* at 31, 33; *see also* Vigilante Dep. Tr. at 83:6-24.) In particular, "had Sig Sauer integrated a trigger tab safety into the design of the subject P320[,] any jarring the pistol experienced would not have

engaged the tab trigger safety" (Vigilante Rpt. at 31, 33.), based on the way tab triggers operate and the placement of the pistol in the holder when it fired.  (Vigilante Dep. Tr. at 181:6-16.)

An unintentional discharge occurs either when a finger is inadvertently on the trigger or the trigger is inadvertently pulled from or by an object.  (*Id*. at 84:2-12.)  "It's possible that the interface between the trigger and the holster resulted in there being pressure on the trigger resulting in it being discharged," Vigilante testified.  (*Id*. at 84:13-18.)  "If there was a tab trigger in there that required a deliberate and square pull of the trigger, there's nothing to indicate that that would have occurred in this instance and therefore, the gun wouldn't have unintentionally discharged," he continued.  (*Id*. at 84:19-24.)  Vigilante testified that he understands that "the sides of the P320 can be used to engage the trigger or activate the trigger.  It doesn't have to be pulled with your finger directly on the fact."  (*Id*. at 85:15-19.)  "It could be engaged with your fingers or objects squeezing the sides and putting pressure on the sides."  (*Id*. at 85:20-22.)  However, Vigilante conducted no testing to determine whether a tab trigger could have been pulled under the circumstances of the incident.  (*Id*. at 182:6-9.)

Vigilante testified that he "didn't do an analysis of the exact cause of the inadvertent discharge."  (*Id*. at 25:1-2.)  He stated that he "wasn't asked to address [the] question" "as to what caused the trigger to move on Officer Slatowski's pistol causing it to fire" and does not offer an opinion on the question.  (*Id*. at 61:6-15.)  He testified that he does not have an opinion as to what object contacted the trigger causing it to be pulled, what part of the trigger was contacted, whether an object caused the trigger to move, or whether the pistol fired without trigger movement.  (*Id*. at 25:2-11, 180:23-181:5.)  However, based on the testimony of Officer Slatowski and the fact that the shell wasn't ejected, it was Vigilante's understanding that the trigger movement was caused by something other than Officer Slatowski's finger.  (*Id*. at 25:12-

14

18, 180:16-22.)  He does not offer an opinion as to how the P320 pistol can fire without trigger movement.  (*Id*. at 25:19-22.)

Vigilante did not conduct testing to assess whether the physical evidence confirms Officer Slatowksi's testimony about the location of the pistol at the time of the discharge.  (*Id*. at 60:19-23.)  He did not test whether a round would eject from a P320 pistol that was holstered in the same type of holster that Slatowski used at the time of the incident.  (*Id*. at 180:7-12.)

Vigilante argues that Sig Sauer's trigger is "significantly more sensitive than competitor . . . striker fire guns."  (Vigilante Rpt. at 16-17.)   Vigilante drew from redacted data from ICE and a handful of YouTube videos of unintentional discharges involving P320 pistols.  (*Id*. at 20; Vigilante Dep. Tr. at 124:21-125:7; 125:22-126:23.)

### 2.   *Dr. Vigilante's Opinion is Not Admissible*

Sig Sauer argues that Vigilante's causation opinion is inadmissible because it is not reliable for multiple reasons: he did not opine on what caused the trigger of Officer Slatowski's gun to move or conduct testing to confirm whether the physical evidence is consistent with Officer Slatowski's description that his pistol was in his holster at the time of the discharge. (Mot. at 17-19.)  Vigilante does not offer an opinion as to where the trigger was contacted to cause the gun to discharge and lacks information as to how the trigger was actuated.  (*Id*. at 17, 19.)  Sig Sauer maintains that Vigilante's conclusions are speculative, unsupported by evidence in the record, and drawn from anecdotal data.  (*Id*. at 18-19.)

In opposition, Plaintiffs maintain that Vigilante's testimony is reliable because it is "predicated on two fundamental facts:" that "tabbed trigger safeties effectively prevent firearm triggers from being unintentionally depressed" and that "Officer Slatowski did not intentionally depress his trigger."  (Opp'n at 48.)  Plaintiffs argue that Vigilante's opinions comparing

unintended discharges from P320 pistols and competitors are based on "a reliable real-world case study." (*Id.* at 49.)

