**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1639
_____

KEITH SLATOWSKI; BIANCA CEMINI SLATOWSKI,
   Appellants

v.

SIG SAUER, INC.,

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:21-cv-00729)
District Judge: Hon. R. Barclay Surrick
_____

Argued: April 30, 2025

Before: KRAUSE, BIBAS, and MONTGOMERY-REEVES,
*Circuit Judges*

(Filed: August 1, 2025)

Robert W. Zimmerman    **[ARGUED]**
SALTZ MONGELUZZI & BENDESKY
1650 Market Street
One Liberty Place, 52nd Floor
Philadelphia, PA 19103
    *Counsel for Appellants*

Kristen E. Dennison    **[ARGUED]**
LITTLETON JOYCE UGHETTA & KELLY
2460 N Courtenay Parkway, Suite 204
Merritt Island, FL 32953

Jonathan T. Woy
VSCP LAW
2001 Market Street
Two Commerce Square, 41st Floor
Philadelphia, PA 19103
    *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

BIBAS, *Circuit Judge*.

    Do not underestimate jurors. Pennsylvania law requires expert testimony for complicated questions beyond a jury's knowledge. But not every hard question is too hard for the jury. Here, the District Court rightly excluded two experts' testimony about what caused a gun to fire accidentally. Yet it went on to grant summary judgment, reasoning that without an expert,

2

the jury could not determine causation. That was wrong. Given the other admissible evidence, a jury is well equipped to figure out what caused this gun to fire. So we will affirm the District Court's exclusion of the expert testimony on causation but reverse its grant of summary judgment.

## I. AFTER SLATOWSKI'S GUN FIRED INTO HIS LEG, HE SUED THE GUN MAKER

### A. An officer gets hurt, allegedly because his gun was unsafe

This case is about a simple question: Why did an officer get shot in the leg? The story starts at a quarterly gun training for federal immigration agents. There, ex-marine-turned-agent Keith Slatowski was practicing with the pistol he had been issued, a Sig Sauer P320. He fired about four magazines, reloaded, and put the gun in his holster. When he next went to draw it, it fired a bullet into his hip and out his thigh. He says he did not touch the trigger, but only the grip.

If that sounds unusual, it is because the P320's design is unusual, making it much easier to fire—intentionally or not. To start, it is a single-action pistol; its trigger does only one thing. That differs from the trigger of a double-action pistol, which does double duty: It both cocks the firing mechanism and releases it. By contrast, on a single-action pistol, the *shooter* cocks the firing mechanism by (on the P320) pulling and releasing a slide on the top of the gun. Then the trigger does its single job, releasing the cocked firing mechanism. After this, the shooter need not re-cock the gun; the mechanism re-cocks itself using the recoil generated each time the gun is fired.

3

That mechanism makes a single-action gun's trigger quite sensitive. Like a coiled spring in a mousetrap, the cocked firing mechanism stores explosive energy, requiring less of a tug on the trigger. That increases the risk of accidental firing, so many single-action handguns use external safeties. An external safety forces the shooter to deactivate it before firing. One type is a thumb safety, a switch near the back of the pistol that the shooter can flip with his thumb. Another is a grip safety, which prevents firing until the shooter squeezes the grip tightly. Both types of external safeties do the same thing: Each stops a gun from firing until the shooter does something to turn the safety off. Until he does, an external safety stops the trigger from being pulled altogether.

Internal safeties, by contrast, do not stop accidental trigger pulls. All they do is keep the gun from firing without a trigger pull. That addresses the risk that jostling the gun might release the tension inside the firing mechanism and fire the gun—not the risk that someone might graze the trigger and so shoot a bullet by accident.

Slatowski's P320 had no external safety. Though the version issued to the military has a thumb safety, the version issued to law-enforcement officers does not. But it has two internal ones. Keep in mind this diagram, from one of Sig Sauer's expert reports, mapping out the mechanisms described below:

4



The first internal safety immobilizes the striker pin, the part of the firing mechanism that ignites the gunpowder. The striker pin is first cocked by pulling back the slide. Once cocked, it is ordinarily held back by another part, the sear. The safety is a spring that keeps the sear in tension against the striker pin until the trigger is pulled. When that happens, the sear moves, releasing the striker pin, igniting the gunpowder, and firing the round in the chamber. Without the spring, the sear could more easily get dislodged without a trigger pull.

The second internal safety is a lock that works as a catch for the striker pin. If the sear slips, releasing the striker pin, the safety lock catches the pin before it can complete its journey.

But internal safeties are not foolproof. The safety lock can be disengaged by pulling the trigger back as little as 1/13 of an inch—about the thickness of a quarter. That would leave only the sear, which can be jostled loose.