Under Fed. R. Evidence 702 and *Daubert*, Vigilante's causation testimony is not admissible. "An important aspect of the *Daubert* reliability analysis is determining whether an expert's causation opinion is supported by an explanation of the . . . mechanisms at work." *Soldo*, 244 F. Supp. 2d at 561. An "expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Oddi*, 234 F.3d at 158 (quoting *In re Paoli Railroad Yard PCB Litig.*, 35 F.3d at 742). "[S]tatements constituting a scientific explanation must be capable of empirical test[ing]." *Daubert*, 509 U.S. at 593. A district court does not abuse its discretion in excluding expert opinion testimony when the expert "used little, if any, methodology beyond his own intuition," and the trial court cannot "assess the relationship of [the expert's] method to other methods known to be reliable." *Id.*

Vigilante has not provided analysis to support his conclusion that "had Sig Sauer integrated a tab trigger safety into the design of the P320, the subject unintentional discharge would most likely not have occurred." (Vigilante Rpt. at 33.) This conclusion is based on Vigilante's descriptions that other striker fired pistols include a tab trigger safety and approximately six YouTube videos involving unintentional discharges and P320 pistols and limited ICE data. (*Id.* at 20, 29-30.) While Vigilante's report describes the design specifications of other pistols and states that "some of the best action pistol shooters in the world use handguns with tab trigger safeties" (Vigilante Rpt. at 16-17, 29-30), he does not include any studies, analyses, or explanations that support his conclusion that the inclusion of a tab trigger safety would have prevented the unintentional discharge in this case. *See Soldo*, 244 F. Supp. 2d at 562 ("While *Daubert* does not require absolute precision in identifying the . . . mechanism of injury,

16

there still must be sufficiently compelling proof that the agent must have caused the damage

somehow.") (citation omitted).  In addition, Vigilante's conclusion or any proffered support are

neither testable nor tethered to the circumstances in which Officer Slatowksi's pistol fired, as

Vigilante recognized in his deposition that he lacked key information and analysis concerning

how the gun discharged in this case.  *See Oddi*, 234 F.3d at 156-58 (holding that expert

testimony was not admissible when the expert made no calculations, did not test his hypotheses,

and failed to consider alternative explanations for the collision); *State Farm Fire and Cas. Co. v.*

*Holmes Prods.*, 165 F. App'x 182, 186 (3d Cir. 2006) (finding that expert testimony was

"speculative" when it was "not supported by any scientific analysis or methodology" and was not

"sufficiently supported by evidence in the record").  Accordingly, Vigilante's opinion is not

admissible.[4]

      **E.**     **Sig Sauer's Motion is Granted.**

      As analyzed above, Plaintiffs must utilize expert evidence to establish causation—a

*prima facie* element—in this case.  We are sympathetic that Officer Slatowski was injured after

his P320 pistol unintentionally discharged.  However, we have excluded the causation testimony

of Tertin and Vigilante.  Therefore, Plaintiffs cannot prove that an alleged defect to the P320

pistol caused Officer Slatowski's injury, and they have failed to raise a genuine dispute of

material fact regarding liability.  Accordingly, Sig Sauer's Motion is granted.  *See Oddi*, 234

F.3d at 159.

---

[4] We join other district courts that have excluded the testimony of Tertin and Vigilante in product liability actions against Sig Sauer involving the P320 pistol.  *See, e.g.*, *Davis*, 2024 WL 54595, at *2-3; *Herman v. Sig Sauer Inc.*, No. 21-1038, 2023 WL 5827054, at *3-4 (W.D. Okla. Sept. 8, 2023); *but see Lang v. Sig Sauer, Inc.*, No. 21-4196, (N.D. Ga. Sept. 28, 2023).  *Davis* and *Herman* are both on appeal. A similar motion involving the expert opinions of Vigilante and Tertin is pending in the District of Massachusetts.  *See* Defendant Sig Sauer, Inc.'s Mot. for Summary Judgment, *Catatao v. Sig Sauer, Inc.* (No. 22-10620, ECF No. 67), (D. Mass. Jan. 31, 2024).

## VI.      CONCLUSION

For the foregoing reasons, Sig Sauer's Motion is granted.  The Clerk of Court is directed to mark this matter as closed.  An appropriate Order follows.

**BY THE COURT:**

*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**