That background sets the stage for Slatowski's theory of the case. He sued Sig Sauer, arguing that it designed the P320

5

defectively because very light trigger pressure is enough to fire the gun. On his telling, something could have gotten into the holster, lightly pressing the trigger and so disengaging the safety lock. Then, when he went to draw the gun, the motion jostled it, dislodging the sear, releasing the striker, and firing the gun.

Slatowski argues that the P320 would not have fired if Sig Sauer had used a different safety design: a tabbed trigger, shown below. A tabbed trigger is a bit like an external safety. It is a mini-trigger attached to the main trigger that must first be pulled before the rest of the trigger will move. It forces the shooter to put his finger squarely in the center of the trigger, which could reduce the chance that debris in the holster would accidentally pull the trigger. This is what a tabbed trigger looks like:



### B. The District Court did not let him proceed to trial because it excluded his experts on causation

To make his case, Slatowski offered the testimony of two experts. He offered them to show both that the gun's design was defective and that the defective design caused the gunshot. Those two experts are at the heart of this case.

The first expert was a gunsmith, Dr. James Tertin. After inspecting Slatowski's gun, Tertin opined that (1) the P320's design makes it easy to fire, (2) its lack of a manual safety makes it "unique among single-action pistols and uniquely dangerous," and (3) a tabbed trigger would lower the risk of accidental firing. App. 204 (semicolon omitted).

The second expert was a firearms instructor with a doctorate in ergonomics, Dr. William Vigilante, Jr. He analyzed data about accidental firing and watched videos of the P320 in action. He opined that (1) if Sig Sauer had added an external safety, "it would have significantly reduced the risk of an unintentional discharge," and (2) its failure to add one "was most likely a cause" of the accidental firing. App. 245, 247.

The District Court excluded both experts' causation testimony. It ruled that while both could opine on whether the P320's design was defective, neither could opine on whether those alternative designs would have prevented this *particular* accidental firing. Because neither expert had simulated the conditions of this shooting, the court reasoned that neither's testimony was reliable evidence of what had caused it.

That exclusion doomed Slatowski's case, the District Court thought, so it granted summary judgment for Sig Sauer. Under

7

Pennsylvania law, it reasoned, the causation question was too complicated for the jury to decide without an expert's help.

Slatowski now appeals both rulings. We review the District Court's exclusion of expert testimony for abuse of discretion and its grant of summary judgment de novo. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000); *Tundo v. Passaic County*, 923 F.3d 283, 286–87 (3d Cir. 2019). As the parties and the District Court agree, Pennsylvania substantive law governs this state-law tort suit.

## II. THE DISTRICT COURT PROPERLY EXCLUDED EXPERT TESTIMONY TO PROVE CAUSATION

As the plaintiff, Slatowski bears the burden of proving each element of each tort, including causation. *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 898 (Pa. 1975), *overruled on other grounds by Reott v. Asia Trend, Inc.*, 55 A.3d 1088, 1098–1100 (Pa. 2012); *Spino v. John S. Tilly Ladder Co.*, 696 A.2d 1169, 1172 (Pa. 1997). No one disputes that the gun injured Slatowski. The dispute, rather, is whether that injury was caused by the gun's defective design. Under Pennsylvania law, Slatowski could prove that by showing that if Sig Sauer had used a different design, he would not have sustained the same injuries. *See Oddi*, 234 F.3d at 143; *cf. Gaudio v. Ford Motor Co.*, 976 A.2d 524, 532 (Pa. Super. Ct. 2009).

To carry that burden, Slatowski offered opinions from his two experts, Tertin and Vigilante. They explained the P320's design and potential alternatives. They included technical details about the firing mechanism as well as opinions based on videos of accidental firings.

8

The District Court allowed that testimony but faulted some of the experts' conclusions about what happened that day, such as:

- If Slatowski's gun had had a manual safety, it "most likely would not have discharged." App. 15, 208 (Tertin).

- If the gun had been safely designed and Slatowski's finger or an object had touched the trigger, "it most likely would not have discharged." App. 16, 208 (Tertin).

- "The defective design of the P320 was a proximate cause of [Slatowksi's] accident, in the event that his finger or a foreign object touched the trigger." *Id.* (Tertin).

- "Sig Sauer's failure to integrate an external manual safety into the design of the P320 … was most likely a cause of the subject unintentional discharge." App. 18, 245 (Vigilante) (internal quotation marks omitted).

- "If there was a tab trigger in there that required a deliberate and square pull of the trigger, there's nothing to indicate [that pressure from the holster on the trigger] would have occurred in this instance and therefore, the gun wouldn't have unintentionally discharged." App. 19, 287 (Vigilante).

The District Court rightly excluded those conclusions. Though they speak to whether the gun's design caused the injury, they are not based on testing specific to the context of

9

the shooting. Instead, they are based on mere analysis that the gun *could* fire more easily in theory.

Consider what an expert analysis of this situation could have looked like. Slatowski's experts could have tested designs against each other in a context that mimicked what happened that day. They could have simulated a situation in which a gun was drawn from a holster. But neither expert did. Instead, they both resorted to another method: speculation.

That is a problem for Slatowski. Expert testimony offered in federal court must be "the product of reliable principles and methods." Fed. R. Evid. 702. "The hallmark of *Daubert*'s reliability prong is the scientific method." *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 559 (W.D. Pa. 2003) (explaining *Daubert v. Merrell Dow Corp.*, 509 U.S. 579, 593 (1992)). In turn, "the scientific method [is] the generation of testable hypotheses that are then subjected to the real-world crucible of experimentation, falsification/validation, and replication." *Id.* at 457; *see also Daubert*, 509 U.S. at 590, 593 (requiring "appropriate validation" and focusing on "whether [a theory or technique] can be (and has been) tested"). Speculation does not cut it. After all, "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

Yet Slatowski never bridges the gap between theory and reality. Instead, he just touts his theory. His experts explained how easily P320s fire, reviewed statistics about how often other P320s fire accidentally, and analyzed why those accidents might be so common. But neither expert considered how the conditions that could cause accidental firing might have

manifested on the day of Slatowski's accident. Their testimony is reliable about whether the P320's design *could have* caused an accident, but not whether it *did* cause this accident. That would have required not just theory, but factual context.

So the District Court did not abuse its discretion by excluding Tertin's and Vigilante's conclusions about causation. But that exclusion is not fatal to Slatowski's case, as we will see.

### III. EVEN WITHOUT A CAUSATION EXPERT, THIS CASE CAN GO TO A JURY

Though Slatowski's experts may not opine on causation, they may still testify that the gun's design was defective. That means that experts will explain to the jury the most complicated part of the case: how the P320 and the safeties work. And a lay juror can understand the rest—namely, what happened that day. So the District Court should not have granted summary judgment.

#### A. Pennsylvania law requires experts for overly complex questions

To decide when a jury may consider an issue without expert testimony, Pennsylvania's law takes a functional approach. "If all the primary facts can be accurately described to a jury and if the jury is as capable of comprehending" them as a specialist, "then there is no need for the testimony of an expert." *Reardon v. Meehan*, 227 A.2d 667, 670 (Pa. 1967). But "[e]xpert testimony becomes necessary when the subject matter of the inquiry is one involving special skills and training not common to the ordinary lay person." *Storm v. Golden*, 538 A.2d 61, 64 (Pa. 1988).

11

So when is a question too complicated for the jury? That depends on whether, given all the admissible evidence, the jury can answer it without speculating. We distill that principle from three lines of cases.

*First*, experts are often needed in cases where the theory of harm is abstract or technical and so requires expert analysis. One example is whether water erosion or flooding came from runoff from a neighbor's property or from some other water source. *Landman v. Calvary Full Gospel Church*, 2014 WL 10752219, at *2 (Pa. Super. Ct. Dec. 3, 2014); *Schirmacher v. Crawford*, 2013 WL 11266147, at *1 (Pa. Super. Ct. Apr. 1, 2013). Another is whether a mold infestation was caused by a leaky toilet or by a fungus. *Jemmerer v. State Farm Ins. Co.*, 2004 WL 87017, *3 (E.D. Pa. Jan. 19, 2004). The story of harm in those cases depends on sophisticated analyses that try to isolate individual factors' roles, requiring an expert. After all, common knowledge and life experience are not enough to answer questions about mold and fungi.

*Second*, an expert is needed in products-liability cases where something seems to have gone very wrong with machinery, but the plaintiff is not sure what. For instance, a wheel might fall off a delivery truck or forklift. *Brandon v. Ryder Truck Rental, Inc.*, 34 A.3d 104, 105–06 (Pa. Super. Ct. 2011); *Bibbs v. Se. Pa. Transp. Auth.*, 2012 WL 8704635, at *1 (Pa. Commw. Ct. Apr. 13, 2012). Or a truck's engine might fail catastrophically. *Am. Power, LLC v. Speedco, Inc.*, 2017 WL 4084060, at *1 (M.D. Pa. Jan. 17, 2017). Or its bumper might ride up onto a guardrail, causing a crash. *Oddi*, 234 F.3d at 141. Or a van might suddenly catch fire. *Miller v. Davies Ford, Inc.*, 2019 WL 1530237, at *1 (Pa. Super. Ct. Apr. 9, 2019). In each

12

case, complex machinery allegedly malfunctioned, but the plaintiff was not sure why. So in each, the court held that the plaintiff needed a causation expert.

*But third*, no expert is needed when, even though the subject matter is complex, lay testimony can tell the story of causation. Some of these are cases where courts let juries decide causation based on eyewitness testimony paired with expert testimony that explained the complex background information. For example, after an expert explained how the pressure in a beer bottle could make it explode spontaneously, a jury could rely on eyewitness testimony to decide whether that had in fact caused the explosion. *Bialek v. Pittsburgh Brewing Co.*, 242 A.2d 231, 233, 235 (Pa. 1968). And when an "expert mechanic" testified that a car's underside was rusted, a jury could decide based on the driver's testimony whether the rust created a brake failure that caused the crash. *Topelski v. Univ. S. Side Autos, Inc.*, 180 A.2d 414, 418–19 (Pa. 1962). In other cases, a jury can decide causation with no expert at all because, even though the subject matter is complex, a combination of lay testimony and pictures gives enough background. *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 415–16 (3d Cir. 1999).

Those cases decided under Pennsylvania law teach us to look functionally. Putting ourselves in a juror's shoes, we ask whether he would need more explanation.

### B. No expert is needed here

Here, a jury will be armed with enough expert knowledge to decide causation. To explain why, we summarize how products-liability suits differ from ordinary negligence suits. Ordinary negligence suits require proof that the defendant

13

behaved negligently and that the negligent behavior caused the plaintiff's injury. In products liability, the defect takes the place of negligent behavior. *See Sullivan v. Werner Co.*, 306 A.3d 846, 849–50 (Pa. 2023). Whether a design is defective depends on whether it is unreasonably dangerous. *Id.* at 849. A plaintiff can carry that burden by showing either (1) that an ordinary consumer would not know of the unacceptable danger, or (2) that the risk and seriousness of harm outweigh the cost of a safer design. *Id.*; *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 388–89, 417 (Pa. 2014). Either way, the plaintiff will have to explain to the jury both how the product works and how it could cause an injury. Whether it *did* cause an injury might then become a much simpler question. *See Davis v. Sig Sauer*, 126 F.4th 1213, 1231 (6th Cir. 2025).

And it is a simpler question here. The P320's design is technical and probably needs explaining. How the sear, the firing pin, and the trigger interact is not common knowledge, nor are the mechanics of different safeties. And Slatowski's theory of the case turns on how they interact: that something compressed the trigger, releasing the safety lock, and then when he reached for the gun's grip, the sear was dislodged, causing the gun to fire. But Slatowski has experts who may explain how all these internal mechanisms work together.

The remaining causation question is not beyond the average juror. It turns on whether Slatowski is telling the truth and remembers it accurately, whether something could have gotten into the holster, and whether a tabbed trigger might have stopped some debris or the holster itself from depressing the trigger. During the trial, jurors would have the benefit of the experts' descriptions of the different safeties. And jurors could

14

view up close a P320 as well as a gun with a tabbed trigger and Slatowski's holster and ponder whether his story really holds up. That requires no degree in ergonomics or scientific study.

Those factors distinguish this case from the products-liability cases that required experts on causation. Those cases lacked any expert at all but required one to explain what went wrong. Here, by contrast, we have two experts to explain the design defect. From there, like the plaintiffs in *Bialek* and *Topelski*, Slatowski must rely on his lay eyewitness testimony. 242 A.2d at 233, 235; 180 A.2d at 418–19. It may not prove persuasive. But that is up to the jury, not the judge.

True, Slatowski's theory of causation is fuzzy. He does not know whether the trigger was depressed by some debris or the holster itself. And his experts neither considered the gun's holster nor tested how it would have interacted with the gun. Yet all that goes to the strength of his case, not whether a jury could decide for itself how his theory adds up.

\* \* \* \* \*

We are not the first federal court of appeals to decide whether a tort suit about the P320 can proceed without expert testimony on causation. We join the Sixth Circuit in holding that these two experts may testify against Sig Sauer that the P320 is defectively designed. *Davis*, 126 F.4th at 1232. And we depart from the approach that the Tenth Circuit took in an unpublished opinion. *See Herman v. Sig Sauer*, 2025 WL 1672350, at \*6 (10th Cir. June 13, 2025). But those cases each turned on a different state's law and a different factual record. The Tenth Circuit's holding rested largely on the plaintiff's failure to testify that he never pulled the trigger. *Id.* at \*7 n.4.

15

By contrast, both Slatowski and the Sixth Circuit plaintiff did testify to that. App. 184–85; *Davis*, 126 F.4th at 1232–33. Whether Slatowski is telling the truth is now for the jury to decide. We will thus reverse the District Court's grant of summary judgment, affirm its exclusion of expert testimony on causation, and remand to let the case to proceed to trial.